# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

———————————————————

| | | |
|---|---|---|
| **JAMAL B. ROBINSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **C.A. No. 15-100 (RJL)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **DISTRICT OF COLUMBIA,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

———————————————————  )

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Defendants the District of Columbia (the District), as well as Metropolitan Police Department ("MPD") Detective Scott Pinto, and Officer Maurice Clifford (collectively, "MPD Defendants") respectfully submit this memorandum in support of their motion for summary judgment under Fed. R. Civ. Proc. 56. As set forth below, Plaintiff's claims for false arrest (Count 1), assault and battery (Count II), as well as unlawful seizure and excessive force under the Fourth Amendment of the U.S. Constitution (Count IV) all fail, as a matter of law, for the same reason. The undisputed material facts of this case establish that at a minimum the officers were entitled to conduct a Terry stop[3] of Plaintiff and his brother, and they were entitled to use force to accomplish that purpose. The undisputed facts also demonstrate that under the Fourth Amendment, they also had probable cause to detain Plaintiff, even for the minor violations of law that they believed that he and his brother had committed in their presence. Accordingly,

---

[3]     *See Terry v. Ohio*, 392 U.S. 1 (1968) (authorizing a seizure under the Fourth Amendment based upon reasonable suspicion that criminal activity is afoot, as well as a search for weapons for officer safety, where an initial encounter has not dispelled reasonable belief that person seized may be armed).

Counts I and II must fail on their face, and the MPD Defendants are entitled to qualified

immunity against Count IV.  No reasonable jury could find that Defendants violated Plaintiff's

rights as alleged in the Amended Complaint.  Further, Plaintiff's claim against the District for

negligent training and supervision (Court III) fails because Plaintiff has failed to present any

expert testimony as to the applicable standard of care.  Lastly, Count III also fails substantively,

as the MPD Defendants acted lawfully and Plaintiff proffers no evidence in support of the

allegations of this claim.  Therefore, Defendants are entitled to summary judgment.

## FACTS

Officers Clifford and Pinto were assigned to the Metropolitan Police Department

("MPD") Gun Recovery Unit ("GRU") in 2013.  *See* Statement of Material Facts ("SOMF") ¶¶

3, 5.[4]  Plaintiff Jamal Robinson was an officer for MPD in 2013.  SOMF ¶ 1.  The mission of

GRU is to take illegal firearms off the streets of the District through interdiction, search

warrants, and arrests.  SOMF ¶ 6.  In the course of performing this mission, GRU enforces the

laws of the District and enforces any violations of the laws that the GRU officers observe while

on patrol.  SOMF ¶ 7.

On November 6, 2013, Officers Clifford, Pinto, and Ryan Roe were on patrol in the same

vehicle.  SOMF ¶ 9.  The officers were wearing tactical police vests with the word "POLICE" on

the front and back.  SOMF ¶ 10.  During the course of the day, Clifford, Pinto, and Roe were

conducting gun interdiction on the 5500 block of C Street, S.E.  SOMF ¶ 11.  The officers were

driving on the 5500 block of C Street, S.E. and observed Robinson sitting on the retaining wall

of a vacant property with no trespassing signs.  SOMF ¶ 13.  Robinson was on the property by

virtue of sitting on the retaining wall of the property.  SOMF ¶ 22.  Robinson was off-duty, and

---

[4]      The Statement of Material Facts further references the admissible testimony and evidence
upon which each fact is based.

wearing tan pants, a green shirt, and a black coat.  SOMF ¶ 18.  A vehicle that was not properly parked and had heavily tinted windows was in front of Robinson.  SOMF ¶ 14-15.  The driver of the vehicle, who was later determined to be Robinson's brother, and Robinson were talking. SOMF ¶ 16-17.

Clifford testified that if he observed an individual on a vacant property that displayed no trespassing signs, he would investigate the individual for unlawful entry and determine whether the individual resided there or had a reason to be there.  SOMF ¶ 19.  Moreover, in Clifford's and Pinto's experience, vacant properties are used as stash houses for weapons and drugs.  SOMF ¶ 20.  In his experience, Clifford has conducted arrests for unlawful entry that began with his observation of an individual sitting on the curtilage of vacant properties with no trespassing signs and has had those cases "papered" in that the cases progressed further in the prosecution process after an arrest.  SOMF ¶ 21.  Based on their observations, the officers believed that Robinson was possibly in violation of the unlawful entry law, and stopped to investigate the situation further and ascertain whether there was probable cause to arrest Robinson.  SOMF ¶ 24.  The officers wanted to investigate whether Robinson owned the property or had some reason to be there.  SOMF ¶ 25.

Before the officers exited their vehicle, Pinto asked Robinson whether he lived on the property and Robinson responded that he did not.  SOMF ¶ 26.  When Robinson stated that he did not live on the property, the officers exited their vehicle.  SOMF ¶ 27.  When the officers exited the vehicle, Robinson stood up quickly as if he was going to run and then sat back down on the wall and put his hands in his jacket pockets.  SOMF ¶ 28.  Pinto believed that Robinson was acting suspiciously.  SOMF ¶ 29.

Upon exiting the vehicle, Pinto approached the driver of the parked vehicle.  SOMF ¶ 30.
Clifford focused his attention on Robinson.  SOMF ¶ 31.  Clifford asked whether Robinson lived
there and Robinson stated that he did not but that he lived on the block.  SOMF ¶ 32.  Clifford
then asked Robinson to take his hands out of his pockets.  SOMF ¶ 33.  In response to Clifford's
requests, Robinson said "f*ck no," "I ain't got to do sh*t you have to say," and "I ain't doing
sh*t, I ain't showing you sh*t."  *Id*.  Based on Robinson's bad attitude, use of profanity, and
failure to comply with Clifford's directives, Clifford believed that Robinson may have been
engaged in criminal activity.  SOMF ¶ 34.

When the officers perform a stop, they take security precautions to ensure the individual
they are investigating cannot harm the officers.  SOMF ¶ 70.  Clifford asked Robinson to stand
up and Robinson replied that he would not stand up to let the officer search him.  SOMF ¶ 35.
Roe asked Robinson if he had a weapon and Robinson responded that he did.  SOMF ¶ 36.
Immediately after Robinson stated he had a gun, Clifford grabbed Robinson.  SOMF ¶ 37.  The
officers proceeded to detain Robinson because he said he had a weapon.  SOMF ¶ 38.

While a candidate to be a police officer is in the police academy, the candidates are
instructed that an on-duty officer is in control of a situation involving an off-duty officer.  SOMF
¶ 71.  The candidates are also taught the universal sign to inform on-duty officers that they are
police officers.  *Id*.  Robinson acknowledged that the on-duty officer should be in charge when
confronting an off-duty officer.  SOMF ¶ 72.  Based on Robinson's behavior when Clifford first
approached him and Robinson's failure to demonstrate this training, Clifford did not believe
Robinson was a police officer.  SOMF ¶ 73.

Clifford testified that Robinson began to resist Clifford and Clifford rolled Robinson over
onto his stomach, and Roe assisted Clifford in putting handcuffs on Robinson.  SOMF ¶ 40.

Pinto also testified that Robinson resisted being detained. SOMF ¶ 41. Robinson, however, testified that he did not resist. SOMF ¶ 43. Regardless, Clifford testified that he placed Robinson in an "arm bar" and grabbed one of Robinson's arms to place a handcuff on him. SOMF ¶ 42. Roe grabbed Robinson's other arm to place the other handcuff on him. *Id*. Pinto also assisted in detaining Robinson. SOMF ¶ 46. Pinto testified that he had physical contact with Robinson's shoulder or back for a couple of seconds. SOMF ¶ 47. Pinto testified that during the interaction detaining Robinson he believed his safety was in danger. SOMF ¶ 50. Robinson recalled that Roe placed a knee on his neck for under 10 seconds. SOMF ¶ 51-52. Clifford, however, did not recall any officer placing a knee on Robinson's neck. SOMF ¶ 53.

While the officers were putting both handcuffs on Robinson, Robinson stated that he was a MPD officer. SOMF ¶ 44. Robinson acknowledged that he told the officers he had a weapon before telling the officers he was a MPD officer. SOMF ¶ 39. Because it was not apparent that Robinson was actually a MPD officer and Robinson stated he had a weapon, Clifford and Roe proceeded to put the handcuffs on Robinson for their safety. SOMF ¶ 45.

Both Clifford and Robinson recalled that the time to place Robinson in handcuffs from the time Robinson said he had a weapon took less than a minute. SOMF ¶ 48. Indeed, Robinson conceded that the time it took Clifford and Roe to put Robinson in handcuffs was no longer than necessary. SOMF ¶ 49. After Robinson was placed in handcuffs, Roe removed Robinson's weapon. SOMF ¶ 54. Robinson again stated that he was a MPD officer and had his badge and credentials on him. SOMF ¶ 55. After Robinson was handcuffed and the threat of Robinson having a gun was no longer an issue, the officers found Robinson's credentials. SOMF ¶ 63. Clifford positioned Robinson on the retaining wall and the officers called their supervisors to the scene. SOMF ¶ 61. The officers called their supervisors because doing so is the protocol

involving interactions with off-duty officers.  SOMF ¶ 62.  Clifford and Pinto recalled that

Robinson remained in handcuffs for approximately up to 30 minutes.  SOMF ¶ 64.  Robinson

recalled that he was in handcuffs for over an hour.  SOMF ¶ 65.  After Robinson was detained,

he told Clifford that "he [Robinson] f*cked up" and asked Clifford if there was anything the

officers could do to work out the situation.  SOMF ¶ 74.

 Despite the allegations in the Amended Complaint, *see* Am. Compl. ¶¶ 29-30, Robinson

has not proffered any evidence that the District knew or tacitly authorized Pinto or Clifford to

conduct illegal searches and seizures, detainments, or arrests.  SOMF ¶ 84.  Nor has Robinson

proffered any evidence as to the type of training that GRU officers receive.  SOMF ¶ 8.

From the outset of the encounter, Robinson was required by MPD policy to have either

displayed the universal sign to the on-duty officers that he was a MPD officer or should have

immediately advised them that he was an officer before saying anything else.  SOMF ¶¶ 56-57.

Robinson acknowledged that in certain circumstances it may be reasonable to restrain an

individual who informed an on-duty officer that he had a weapon.  SOMF ¶ 58.  Robinson also

acknowledged that when an officer encounters someone with a weapon, then that is a dangerous

situation and the officer may take measures to protect himself.  SOMF ¶ 59.  Robinson testified

that an on-duty officer could be in a dangerous situation when that officer confronts an

individual who says he has a weapon and the officer is unsure whether he is actually a MPD

officer.  SOMF ¶ 60.

Robinson remained in handcuffs until the officers' supervisors arrived because the

officers were determining whether Robinson would be arrested for hindering.  SOMF ¶ 66.

Clifford testified that if Robinson was a civilian he would have been arrested for hindering.

SOMF ¶ 67.  The officers' supervisors arrived at the scene and determined that they would

handle the situation administratively rather than arrest Robinson.  SOMF ¶ 68.  At no time was Robinson arrested.  SOMF ¶ 69.  Pinto issued Robinson's brother a ticket for illegal parking and a window tint violation, and he was arrested for a suspended license.  SOMF ¶¶ 75-76.

Immediately following the incident, Clifford, Pinto, and Roe drove to Internal Affairs and made statements regarding the incident.  SOMF ¶ 77.  During the Internal Affairs investigation, Robinson was placed on non-contact duty.  SOMF ¶ 79.  In 2014, the Assistant Chief of Police determined that Robinson engaged in misconduct for failing to identify himself as a MPD officer prior to advising on-duty officers that he had a weapon and for using profanity toward on-duty police officers.  SOMF ¶ 80.  Later in 2014, MPD determined that Clifford, Pinto, and Roe engaged in justified use of force during the incident detaining Robinson.  SOMF ¶ 81.

Robinson was terminated from MPD in 2016 after he was indicated and ultimately found guilty for fleeing from MPD officers while traveling in his personal vehicle in a separate incident.  SOMF ¶¶ 82-83.

## STANDARD OF REVIEW

Summary judgment must be granted if the moving party demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).  Although the movant has the burden of demonstrating the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law, the "moving party is not required to support its motion for summary judgment with 'affidavits or other similar materials *negating* the opponent's claim.'" *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033 (D.C. Cir. 2003).  At this point, "the burden shifts to the non-movant to come forward with specific facts showing that there is a *genuine issue for trial*."  *Sykes v. Dudas*, 573 F. Supp. 2d 191, 199 (D.D.C. 2008) (internal

citations omitted).  To assert a genuine issue of fact, the issue must be supported by evidence

sufficiently admissible that a reasonable trier of fact could find for the nonmoving party; to be

material, the factual assertion must be capable of affecting the substantive outcome of the

litigation.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Laningham v.

U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).

**ARGUMENT**

**I.      Count I (False Arrest) Should Be Dismissed Because the MPD Defendants, at a Minimum, Were Entitled to Conduct a Stop, and, Thereafter, Plaintiff's Own Conduct Gave the Officers Cause to Further Detain Him.**

Plaintiff's first two claims under D.C. common law, false arrest and assault and battery,

all fail for the same reason, as the MPD Defendants were privileged to touch him without his

consent, based upon the undisputed facts of this case.  The elements of a false arrest claim, under

D.C. common law, are well settled: (1) detention or restraint against one's will within boundaries

fixed by the defendant, and (2) the unlawfulness of such restraint.  *See Harris v. U.S. Dep't of

Veterans Affairs*, 776 F.3d 907, 911-12 (D.C. Cir. 2015) (citations and footnote omitted); *see

also Hargraves v. Dist. of Columbia*, 134 F. Supp. 3d 68, 81-84 (D.D.C. 2015); 736 F. Supp. 2d

2 *v. Dist. of Columbia*, 736 F. Supp. 2d 2, 8-9 (2010); *Cotton v. Dist. of Columbia*, 541 F. Supp.

2d 195, 205 (D.D.C. 2008).  "The existence of probable cause for arrest defeats claims for false

arrest and imprisonment."  *Harris*, 776 F.3d at 912; *see also Hargraves*, 134 F. Supp. 3d at 81-

84, 97-98; *Pointer*, 736 F. Supp. 2d at 8-9; *Cotton*, 541 F. Supp. 2d at 205.

"The D.C. Court of Appeals has made clear that the tort of false arrest and its defenses at

common law are 'indistinguishable as a practical matter from the common law tort of 'false

imprisonment,' since the 'gravamen of a complaint for false arrest or false imprisonment is an

unlawful detention.'"  *Hargraves*, 134 F. Supp. 3d at 97 (quoting *Bradshaw v. Dist. of Columbia,*

43 A.3d 318, 322 n.7 (D.C. 2012); *Enders v. Dist. of Columbia*, 4 A.3d 457, 461 (D.C.2010));

*see also Pointer*, 736 F. Supp. 2d at 9 ("In actions for false arrest and false imprisonment, the

central issue is 'whether the arresting officer was justified in ordering the arrest of the plaintiff; if

so, the conduct of the arresting officer is privileged and the action fails.'" (citations and internal

quotations omitted).

The existence of whether probable cause is a question of law for the Court to decide,

where the material facts are undisputed.  *Pointer*, 736 F. Supp. 2d at 9 ("The issue of probable

cause for false arrest is a mixed question of law and fact.  Where the facts are in dispute, the

issue of probable cause is for the jury, but where the facts are undisputed or clearly established, a

question of law arises for the court.") (quoting *Safeway Stores, Inc. v. Kelly*, 448 A.2d 856, 862

(D.C.1982) (citations omitted)).  Thus, the "central issue" in evaluating claims for both false

arrest and false imprisonment "''is whether the arresting officer was justified in ordering the

arrest of the plaintiff; if so, the conduct of the arresting office is privileged and the action fails.'"

*Hargraves*, 134 F. Supp. 3d at 97 (quoting *Bradshaw*, 43 A.3d at 323 and *Scott v. Dist. of

Columbia*, 493 A.2d 319, 321 (D.C.1985)).

Most importantly, the existence of facts which justify a stop is sufficient to defeat a false

arrest or false imprisonment claim, *i.e.*, where law enforcement officers have a reasonable

suspicion that criminal activity are afoot, they are entitled to conduct an investigatory stop to

dispel or confirm their reasonable belief.  *See Hargraves*, 134 F. Supp. 3d at 97-98 ("The Court

has already found that the defendant officers, objectively, had reasonable suspicion to support

the initial investigative stop of the plaintiff and, further, that during the struggle to handcuff the

plaintiff, who was not following police commands, the defendant officers developed probable

cause for arrest . . . . Therefore, the plaintiff's claims for false arrest and false imprisonment fail

as a matter of law.") (internal citations and footnotes omitted); *Cotton*, 541 F. Supp. 2d at 205

("The court has already determined that the plaintiff was legally stopped for investigatory

purposes. Thus, the plaintiff cannot substantiate her claims that she was falsely arrested or

imprisoned, and the court grants the defendants' motion for summary judgment as to Count III.")

    The legal analysis of whether law enforcement officers have probable cause to arrest or to

conduct a stop can be based upon an objective test, as well as the subjective test, and under either

test, the existence of probable cause will defeat a false arrest or false imprisonment claim.  Thus,

"[u]nder District of Columbia law, police officers are entitled to immunity from false arrest and

false imprisonment claims by establishing either of 'two affirmative defenses (which are distinct

from 'qualified privilege') . . .  (1) that the officers had probable cause for the arrest 'based

entirely on the objective facts and in this context,' and (2) a 'usually easier-to-meet,' so-called

'partially subjective test' that the officer 'believed, in good faith, that his [or her] conduct was

lawful, and [ ] this belief was reasonable.'" *Hargraves*, 134 F. Supp. 3d at 97 (quoting *Scales v.

Dist. of Columbia*, 973 A.2d 722, 729 (D.C. 2009) and *Dist. of Columbia v. Murphy*, 635 A.2d

929, 932 (D.C.1993)); *see also Pointer*, 736 F. Supp. 2d at 9 ("To determine whether the

arresting officer had probable cause or a good faith belief, the court evaluates the evidence from

the perspective of the officer, not the plaintiff.").

    Moreover, an officer's reasonable, but mistaken belief that he or she had probable cause

to arrest will defeat a false arrest or false imprisonment claim under D.C. law.  Thus, even if an

arrest lacks actual probable cause, "a false arrest claim can be defeated . . . if the defendant

officers had merely a reasonable, good faith belief that probable cause existed." *Pointer* 736 F.

Supp. 2d at 9 (quoting *Liser v. Smith*, 254 F.Supp.2d 89, 98 (D.D.C.2003)).

D.C. law makes it a criminal offense to unlawfully enter a vacant dwelling, and where a vacant dwelling displays a no trespass sign that is prima facie evidence that any person found on the property is trespassing.  *See* D.C. Code § 22-3302(a)(1) (2013) ("The presence of a person in any private dwelling, building, or other property that is otherwise vacant and boarded-up or otherwise secured in a manner that conveys that it is vacant and not to be entered, or displays a no trespassing sign, shall be prima facie evidence that any person found in such property has entered against the will of the person in legal possession of the property.").  Further, D.C. law also makes it a traffic violation to have either a "front windshield or front side windows that allow less than 70% light transmittance"; or "[a] rear windshield or rear side windows that allow less than 50% light transmittance."  D.C. Code § 50-2207.02 (2013).  D.C. law also makes it a traffic violation to park an automobile more than 12 inches from the curb.  *See* 18 DCMR §§ 2400.2-2400.3 (2013).

Of course, once law enforcement officers have reasonable suspicion to conduct a stop, the circumstance can ripen into an actual arrest, especially where the suspect resists officers attempts to conduct the stop.  "Courts have consistently upheld the reasonable use or show of force during investigative stops in order to protect police officers in potentially dangerous situations."  *Hargraves*, 134 F. Supp. 3d at 83 (citing *United States v. White*, 648 F.2d 29, 36 (D.C.Cir.1981) (finding that police officers drawing their guns during an automobile stop was reasonable and did not convert stop to an arrest because it "would be a little foolhardy if they approached the car at 7:30 in the evening, a car with three people in it, without their guns, at the ready"); *Cotton,* 541 F.Supp.2d at 203 (finding use of force to push the plaintiff to the ground and place her in handcuffs during an investigative stop reasonable, even though the officer had been told by bystanders that someone else had threatened the plaintiff with a knife during an

altercation rather than the other way around).  Therefore, "[r]esisting a law enforcement officer while that officer is engaged in the performance of his or her official duties qualifies as a violation of D.C. Code § 22-405(b), commonly referred to as APO. *Hargraves*, 134 F. Supp. 3d at 84 (footnote omitted).

Here, the MPD Defendants actions were based on observing what they believed to be a possible unlawful entry and had grounds to conduct a traffic stop, and because there was, at a minimum, reasonable articulable suspicion, the officers' actions were reasonable.  On November 6, 2013, Officers Clifford, Pinto, and Roe were on patrol in the same vehicle.  SOMF ¶ 9.  The officers were wearing tactical police vests with the word "POLICE" on the front and back. SOMF ¶ 10.  During the course of the day, Clifford, Pinto, and Roe were conducting gun interdiction on the 5500 block of C Street, S.E.  SOMF ¶ 11.  The officers were driving on the 5500 block of C Street, S.E. and observed Robinson sitting on the retaining wall of a vacant property with no trespassing signs.  SOMF ¶ 13.  Robinson was on the property by virtue of sitting on the retaining wall of the property.  SOMF ¶ 22.  Robinson was off-duty, and wearing tan pants, a green shirt, and a black coat.  SOMF ¶ 18.  A vehicle that was not properly parked and had heavily tinted windows was in front of Robinson.  SOMF ¶ 14-15.  The driver of the vehicle, who was later determined to be Robinson's brother, and Robinson were talking.  SOMF ¶ 16-17.

These facts gave the MPD Defendants the lawful authority to conduct a stop, and thereafter, Plaintiff's own actions gave them cause to further detain Robinson.  Before the officers exited their vehicle, Pinto asked Robinson whether he lived on the property and Robinson responded that he did not.  SOMF ¶ 26.  When Robinson stated that he did not live on the property, the officers exited their vehicle.  SOMF ¶ 27.  When the officers exited the vehicle,

Robinson stood up quickly as if he was going to run and then sat back down on the wall and put his hands in his jacket pockets.  SOMF ¶ 28.  Pinto believed that Robinson was acting suspiciously.  SOMF ¶ 29.

Upon exiting the vehicle, Pinto approached the driver of the parked vehicle.  SOMF ¶ 30.  Clifford focused his attention on Robinson.  SOMF ¶ 31.  Clifford asked whether Robinson lived there and Robinson stated that he did not but that he lived on the block.  SOMF ¶ 32.  Clifford then asked Robinson to take his hands out of his pockets.  SOMF ¶ 33.  In response to Clifford's requests, Robinson said "f*ck no," "I ain't got to do sh*t you have to say," and "I ain't doing sh*t, I ain't showing you sh*t."  *Id*.  Based on Robinson's bad attitude, use of profanity, and failure to comply with Clifford's directives, Clifford believed that Robinson may have been engaged in criminal activity.  SOMF ¶ 34.

When the officers perform a stop, they take security precautions to ensure the individual they are investigating cannot harm the officers.  SOMF ¶ 70.  Clifford asked Robinson to stand up and Robinson replied that he would not stand up to let the officer search him.  SOMF ¶ 35.  Roe asked Robinson if he had a weapon and Robinson responded that he did.  SOMF ¶ 36.  Immediately after Robinson stated he had a gun, Clifford grabbed Robinson.  SOMF ¶ 37.  The officers proceeded to detain Robinson because he said he had a weapon.  SOMF ¶ 38.

In sum, the undisputed facts show that the MPD Defendants had reasonable suspicion to investigate Plaintiff and his brother for different violations.  Plaintiff's uncooperative behavior escalated the situation, giving the officers cause to further detain him.  Even if the MPD Defendants were mistaken that Plaintiff and his brother were not involved in criminal activity, their belief that they could possibly be involved in criminal activity was reasonable, as matter of

law.  Under either the objective test or subjective test, Plaintiff's fails arrest claim fails, as a

matter of law.

## II.    Plaintiff's Assault and Battery Claim (Count II) Fails Because the MPD Defendants Were Privileged To Touch Him Without His Permission.

The right of the MPD Defendants to seize Plaintiff (as well as to use force to do so) gave

the officers a qualified privileged which defeats Plaintiff's claims of assault and battery.  A claim

for assault must involve an "'intentional and unlawful attempt or threat, either by words or acts,

to do physical harm to the plaintiff.'"  *Pointer*, 736 F. Supp. 2d at 8 (quoting *Dist. of Columbia v.*

*Chinn*, 839 A.2d 701, 705 (D.C.2003) and *Holder v. Dist. of Columbia*, 700 A.2d 738, 741

(D.C.1997)).  "But, a 'police officer has a qualified privilege to use reasonable force to effect an

arrest, provided that the means employed are not in excess of those which the actor reasonably

believes to be necessary.'"  *Pointer*, 736 F. Supp. 2d at 8 (quoting *Etheredge v. Dist. of*

*Columbia*, 635 A.2d 908, 916 (D.C. 1993)).  "Accordingly, an officer may defend a claim of

assault 'by proof that only reasonable force was used to maintain the arrest and that the arrest

was made in good faith, with probable cause, under a statute he reasonably believed to be

valid.'"  *Pointer*, 736 F. Supp. 2d at 8 (quoting *Wade v. Dist. of Columbia*, 310 A.2d 857, 862

(D.C.1973) (en banc)).

Likewise "[u]nder District of Columbia law, a battery is 'an intentional act that causes a

harmful or offensive bodily contact.'"  *Hargraves*, 134 F. Supp. 3d at 90 (quoting *Evans–Reid v.*

*Dist. of Columbia*, 930 A.2d 930, 937 (D.C.2007) and *Etheredge*, 635 A.2d at 916).  "At the

same time, 'District law provides a government actor with a privilege defense to such tort claims

when '(1) he or she believed, in good faith, that his or her conduct was lawful, and (2) this belief

was reasonable.'"  *Hargraves,* 134 F. Supp. 3d at 90 (quoting *Doe v. Dist. of Columbia,* 796 F.3d

96, 107 (D.C.Cir.2015) and *Bradshaw*, 43 A.3d at 323 (citations and alterations omitted).

14

Here, the same facts that defeat Plaintiff's false arrest claim are equally fatal to his assault and battery claim. *See* Section I, *supra*. Simply stated, the MPD Defendants had the right to stop Plaintiff as a matter of law, including the right to use reasonable force to accomplish that objective. Summary judgment on Count II is appropriate

**III.    The MPD Defendants Are Entitled to Summary Judgment on Plaintiff's Fourth Amendment Claim Under § 1983 (Count IV) on the Grounds of Qualified Immunity.**

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate a clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly, and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Pearson*, 555 U.S. at 231. "The protection of qualified immunity applies regardless of whether the government official's error is a 'mistake of law, mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting) (quoting *Butz v. Economou*, 438 U.S. 478, 507 (1978) (qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law")).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019 (2014) (quoting *Pearson*, 555 U.S. at 231 and *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). The Supreme Court has emphasized that the "'driving force' behind the creation of the qualified immunity doctrine [is] a desire to ensure that

'insubstantial claims' against government officials [will] be resolved prior to discovery.'"

*Pearson*, 555 U.S. at 231-32 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, n.2 (1987)).

Under *Pearson*,[5] application of the qualified immunity doctrine, the officers are immune

from suit.  The inquiry turns on the objective legal reasonableness of the officers' action,

"assessed in light of the legal rules that were clearly established at the time he took them."

*Pearson*, 555 U.S. at 245 (quoting *Wilson v. Layne*, 526 U.S.603, 614 (1999)).  In other words,

"[q]ualified immunity shields government officials from civil damages liability unless the

official violated a statutory or constitutional right that was clearly established at the time of the

challenged conduct."  *Reichle v. Howards*, 566 U.S. 658, 664  (2012) (citations omitted).

Importantly, in the Fourth Amendment context, to be clearly established "a right must be

sufficiently clear '*that every 'reasonable official* would [have understood] that what he is doing

violates that right.'"  *Id.* (citations omitted) (emphasis added).  In other words, "existing

precedent must have placed the statutory or constitutional question beyond debate."  *Id.*  This

"clearly established" standard protects the balance between vindication of constitutional rights

and government officials' effective performance of their duties by ensuring that officials can

"'reasonably . . . anticipate when their conduct may give rise to liability for damages.'"  *Id.*

The Fourth Amendment prohibits officers from seizing persons absent a reasonable

articulable suspicion "that criminal activity is afoot."  *Terry v. Ohio*, 392 U.S. 1, 30 (1968).  A

police officer must be able to articulate something more than an "inchoate and unparticularized

suspicion or 'hunch.'"  *Id.* at 27.  The Fourth Amendment requires "some minimal level of

---

[5]     In *Pearson,* the Supreme Court held that the federal courts are no longer required to
adhere to the two-step procedure in determining whether a public official is entitled to qualified
immunity, as was required in *Saucier v. Katz*, 533 U.S. 194 (2001).  While the *Pearson* Court did
not overrule *Saucier,* the Court left it to the lower federal courts to determine whether the
*Saucier* two-step procedure "will best facilitate the fair and efficient disposition of each case."
*Pearson*, 555 U.S. at 242.

objective justification" for making the stop.  *United States v. Sokolow*, 490 U.S. 1, 7 (1989)

(quoting *INS v. Delgado,* 466 U.S. 210, 217 (1984)).  This level of suspicion is "considerably

less than proof of wrong-doing by a preponderance of the evidence."  *Sokolow*, 490 U.S. at 7.

While probable cause means a "fair probability that contraband or evidence will be found,"

*Illinois v. Gates,* 462 U.S. 213, 238 (1983), the level of suspicion required for a stop is

"obviously less demanding than that for probable cause."  *United States v. Montoya de*

*Hernandez,* 473 U.S. 531, 541 (1985).   The concept of reasonable suspicion, as developed

through Supreme Court jurisprudence, is not "readily, or even usefully, reduced to a neat set of

legal rules."  *Gates*, 462 U.S. at 232.  When assessing the validity of a stop as occurred initially

in the instant case, this Court, then, "must consider 'the totality of the circumstances – the whole

picture.'"  *Sokolow*, 490 U.S. at 7-8 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

Of course, it is also well settled law that officers can draw on their training and

experience as a part of the calculus for determining whether reasonable suspicion exists for an

investigatory stop.  *See Hargraves*, 134 F. Supp. 3d at 82;  ("In this case, the nervous behavior of

the plaintiff after looking in the direction of the police in a high crime area, together with his

unorthodox exit from the abruptly stopped car in the middle of a busy street, provided

objectively reasonable grounds for suspicion and renders the investigative stop of the plaintiff

lawful); *see also Clark v. City of Atlanta*, 544 Fed. App'x 848, 854 (11th Cir. 2013) ("The

undisputed evidence shows that, at the moment of the seizure, the officers were aware that there

had been a rash of burglaries in the area, that vacant properties were often targeted for burglaries,

and that the property where the Clarks were standing appeared to be vacant.  Accordingly, based

on the totality of the circumstances, the district court correctly found that the officers had at least

arguable reasonable suspicion that the Clarks might have been engaged or were about to engage

in criminal activity."); *Gomez v. City of N.Y.*, No. 05-2147, 2008 U.S. Dist. LEXIS 41455, at *10 (S.D.N.Y., May 28, 2008) ("[O]fficers are permitted to 'draw on their own experiences and specialized training to make inferences from and deductions about the cumulative information available to them.") (quoting *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002)).

The experience and training that an officer can use to justify a stop can include whether a party is being truthful or whether a party is armed with a weapon.  *See Cotton*, 541 F. Supp. 2d at 203 ("Wallace was under no obligation to initially trust the word of bystanders as to whom was the instigator or who was or was not armed; this information is the proper subject of investigation.") (*citing United States v. Holmes*, 385 F.3d 786, 790 (D.C.Cir.2004) (stating that "the Fourth Amendment does not require the officer to gamble his safety and that of those around him on the accuracy of [the statements of others]")).

Again, "[c]ourts have consistently upheld the reasonable use or show of force during investigative stops in order to protect police officers in potentially dangerous situations." *Hargraves*, 134 F. Supp. 3d at 83 (citing *White*, 648 F.2d at 36 and *Cotton*, 541 F.Supp.2d at 203).  This includes handcuffing a potential suspect until the investigation is finished.  *See Hargraves*, 134 F.Supp.3d at 82 ("Nevertheless, the use of handcuffs during a *Terry* stop does not automatically convert it into an arrest since 'the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'"); *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Cotton*, 541 F. Supp. 2d at 204 ("Nor does Wallace's use of handcuffs or relocation of the plaintiff change the court's conclusion.") (citing *U.S. v. Jones*, 973 F.2d 928 (D.C.Cir.1992) *reh'g granted and opinion vacated in part on other grounds*, 973 F.2d 944 (D.C.Cir.1992) (explaining that a "*Terry* stop does not turn into a full arrest merely because the officers use handcuffs and force the suspect to lie down to prevent

flight, so long as the police conduct is reasonable" and that a Terry stop "may also include forced relocation of the subject")).  It also includes forcing the suspect to the ground in order to handcuff him or her during the stop.  *See Cotton*, 541 F. Supp. 2d at 203 ("In addition, the court cannot conclude that Wallace's forcing the plaintiff to the ground was inherently impermissible during a Terry stop.").

In this case, the officers observed that Robinson was sitting on a retaining wall of a vacant property with no trespassing signs.  SOMF ¶ 13; *see also* Am. Compl. ¶ 8.  In addition, Robinson was conversing with an individual in a vehicle that was not properly parked and had heavily tinted windows.  SOMF ¶ 14-15.  Based on Pinto's and Clifford's prior experiences, vacant properties are used as stash houses for weapons and drugs.  SOMF ¶ 20.  Further, Clifford has investigated individuals sitting on the curtilage of vacant properties which resulted in arrests and ended up being prosecuted for unlawful entry or attempted unlawful entry.  SOMF ¶ 21. Based on their prior experiences and observations of Robinson, the officers believed that Robinson was possibly in violation of the unlawful entry law, and stopped to investigate the situation further and ascertain whether there was probable cause to arrest Robinson.  SOMF ¶¶ 24-26.  Robinson also demonstrated suspicious behavior by appearing as if he was going to flee the scene, and then sat down and put his hands in his pockets.  SOMF ¶¶ 28-29.  The officers believed that they had reasonable suspicion that unlawful entry may have been committed and decided to initiate a contact on Robinson.  SOMF ¶ 23.  Moreover, after Clifford and Roe approached Robinson and he failed to heed their directives and did not identify himself as a MPD officer, the officers' suspicions were further heightened.  SOMF ¶¶ 33-35, 56, 73.

Importantly, the officers are entitled to qualified immunity even if their belief was mistaken.  *Brinegar v. United States*, 338 U.S. 160, 176 (1949) ("Because many situations which

confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistake must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability."). Any mistake made by the officers would be a mistake made by reasonable officers facing the same set of circumstances that they faced.

While Plaintiff brings a claim for false arrest, Plaintiff acknowledged that at no time was he arrested. SOMF ¶ 69. As for the decision to keep Robinson in handcuffs until the officers' supervisors arrived at the scene, Clifford testified that based on Robinson's conduct during the stop, Robinson would have been arrested if he was a civilian for hindering. SOMF ¶ 67; *see also* D.C. Code § 22-405(b) (2013) (resisting or interfering with a law enforcement officer's performance of his official duties is a misdemeanor offense). It is undisputed that Robinson refused to cooperate when the officer initiated contact with him. SOMF ¶ 35.

Even assuming that Plaintiff's detention lasted for over an hour is accurate, "there is no 'clearly established' rule stating that a detainment for 75 minutes – justified by reasonable suspicion and during which a police officer diligently continued their investigation – is unlawful under the Fourth Amendment," and the officer may still be afforded the protection of qualified immunity. *Schloss v. Lewis*, No. JFM-15-1938, 2016 U.S. Dist. LEXIS 49380, at *19 (D. Md., Apr. 12, 2016). Pinto testified that it is the officers' practice to wait until their supervisors' arrive at the scene to make a determination regarding an incident with an off-duty officer. SOMF ¶ 62. Keeping Robinson detained in handcuffs until the supervisors did arrive on the scene was reasonable.

In sum, the MPD Defendants did not violate any "clearly established" Fourth

Amendment right belonging to Plaintiff.  The Court must grant summary judgment against Count

IV of the Amended Complaint.

**IV.     Plaintiff's Negligence Claim Against the District Fails, for Multiple Reasons, Including the Failure to Proffer Expert Testimony.**

Plaintiff asserts a common law claim of negligent training and supervision against the

District in Count III of the Amended Complaint.  Am. Compl. at ¶¶ 28-31.  To establish a cause

of action for negligent supervision, a plaintiff must show "that the employer 'knew or should

have known its employee behaved in a dangerous or otherwise incompetent manner, and that the

employer, employee.'"  *Phelan v. City of Mount Rainier*, 805 A.2d 930, 937-38 (D.C. 2002)

(quoting *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C.1985)).  Similarly, negligent training

requires a showing that an employer failed to use reasonable case in training an employee

thereby proximately causing harm to plaintiff.  *Clark v. Computer Science Corp.*, 958 F. Supp. 2d

208, 216 (D.D.C. 2013).

Where the allegations of negligent training are unsupported by the evidence in the case,

they must fail, particularly where the underlying actions of the MPD Defendants are lawful.

"Since the defendant officers' conduct was lawful, the premise of this allegation is flawed and,

consequently, cannot support the plaintiff's negligence claim against the District.  *Hargraves*,

134 F. Supp. 3d at 96.

Here, Plaintiff claims that the District was negligent in training and supervising Pinto and

Clifford.  Plaintiff's Complaint states:

> Defendant District of Columbia knew or should have known that its employees officers Roe, Clifford and Pinto, were conducting illegal searches and seizures, detainments and arrests as a matter of course and were otherwise engaging in dangerous, illegal, unprofessional and unconstitutional actions during the course of their employment.  Defendant District of Columbia, knew or should have

known that its officer-employees were engaging in racial targeting and routinely violating the Constitutional rights of African-Americans.

Am. Compl. at ¶¶ 29-30.  Plaintiff admits, however, that he has no facts to show that the District had actual or constructive notice that these officers behaved in an allegedly dangerous or incompetent manner.  SOMF ¶¶ 8, 84.  The record is devoid of any evidence regarding how Pinto and Clifford were trained or supervised.  No reasonable jury could infer from this evidence, even taking the facts in the light most favor to Plaintiff, that the District negligently trained or supervised either Pinto or Clifford.  As a result, the District is entitled to judgment as a matter of law on Count III of the Complaint.

In addition, as in any negligence action, Plaintiff bears the burden of proof on three issues: "the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury."  *Panell v. Dist. of Columbia*, 829 A.2d 474, 479 (D.C. 2003); *Evans-Reid v. Dist. of Columbia*, 930 A.2d 930, 937 n.6 (D.C. 2007) (stating elements of negligence claim).  On the issue of the applicable standard of care, "expert testimony is required when the subject presented is so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman."  *Dist. of Columbia v. White*, 442 A.2d 159, 164 (D.C. 1982) (internal quotations and citations omitted).

The standards of supervising police personnel relate to an occupation that is beyond the ken of the average layman.  *Flythe v. Dist. of Columbia*, 994 F. Supp. 2d 50, 70 (D.D.C. 2013) (granting summary judgment for the District on negligent supervision claim where the plaintiff did not present expert testimony on the standard of care); *Rawlings v. Dist. of Columbia*, 820 F. Supp. 2d 92, 115-116 (D.D.C. 2011) (concluding that expert testimony was needed to determine the standard of care as to whether officers require additional training when they are reported for

incidents of unjustified shooting); *Linares v. Jones*, 551 F. Supp. 2d 12, 19- 20 (D.D.C. 2008)

(finding that expert testimony was needed to establish the "actual process used in reviewing

police misconduct" and whether that standard was met); *Parker v. Grand Hyatt Hotel*, 124 F.

Supp. 2d 79, 89-90 (D.D.C. 2000) (requiring expert testimony because otherwise the jury "would

be forced to engage in [improper] 'idle speculation' regarding the duty of care governing [the

defendants] in the training of their employees"); *White*, 442 A.2d at 164-66 (reversing the trial

court's decision not to require expert testimony on a negligent training claim because the absence

of such evidence "left the jury with unanswerable questions regarding the scope of the District's

training program and the format, content, and frequency of an adequate training and retraining

program").  Plaintiff has not presented any expert testimony on the applicable standard of care

for training or supervision of police personnel and his failure to do so is fatal to his negligent

training and supervision claims.

## V.   Plaintiff Failed To Present Any Evidence or Expert Testimony to Support His Claims Against the District for Negligent Training and Supervision.

Plaintiff asserts a common law claim of negligent training and supervision against the

District in Count III of the Amended Complaint. Am. Compl. at ¶¶ 28-31.  To establish a cause

of action for negligent supervision, a plaintiff must show "that the employer 'knew or should

have known its employee behaved in a dangerous or otherwise incompetent manner, and that the

employer, employee.'"  *Phelan v. City of Mount Rainier*, 805 A.2d 930, 937-38 (D.C. 2002)

(quoting *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C.1985)).  Similarly, negligent training

requires a showing that an employer failed to use reasonable case in training an employee

thereby proximately causing harm to plaintiff.  *Clark v. Computer Science Corp.*, 958 F. Supp. 2d

208, 216 (D.D.C. 2013).

Here, Plaintiff claims that the District was negligent in training and supervising Pinto and Clifford.  Plaintiff's Complaint states:

> Defendant District of Columbia knew or should have known that its employees officers Roe, Clifford and Pinto, were conducting illegal searches and seizures, detainments and arrests as a matter of course and were otherwise engaging in dangerous, illegal, unprofessional and unconstitutional actions during the course of their employment.  Defendant District of Columbia, knew or should have known that its officer-employees were engaging in racial targeting and routinely violating the Constitutional rights of African-Americans.

Am. Compl. at ¶¶ 29-30.  Plaintiff admits, however, that he has no facts to show that the District had actual or constructive notice that these officers behaved in an allegedly dangerous or incompetent manner.  SOMF ¶¶ 8, 84.  The record is devoid of any evidence regarding how Pinto and Clifford were trained or supervised.  No reasonable jury could infer from this evidence, even taking the facts in the light most favor to Plaintiff, that the District negligently trained or supervised either Pinto or Clifford.  As a result, the District is entitled to judgment as a matter of law on Count III of the Complaint.

In addition, as in any negligence action, Plaintiff bears the burden of proof on three issues: "the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury."  *Panell v. Dist. of Columbia*, 829 A.2d 474, 479 (D.C. 2003); *Evans-Reid v. Dist. of Columbia*, 930 A.2d 930, 937 n.6 (D.C. 2007) (stating elements of negligence claim).  On the issue of the applicable standard of care, "expert testimony is required when the subject presented is so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman." *Dist. of Columbia v. White*, 442 A.2d 159, 164 (D.C. 1982) (internal quotations and citations omitted).

The standards of supervising police personnel relate to an occupation that is beyond the ken of the average layman. *Flythe v. Dist. of Columbia*, 994 F. Supp. 2d 50, 70 (D.D.C. 2013) (granting summary judgment for the District on negligent supervision claim where the plaintiff did not present expert testimony on the standard of care); *Rawlings v. Dist. of Columbia*, 820 F. Supp. 2d 92, 115-116 (D.D.C. 2011) (concluding that expert testimony was needed to determine the standard of care as to whether officers require additional training when they are reported for incidents of unjustified shooting); *Linares v. Jones*, 551 F. Supp. 2d 12, 19- 20 (D.D.C. 2008) (finding that expert testimony was needed to establish the "actual process used in reviewing police misconduct" and whether that standard was met); *Parker v. Grand Hyatt Hotel*, 124 F. Supp. 2d 79, 89-90 (D.D.C. 2000) (requiring expert testimony because otherwise the jury "would be forced to engage in [improper] 'idle speculation' regarding the duty of care governing [the defendants] in the training of their employees"); *White*, 442 A.2d at 164-66 (reversing the trial court's decision not to require expert testimony on a negligent training claim because the absence of such evidence "left the jury with unanswerable questions regarding the scope of the District's training program and the format, content, and frequency of an adequate training and retraining program"). Plaintiff has not presented any expert testimony on the applicable standard of care for training or supervision of police personnel and his failure to do so is fatal to his negligent training and supervision claims.

## IV.   Punitive Damages Against the Individual Officers Are Inappropriate.

Plaintiff's claim for punitive damages should also fail. The test for punitive damages is a rigorous one because punitive damages are meant to punish unlawful conduct and deter its repetition. Punitive damages are, accordingly, to be awarded only in cases of outrageous or egregious wrongdoing where the defendant acted with evil motive, actual malice, or in willful

disregard for the plaintiff's rights.  This high substantive burden requires the plaintiff to prove

egregious conduct and the requisite mental state by *clear and convincing evidence.  Rosenthal v.*

*Sonnenschein Nath & Rosenthal, LLP*, 985 A.2d 443, 455-56 (D.C. 2009) (internal quotations

and citations omitted).  "Clear and convincing evidence is evidence that will produce in the mind

of the trier of fact a firm belief or conviction as to the facts sought to be established."  *Wood v.*

*Neuman*, 979 A.2d 64, 73 (D.C. 2009) (internal quotations and citations omitted).

As discussed above, Plaintiff fails to present any evidence to substantiate his claim that

the officers engaged in egregious conduct.  No reasonable trier-of-fact could, on the evidence

present, form a "firm belief or conviction as to the facts sought to be established."  Thus,

Plaintiff's punitive damages claim should be denied because he simply cannot meet the rigorous

test to demonstrate entitlement to punitive damages against these defendants.

## CONCLUSION

For the reasons set forth above, the Court should grant Defendants' motion for summary

judgment and dismiss the Amended Complaint in its entirety.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

*Glenn T. Marrow*[6]
GLENN T. MARROW
Chief, Civil Litigation Division Section II

*/s/ Nathan A. Guest*

---

[6]     Admitted in the State of Maryland and the State of New York Only.  Practicing in the District of Columbia under the supervision of George C. Valentine, a member of the D.C. Bar, pursuant to D.C. Rule 49(c).

NATHAN A. GUEST [494409]
Assistant Attorney General
441 Fourth Street, N.W.
Suite 630 South
Washington, D.C. 20001
202-724-6534
202-730-1899 (fax)
nathan.guest@dc.gov

**_Counsel for Defendants_**