# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

_____ :
                              :
IN THE MATTER OF:             :
                              :
JAMAL B. ROBINSON,            :
                              :
          Plaintiff,          :
                              :
     v.                       :  C.A. No.
                              :  15-100 (RJL)
DISTRICT OF COLUMBIA, et al.: :
                              :
          Defendant.          :
                              :
_____ :

               Tuesday,
               March 13, 2018

               Washington, D.C.


DEPOSITION OF:

          JAMAL B. ROBINSON

called for examination by Counsel for the

Defendant, pursuant to Notice of Deposition, in

the Office of the Attorney General for the

District of Columbia, located at One Judiciary

Square, 441 4th Street NW, Washington, DC 20001,

when were present on behalf of the respective

parties:

**APPEARANCES:**

On Behalf of the Plaintiff:

MALIK SHABAZZ, ESQ.
6411 Ivy Lane, Suite 402
Greenbelt, MD  20770

attorney.shabazz@yahoo.com


On Behalf of the Defendant:


NATHAN GUEST, ESQ.

Assistant Attorney General

441 4th Street N.W.

Suite 630 South

Washington, DC 20001

(202) 442-9867

nathan.guest@dc.gov

8

1    Q    Behavioral what?
2    A    Technician.
3    Q    Okay.  What does that work entail?
4    A    Dealing with special education
5  population and the general population as far as
6  behavior and just all around.
7    Q    Okay.  How long have you been a
8  behavioral technician with DCPS?
9    A    August of this year.  August of '17.
10   Q    Gotcha.
11   A    Yeah.
12   Q    Did you have any training or receive
13  any certifications in order to qualify for
14  employment as a behavioral technician?
15   A    My employment with MPD pretty much
16  relates to it.
17   Q    What did you do prior to becoming a
18  behavioral technician with DCPS?
19   A    I was a teacher.
20   Q    Where were you a teacher?
21   A    H.D. Woodson.
22   Q    What class did you teach?

9

1    A    Algebra I and Geometry.
2    Q    How long were you a teacher there?
3    A    A year.  So from August 2016 to June
4  2017.
5    Q    Why did you leave that?
6    A    Different position.
7    Q    Different position at DCPS as a
8  behavioral technician?
9    A    Uh-huh.  Yes, that's correct.
10   Q    And where were you employed prior to
11  being a teacher?
12   A    MPD.
13   Q    When did you join MPD?
14   A    April 23rd, 2012.
15   Q    When did you leave MPD?
16   A    January 2016.
17   Q    So you were with MPD for a little shy
18  of four years, right?
19   A    Correct.
20   Q    And what was your position at MPD?
21   A    Police officer.
22   Q    And the incident that we're here to

10

1  talk about underlying your lawsuit occurred when?
2    A    November 6th, 2004?  2014 I believe.
3    Q    Okay.  Regardless of what year it was,
4  what year do you remember sitting here right now,
5  as to when it occurred?
6    A    Right now.
7    Q    Yes.
8    A    So what year is it right now?
9    Q    No, no, no.  What year did the
10  incident occur that gave rise to your lawsuit?
11  What year do you believe that it occurred?
12   A    2014.
13   Q    Okay.  So regardless of whether it was
14  2013 or 2014, it happened when you were employed
15  by MPD?
16   A    Yes, that's correct.
17   Q    All right.  And when you were employed
18  at MPD, what kind of training, if any, did you
19  receive regarding making stops of individuals
20  when you were --.
21   A    To make a stop?
22   Q    Yes.

11

1    A    We have to have -- we had to have
2  reasonable suspicion to make a stop.
3    Q    Okay.  And is it accurate that the
4  training you received at MPD taught you that if
5  you do have a reasonable suspicion of an
6  individual while you're on duty that you can make
7  a stop?
8    A    That's correct.
9    Q    Okay.  And were you told or given
10  examples about what reasonable suspicion means?
11   A    Yes.
12   Q    Okay.  Tell me some of those examples
13  or some of your training that you received as an
14  MPD officer, as to what reasonable suspicion is
15  in order to make a stop?
16   A    To have reasonable suspicion to make
17  a stop, you need a -- what's that -- a
18  description of the individual, and/or they have
19  to be doing something that's against the law to
20  stop them for.
21   Q    Anything else you remember about any
22  training or education you received at MPD

16

1  you stop that individual, detain them and they
2  start resisting, then you can use a reasonable
3  amount of force to restrain them?
4       MR. SHABAZZ: Objection as to form.
5       THE WITNESS: Reasonable amount of
6  force to restrain them, if they are resisting.
7       BY MR. GUEST:
8    Q   Okay, and based on your experience and
9  training at MPD, are you aware of the protocol or
10 procedure that an on duty officer follows in the
11 event that they confront an off duty officer?
12   A   No.
13   Q   Kind of the opposite question, based
14 on your training and experience at the MPD, are
15 you aware of any protocol or procedure that an
16 off duty officer must follow if they are
17 confronted by an on duty officer?
18   A   You just let them know that you're
19 police.
20   Q   Okay.  Anything else?
21   A   And you let them know that you are
22 armed, that you do have your weapon on you.

17

1    Q   Okay, and do you do it in that order?
2  Do you let -- assuming you're an off duty
3  officer, an on duty officer confronts you, do you
4  do it in the order that you just described, that
5  you tell the officer that I am MPD officer and I
6  have a gun?
7    A   You let them know that you're a
8  police.
9    Q   That's the first thing you tell them?
10   A   Right.
11   Q   Before you tell them anything else,
12 right?
13   A   Right.
14   Q   Okay.  Now I guess my question was
15 more oriented -- well, strike that.  As an off
16 duty officer who's confronted by an on duty
17 officer, do you also as part of any type of
18 protocol or procedure that you're aware of, defer
19 or allow the on duty officer to be in control of
20 the situation?
21       MR. SHABAZZ: Objection as to form.
22       THE WITNESS: Repeat that question

18

1  again?
2       BY MR. GUEST:
3    Q   Of course, and again, any time you
4  need me to repeat it, just ask me.
5    A   Uh-huh.
6    Q   If you are an off duty officer and you
7  are confronted by an on duty officer, is it your
8  understanding that as the off duty officer, it is
9  appropriate to allow the on duty officer to be in
10 control of the situation?
11       MR. SHABAZZ: Objection as to form.
12       THE WITNESS: No.  The off duty needs
13 to be in control of the situation.
14       BY MR. GUEST:
15   Q   The off duty?
16   A   Yes.
17   Q   Okay.  So if you're an on duty officer
18 and you confront an off duty officer, then you
19 allow the off duty officer to be in control of
20 the situation?
21       MR. SHABAZZ: Objection as to form.
22       THE WITNESS: No.

19

1       BY MR. GUEST:
2    Q   And why is that?
3    A   Because I might, as an off duty
4  officer, I might be armed and then I need to tell
5  them what's going on.
6    Q   Okay.  So even though -- well I want
7  to be clear on -- we've been using the term "off
8  duty officer," and when I've been using that
9  term, I mean an officer who is not on duty at the
10 time obviously, but also not showing any outward
11 signs that he or she is a police officer, okay?
12   A   Uh-huh.
13   Q   Right?  And you understood that,
14 right?
15   A   Yes.
16   Q   Okay.  I just want to be clear on
17 this.  If you're an off duty officer -- well,
18 strike that.  Your testimony is that in any
19 situation where there's a confrontation between
20 an on duty officer and an off duty officer, that
21 the off duty officer should be in charge of the
22 situation?

40

1  protocol of involving Internal Affairs at the
2  time of the incident, if you know?
3      A    You're supposed to ask for an
4  official, and then the official goes from there.
5      Q    So an on duty officer stops off duty
6  officer, the protocol is to ask for an Internal
7  Affairs official, right?
8          MR. SHABAZZ:  Objection as to form.
9          THE WITNESS:  Just ask for an
10  official.
11          BY MR. GUEST:
12      Q    Right, to come to the scene, right?
13      A    Yes.
14      Q    And then they show up and deal with
15  it, right?
16      A    Yes.
17      Q    Okay.  You guys need to --
18      A    Yeah, I have to ask him something.
19      Q    You can step out.  We'll go off the
20  record.
21          (Whereupon, the above-entitled matter
22  went off the record at 11:16 a.m. and resumed at

41

1  11:18 a.m.)
2          BY MR. GUEST:
3      Q    Do you know what the Gun Recovery Unit
4  is?
5      A    The unit that recovers guns.
6      Q    Right, GRU?
7      A    Yes.
8      Q    Were you ever on GRU?
9      A    No.
10      Q    Do you know what type of training
11  officers on the GRU receive?
12      A    No.
13      Q    Before the incident that we're going
14  to talk about later, did you know anybody on GRU
15  during your time as an MPD officer?
16      A    No.
17      Q    Okay.  Did you know anything at the
18  time -- well strike that.  Before the incident
19  that we're going to get into, did you -- did you
20  have any sense or understanding about the type of
21  patrols that GRU officers went on?
22      A    They just look for guns.

42

1      Q    Okay.  Do you know whether before the
2  incident giving rise to this lawsuit, whether GRU
3  to your knowledge had any type of reputation?
4          MR. SHABAZZ:  Objection as to form.
5          THE WITNESS:  Nothing that I know of.
6          BY MR. GUEST:
7      Q    Okay.  And so it's fair to say that
8  before the incident -- well strike that.  Is it
9  fair to say that even, you know, sitting here
10  today that, you know, you don't really know
11  anything other than the fact that the Gun
12  Recovery Unit recovers guns in terms of their
13  activities or how they go on patrols or anything
14  like that?
15      A    Yeah, I'm not aware of any of that.
16  They just collect guns.
17      Q    That's all you know about them?
18      A    Yep.  If you have a gun, you just call
19  them.
20      Q    Okay.  Do you have any understanding
21  based on your experience or training as an MPD
22  officer, as to whether there was a use of force

43

1  policy that you had to follow as an officer?
2      A    Yes.  There's a use of force policy.
3      Q    Okay, and what's your understanding of
4  that policy?
5      A    You use the minimal amount of force
6  necessary to control the situation.
7      Q    Anything else about the use of force
8  policy that you know, other than using the
9  minimal amount of force necessary to control the
10  situation?
11      A    Pretty much that's about it.
12      Q    Okay.
13      A    Minimum amount of force.
14      Q    So in a situation that you're facing
15  would determine what level of force you would use
16  as an officer, right?
17      A    Correct.
18      Q    Okay.  Do you remember when you filed
19  this lawsuit?
20      A    I'm not sure.
21      Q    I'd like to not tell you.  So you
22  filed the complaint in this case in February of

48

1 before I had a chance to talk and said you have
2 any weapons on you?
3       I said that yes, I have my -- I said
4 yes, I have my gun, badge and credentials and I'm
5 MPD.  Then they jumped on me, and then I kept
6 telling them that I was MPD, D.C. Police, and
7 they continued their assault on me.  Then while
8 handcuff me, I wasn't resisting, another officer
9 came and put his knee in my neck.
10       And then they flipped me over after
11 they took me down, and then my badge, then they
12 took my gun.
13    Q   Flipped you over from --
14    A   Because they had -- I was handcuffed.
15 So I was laying face down.
16    Q   You were on your stomach?
17    A   Yes.
18    Q   They flipped you over to your back?
19    A   Yes.
20    Q   Where was your gun on your person?
21    A   On my right side of my hip.
22    Q   Where was your badge?

49

1    A   My badge was on the front of my gun.
2 So like in front of it, visible.
3    Q   What credentials are you referring to?
4    A   My police ID.
5    Q   Where was that?
6    A   In my back pocket.
7    Q   Okay.  When the gray truck pulled up
8 and you were sitting outside, did any of the
9 officers say anything to you before exiting their
10 vehicle?
11    A   No, they just came over for me.
12    Q   Where were you sitting outside?
13    A   I was sitting across the street from
14 my house.
15    Q   And that house you're referring to is
16 the 5532 C Street, S.E.?
17    A   Yes.
18    Q   So you're just where?  You were
19 sitting across the street.  What are you sitting
20 on?
21    A   A wall.
22    Q   What was the nature of the property

50

1 across the street where -- in the vicinity of the
2 wall you were sitting on?
3    A   It was a -- just a house.
4    Q   Was it a vacant house?
5    A   I believe so.  It belongs to Ms. Cole.
6 It was -- I think she was not there anymore.
7    Q   Okay.  Do you remember any no
8 trespassing signs or private property signs that
9 were in the vicinity of the house where you were
10 sitting on the wall?
11    A   Yes.  There was a no trespassing sign
12 on the door of the house.
13    Q   What about in the lawn?
14    A   Not on the lawn.
15    Q   What about on the wall?
16    A   Not on the wall.
17    Q   So the only no trespassing sign or
18 private property sign that you remember was on
19 the door of the house?
20    A   That's correct.
21    Q   So the police pull up in a gray truck,
22 right?

51

1    A   Uh-huh.
2    Q   Yes?
3    A   Yes.
4    Q   And they don't say anything to you and
5 you just say they jumped out of the truck?
6    A   Yeah.  They just jumped out of the
7 truck and came to me.
8    Q   Okay.  How many officers were in the
9 truck?
10    A   It was three.
11    Q   And do you recall -- well, did all
12 three of the officers jump out of the truck at
13 the same time?
14    A   Yes, they did.
15    Q   And do you have any understanding as
16 to why the officers stopped their truck?
17    A   No reason why.
18    Q   Okay.  Who else was with you when you
19 were sitting outside?
20    A   My brother.
21    Q   What's his name?
22    A   Lamont Brown.

52

1     Q     And where was Lamont Brown?
2     A     Inside his vehicle.
3     Q     Inside his car?
4     A     Uh-huh.
5     Q     Was anyone else with you?
6     A     No.
7     Q     Was anyone else in the vicinity?
8     A     No.
9     Q     No one walking around?
10    A     Not that I know of.
11    Q     No one was sitting with you on the
12 wall?
13    A     No.
14    Q     No one was in your brother's car with
15 him?
16    A     No, it was just him.
17    Q     So tell me what happened once the --
18 so you said all three of the officers exited
19 their vehicle at the same time?
20    A     Yes.
21    Q     And you noticed that the officers had
22 clothing that identified them as police officers?

53

1     A     They didn't have police uniforms on.
2     Q     I didn't ask that.  I just asked if
3 they had clothing that identified themselves as
4 police officers?
5     A     They had a vest and I believe on the
6 back of it it said "police."
7     Q     Okay.  What about on the sleeves?
8     A     On the sleeves?  No, I don't remember
9 that.
10    Q     What about on the front of the vest?
11    A     I really don't remember.  It probably
12 said "police."
13    Q     It probably said police?
14    A     Yeah.
15    Q     Okay.  So then when the officers
16 exited their vehicle, based on what they were
17 wearing, is it fair to say that you knew they
18 were police officers?
19    A     Not necessarily.
20    Q     Well I'm asking you whether you
21 remember or not?
22    A     Just because you wear something that

54

1 say police, you don't have to be the police.
2     Q     Okay.  Well here's my question.  At
3 the time of the incident when the officers exited
4 the vehicle, do you recall noticing at that time
5 that they were police officers?
6     A     Not immediately, no.
7     Q     When did you first notice that they
8 were police officers?
9     A     I guess when they tackled me.
10    Q     Okay.
11    A     When they took my weapon.
12    Q     Did you notice prior -- so in between
13 the time the police officers exited the vehicle
14 and from when you said that they tackled you and
15 took your weapon, you did not notice them wearing
16 any type of clothing that identified that they
17 were in fact police officers?
18    A     They had vests on that said police.
19    Q     So why didn't you think that they were
20 police until they had tackled you and taken your
21 gun?
22    A     Anybody can go buy a vest that says

55

1 police.  That's not nothing that we can't go buy
2 on Amazon.
3     Q     Okay.  So you thought instead hey,
4 these three guys just got out of their vehicle.
5 They're telling me that they want to search me.
6 They're wearing clothes that say police on them,
7 and instead of thinking that they're police, I'm
8 going to think that they got their clothes from
9 Amazon and they may not be police?
10        MR. SHABAZZ:  Objection as to form.
11        THE WITNESS:  No.
12        MR. SHABAZZ:  Objection.
13        BY MR. GUEST:
14    Q     That's not what you were thinking?
15    A     No.
16    Q     Okay.  So I'm trying to understand
17 this.  Why did you not think that they were
18 police officers when they first exited their
19 vehicle and had clothing that said "police" on
20 it, and they asked you or they told you they
21 wanted to search you?
22    A     Because they didn't identify

60

1    A    Right before they tackled me and took
2  all my stuff.
3    Q    Right before?  Why?
4    A    They just tackled me and took all my
5  stuff.
6    Q    So like immediately before then is
7  when you first had the belief that these three
8  individuals were police officers?
9    A    Yes, immediately before that.
10   Q    And prior to that time -- well okay.
11  So they get out of the truck, right?  Right?
12   A    Uh-huh, yes.
13   Q    They're out of the truck, and you say
14  they tackled you and take your stuff, right?
15   A    Yes.
16   Q    How much time passed to your
17  recollection of when they exited their vehicle
18  and you say they tackled you and took your stuff?
19   A    I would say -- I would say it was over
20  20 seconds, because it was fast.
21   Q    Okay.  So less than a minute you're
22  saying?

61

1    A    Yes, less than a minute.
2    Q    Okay.  So in less than a minute, so
3  the officers get out of the truck, okay?  That's
4  what you're saying, right?
5    A    Yes.
6    Q    They don't say anything to you while
7  they're in the truck, right?
8    A    No.
9    Q    Okay.  So now they're out of the
10  truck, all three of them?
11   A    Yes they are, all three of them.
12   Q    Okay.  You don't know any of them,
13  right?
14   A    Don't know any of them.
15   Q    Never seen them before in your life?
16   A    Never seen them before.
17   Q    Okay.  They don't say anything to your
18  brother at the time or do they?
19   A    I'm not sure if they said anything to
20  my brother at that time, because I was -- they
21  was by me, so I really wasn't looking at my
22  brother.  I know he was just sitting in the car.

62

1    Q    Sure.  Where did they park in relation
2  to where your brother was parked?
3    A    My brother was parked on the -- on the
4  -- where you're supposed to park at on the side,
5  on the curb, on the side, you know, where you're
6  supposed to park at in D.C., and they just
7  stopped in the middle of the street.
8    Q    So they -- were they alongside your
9  brother, ahead of your brother, behind your
10  brother?
11   A    They were -- they were behind.
12   Q    Okay.  So the officers get out of
13  their truck, right, and then do -- how many of
14  the three officers approach you?
15   A    I think it was two of them.
16   Q    Okay, who?  Do you know what their
17  names were?
18   A    I know it was -- Pinto was the short
19  Asian one and Clifford was -- I know one of them
20  was ATF.  I'm trying to think.  I'm not sure of
21  the two, but I know for sure it was Pinto.  He
22  was there.

63

1    Q    You describe Pinto as short and Asian?
2    A    Was he short, Asian?
3    Q    I'm asking you about that.
4    A    I know he was a short and had a real
5  low cut.
6    Q    Okay.  So someone who's short, someone
7  who you believe is an Asian, and someone who has
8  a short haircut is one of the officers that
9  approached you?
10   A    Yes.
11   Q    Okay.  Who, if you don't remember
12  their names, describe the other officer who
13  approached you?
14   A    He was white with brown hair?  He had
15  kind of like taller hair.
16   Q    Taller hair?
17   A    Yes, like longer hair.
18   Q    All right, and you don't remember who
19  that was, in terms of his name?  You don't know
20  what his name is?
21   A    I don't remember his name.
22   Q    All right.

64

1      A    What are the three, what are their
2  three names?
3      Q    You sued them.
4      A    Huh?
5      Q    Do you know any of the three names of
6  the officers that you sued initially?
7      A    Maurice Clifford, Pinto and a third
8  one who I -- I don't know.
9      Q    Okay.  The third one, his name is Ryan
10  Roe, and you understand he's not in the lawsuit
11  anymore, right?
12      A    Right.
13      Q    So there's two officers in the
14  lawsuit, Scott Pinto and Maurice Clifford.
15      A    Scott Pinto and Maurice Clifford.
16      Q    So you're saying the short Asian guy
17  and a white guy with brown hair are two of the
18  officers that approached you?
19      A    Yes.
20      Q    All right.  What was the other officer
21  doing?
22      A    He was -- he was out the vehicle.

65

1      Q    What was he doing?
2      A    I'm not -- I'm not sure.
3      Q    Okay.  You don't know what his name
4  was, what he looked like?
5      A    I don't remember what he was doing.
6      Q    I didn't ask you that.  What did he
7  look like?
8      A    I don't recall.
9      Q    Okay.  So he's doing something and you
10  don't know what he's doing?  How do you know he's
11  out of -- out of the car, out of the truck?
12      A    Because I seen when all three of them
13  got out the truck.
14      Q    Okay.  So one of the three officers is
15  out of the truck.  You don't know what he's doing
16  though?
17      A    No.
18      Q    Okay.  Two of the officers approach
19  you?
20      A    Yes.
21      Q    Okay.  One of the officers says "Stand
22  up so I can search you."  Is that the first thing

66

1  one of the officers said to you on this date that
2  we're talking about?
3      A    Yes.
4      Q    First thing out of their mouth is
5  "Stand up, I want to search you"?
6      A    Yes.
7      Q    Okay.  You say, as you testified
8  earlier no, I'm not going to let you search me?
9      A    Right.
10      Q    Right, okay.  And immediately they
11  came back, as you said, and asked you if you had
12  any weapons?
13      A    Yes.
14      Q    And you say, as you testified earlier,
15  "Yes, I have a gun, badge and credentials,"
16  right?
17      A    Yes.
18      Q    Okay.  Then you said that's when the
19  officers, as you describe, jump on you?
20      A    Yes.
21      Q    Okay.  So two officers approach you,
22  this exchange happens, and then you said they

67

1  jump on you.  Did both of those officers jump on
2  you at the same time?
3      A    Yes.
4      Q    Okay, and describe for me exactly what
5  happened?  What do you mean they jumped on you?
6      A    They just jumped on me.
7      Q    What does that mean?
8      A    They just --
9      Q    You have to describe the scene for me.
10      A    Like tackled, tackled me.
11      Q    How?
12      A    Like they just tackled me, just
13  charged me?
14      Q    Charged you?
15      A    Yes.
16      Q    Okay.  So what part of your body did
17  they touch first?  You're sitting on this wall,
18  right?
19      A    Yes.
20      Q    They're in front of you, right?
21      A    Yes.
22      Q    And they say -- you say they charged

72

1      A    Pinto.
2      Q    And that's the guy you're describing
3  as short and Asian?
4      A    Yeah.
5      Q    Why did you say "no, you can't search
6  me"?
7      A    Because I don't need to be searched.
8  I didn't do anything.
9      Q    Okay.  Any other reason why you did
10  not stand up so they could search you?
11     A    Because if I stand up, I wouldn't be
12  controlling the situation.
13     Q    Why is that?
14     A    Because I need to let them know, I
15  needed to control the situation.
16     Q    Okay.  So you believe by refusing to
17  stand up to be searched and remaining seated,
18  when there are two people in front of you that
19  have police on their clothing, that that was
20  controlling the situation?
21     A    Yes, it was controlling the situation.
22     Q    In your mind?

73

1      A    Yes, in my mind I was controlling the
2  situation.
3      Q    And then the next thing the cop or the
4  officers say to you -- well, do you know which of
5  -- no, you said Pinto said "Stand up so I can
6  search you."  Which of those two officers asked
7  you if you had any weapons?
8      A    It was him.
9      Q    The same guy?
10     A    Yes.
11     Q    And the next thing you said was yeah,
12  I have a gun, badge, credentials, right?
13     A    Yes, I'm MPD.
14     Q    Well when did you say "I'm MPD,"
15  after?
16     A    Right.  I did say gun, badge,
17  credentials, I'm MPD.
18     Q    Okay.  And then they basically do a
19  tactical takedown?
20     A    I never learned that tactical
21  takedown.
22     Q    You don't know what that is?

74

1      MR. SHABAZZ:  Objection.
2      THE WITNESS:  Well, I wasn't taught
3  that in the Academy, what they did.
4      BY MR. GUEST:
5      Q    Do you know what it is?
6      A    Yeah, I know what a tactical takedown
7  is.
8      Q    Okay.  That's what I'm asking you, did
9  they perform a tactical takedown?
10     MR. SHABAZZ:  Objection as to form.
11     THE WITNESS:  They just tackled me.
12     BY MR. GUEST:
13     Q    Okay.  What's a tactical takedown?
14     A    Tactical takedowns, like when you grab
15  someone's arm or something like that, and you
16  slam them to the ground.
17     Q    Okay, and the officers that you say
18  tackled you, they did that?  They took you down.
19  They grabbed your arms and they flipped you over
20  to restrain you in handcuffs, right?
21     A    No, they didn't grab my arms.  They
22  just tackled me.  They just hit me in the front.

75

1      Q    Okay.  Were they laying on top of you?
2      A    Yeah.
3      Q    They were laying on top of you, both
4  officers?
5      A    They just both came.
6      Q    I'm not asking you that.  I'm asking,
7  I'm asking what happened?  I need to know the
8  specific details, and I'm asking you, when you
9  say that they tackled you, jumped on you, were
10  they laying on top of you?
11     A    Yes, they were laying on top of me.
12     Q    Their bodies were on your body?
13     A    Yes, their bodies were on my body.
14     Q    What, were they kneeling with their
15  hands on you or were they kind of like belly-
16  flopping on you?  I mean how were they laying?
17     A    It was a belly flop, and then the
18  other one was putting his knee on my neck.
19     Q    Okay.  So somebody's entire body with
20  their stomach was on you?
21     A    Yes.
22     Q    Okay.  Who was that?

76

1    A    Pinto.
2    Q    Okay, the short Asian guy?
3    A    Yes.  I'm not sure if he's Asian.  I'm
4  saying what his look.
5    Q    I understand.  He wasn't white?
6    A    His skin was.
7    Q    Well, you're describing him as Asian.
8  Is he --
9    A    Well, Asian people are white.
10    Q    Was he -- was he someone that you
11  would describe as Caucasian?
12    A    His skin color was, you know, the
13  same.
14    Q    Okay.  But you just --
15    A    I don't want to get stuck up on like,
16  you know, ethnicity, right.  His skin wasn't
17  brown like mine.
18    Q    Right.  He wasn't a black guy?
19    A    He wasn't a black guy.
20    Q    In your opinion?
21    A    He wasn't a black guy.
22    Q    Okay.  Wasn't a Latino guy in your

77

1  opinion?
2    A    He could have been Latino.
3    Q    He could have been Latino, could have
4  been of Asian descent?
5    A    Yeah, it could have been Latino or
6  Asian descent, yeah.
7    Q    But you didn't think he was a
8  Caucasian male?
9    A    Uh-uh.  Like I said, his skin was --
10  all the skin the same.
11    Q    All right.  So who put their knee on
12  your neck?
13    A    Not Pinto.
14    Q    Okay, the other guy?
15    A    The other guy, yes.
16    Q    And at this time, where's the third
17  officer?
18    A    He's over there on my right side.
19    Q    Oh, so he came and -- came over?
20    A    Yes.
21    Q    So you're on your stomach at this
22  point?

78

1    A    Yes.
2    Q    Okay, and everything we've talked
3  about that's taken place you say happened in
4  about 20 seconds?
5    A    Yeah.  It was all that was like pretty
6  fast, under a minute.
7    Q    Okay.  How many times after they
8  restrained you did you say you were MPD?
9    A    I said it several times.
10    Q    How many?
11    A    Several, more than three.
12    Q    More than five?
13    A    I'm saying that's more than three.
14    Q    More than five?
15    A    I just kept saying it.
16    Q    How many times?
17    A    I can't recall, but I know I said it
18  more than three.
19    Q    More than ten?
20    A    I don't think it was that many times.
21    Q    All right.  So between three and under
22  ten?

79

1    A    Yeah, there we go.
2    Q    All right.  So now you're on your
3  stomach.  How long did it take the officers to
4  place you in handcuffs?
5    A    Immediately.  Like I said, I didn't
6  resist.
7    Q    All right.  You said you didn't
8  resist?
9    A    No.
10    Q    Okay.  So while you're in handcuffs,
11  you're under -- are you still on your stomach?
12    A    Yeah.  So I'm still on my stomach and
13  they flip me over.
14    Q    Okay, or did they flip you over are
15  you lying on your back, or did they flip you over
16  where you're sitting back on the wall?
17    A    Yeah, they flipped me over.  I was
18  sitting back on the wall.
19    Q    Okay.  So you're in handcuffs, you're
20  sitting on the wall now?
21    A    Yes.
22    Q    All right.  Tell me what happens next.

80

1    A    So I'm talking to them, and I kept
2  telling them that, you know, just take out my
3  credentials out of my back pocket and just put
4  them on the ground, because you could see my
5  badge because it was showing, and that was it.
6  They just called an official.
7    Q    Okay.  What were you talking about?
8    A    No, I just told them, I'm like -- just
9  told them that they fucked up.
10    Q    Okay.  Did you say anything other than
11  they fucked up?
12    A    I just kept telling them that I -- I
13  told them I was police.  I'm like yeah, what
14  y'all did was messed up.  Y'all fucked up.
15  That's it.
16    Q    What, say that again?
17    A    I just told them that I -- I kept
18  telling them I was the police and that they
19  fucked up.
20    Q    Oh okay, and tell me what kind of
21  clothes you were wearing that day?
22    A    Tan pants, green shirt and a coat.

81

1    Q    What kind of coat?
2    A    It was a black jacket.
3    Q    Was it buttoned up or zipped up?
4    A    It was open.
5    Q    Okay, and you say that you had your
6  badge on the front of your right hip?
7    A    Yes.
8    Q    And I think you said, I wasn't sure
9  though, do you believe that your badge was
10  visible based on where you were wearing it and
11  the clothes you were wearing?
12    A    It was visible.
13    Q    Okay.  Okay, and you believe that --
14  why do you say it was visible then?
15    A    Because it was.
16    Q    Okay.  And you said that then they
17  called the officials?
18    A    Yes.
19    Q    And who was the officer that made the
20  decision to call the officials?
21    A    Clifford.
22    Q    Clifford, and which one's Clifford

82

1  again?
2    A    The one with the longer hair.
3    Q    Okay.  So how long transpired before,
4  or between when you were flipped back over,
5  sitting on the wall, they called the officials?
6    A    What you mean, how long transpired?
7        MR. SHABAZZ:  Objection as to form.
8        BY MR. GUEST:
9    Q    So you -- they put, you're sitting
10  back on the wall and then they called the
11  officials, right?
12    A    Correct.
13        MR. SHABAZZ:  Objection as to the
14  form.
15        BY MR. GUEST:
16    Q    When you're saying that they called
17  the officials, that means Internal Affairs,
18  right?
19    A    No.  They just called their official.
20    Q    Who's their official?
21    A    Whoever's the official or the watch
22  commander for their unit.

83

1    Q    Okay.  So why do you think they did
2  that, based on your knowledge as an MPD officer?
3    A    Because they messed up.
4    Q    That's what you think?
5    A    That's what I know.
6    Q    Okay.  So the official, does the
7  official come to the scene?
8    A    Yes, he comes to the scene.
9    Q    Okay.  Now based on your recollection,
10  how long went by from the time that one of the
11  officers called their official and the official
12  showed up?
13    A    It was over an hour.
14    Q    Okay, and what happened after the
15  official showed up?
16    A    The official let me out of handcuffs,
17  and then gave me my -- he told me to go talk to
18  Internal Affairs, because they were on the scene
19  too.
20    Q    Okay.
21    A    Then they gave me my gun and my stuff
22  back.

92

1  the sergeant I guess.  My understanding is what
2  the sergeant said, oh okay; what Internal Affairs
3  said, oh okay.  They didn't go into any more
4  detail about their views on what happened to the
5  scene that they were called to?
6        MR. SHABAZZ:  Objection as to form.
7        THE WITNESS:  No.
8        BY MR. GUEST:
9    Q    They did not express any views to you?
10   A    No, that was done later.
11   Q    They did not say oh, they fucked up or
12  anything like that, referring to the officers?
13   A    That was later.
14   Q    Okay, that was later?
15   A    Yeah, days later.
16   Q    Okay.  Anyone else show up to the
17  scene that we haven't already talked about,
18  including people who may not have known, worked
19  for or affiliated with MPD that you can remember?
20   A    Oh, like I said, Lamont Brown and it
21  was Marquette Austin.  He was out there.  I know
22  he spoke to them.

93

1    Q    Sure.
2    A    That was it.
3    Q    And what was going on with your
4  brother during this time?  I'm talking about from
5  the time the truck pulls up until you're let go,
6  what's your brother doing?
7    A    I believe they arrested him.
8    A    I think they did.
9    A    Yeah, I believe they arrested him.
10   Q    Okay.  What did they arrest him for?
11   A    They said for a suspended license.
12   Q    Okay, and at the time your brother's
13  license was suspended?
14   A    I'm assuming so, since they arrested
15  him.
16   Q    Okay.  So he was taken away from the
17  scene?
18   A    Yeah, I think he was.
19   Q    Was he taken away from the scene
20  before any of these other people we talked about,
21  the sergeant, lieutenant, Internal Affairs or
22  Crime Scene showed up to the scene?

94

1    A    To be honest with you, I was away from
2  that area where he was at, so I don't know when
3  he was taken away.
4    Q    Okay, and you said that the first of
5  these individuals who was called to the scene
6  showed up was over an hour after you were
7  detained?
8    A    Yes.  I was in handcuffs for all that
9  time.
10   Q    Yeah, and I'm asking you say over an
11  hour, what does that mean?  Well, I know what it
12  means, but how can -- can you give me a more
13  specific time frame that you recall having been
14  in handcuffs?
15   A    It was over an hour because it was
16  daytime outside at the time, and by the time I
17  was out of handcuffs, it was dark.
18   Q    Okay.  So you believe it's over an
19  hour.  Was it an hour and a half, hour and 15
20  minutes?
21   A    It just was over -- I know for a fact
22  it was just over an hour.  It was over an hour.

95

1    Q    So it could have been approximately an
2  hour in mind?
3    A    It could have ranged from an hour to
4  an hour and 45, the hour or two hours.  I just
5  know it was over an hour.  I gave you an
6  approximate time.
7    Q    You think it could have been over two
8  hours?
9    A    No.  It was over an hour, under two
10  hours.
11   Q    All right, and you can't tell me
12  anything more specifically than that?
13   A    No.
14   Q    Okay.  So you're sitting on this wall
15  the entire time in handcuffs, waiting for other
16  individuals to respond to the scene?
17   A    Correct.
18   Q    Okay.  So what are you doing?  Are you
19  just sitting there?  Are you talking to these
20  officers who detained you?  What's going on?
21   A    I was sitting there.  I was -- like I
22  said, I didn't have anything else to say to them.

96

1   Q   Okay.  Are they talking to you?  Are
2 they engaging you?
3   A  They were talking.
4   Q  What were they saying?
5   A  I don't remember.
6   Q  You didn't say anything to them?
7   A  No.  I didn't really have too much to
8 say after that.
9   Q  Okay.  So they basically got you
10 detained, got you in handcuffs.  They're going
11 about their business, you're just sitting there?
12   A  I just probably was rambling.
13   Q  What were you rambling about?
14   A  That they -- what they did was messed
15 up.
16   Q  Okay.  Did you talk -- did you make
17 those kinds of comments the entire time you were
18 waiting for other officials to show up while
19 you're in handcuffs sitting on this wall?
20   A  No, not the entire time.
21   Q  Okay.  Did you say anything to them
22 other than that they messed up?

97

1   A  I asked them to take me out of
2 handcuffs.
3   Q  Okay, and what did they say?
4   A  No.
5   Q  Why, to your knowledge?
6   A  I don't know why.
7   Q  Did they say why they were leaving you
8 in handcuffs?
9   A  They ain't have no reason to.
10   Q  Okay.  They had no reason to?
11   A  No.
12   Q  Okay.
13   A  I don't know why.
14   Q  You've got to use the restroom man?
15 Is that what you said?
16   A  No, I said I don't know why --
17   Mr. Robinson, I'm sorry.
18   A  No, I didn't know why I was in
19 handcuffs for.
20   Q  Oh, gotcha.  If you need to take a
21 break, I mean let me know, because we've been
22 going for a while, and I've got many more

98

1 questions, you know, to go through.  So are you
2 good?
3   A  Uh-huh, yes.
4   Q  Okay.  What time do you recall the
5 truck arriving in the location where you were
6 sitting on the wall?
7   A  It was probably around like 4:00,
8 4:20-ish p.m.
9   Q  Okay.  So what did you -- were you on
10 duty at all during -- well, you're off duty,
11 right?  I mean at this time, you're not on duty
12 as a police officer?
13   A  Right.  I was off duty.
14   Q  Did you work that day?
15   A  No.
16   Q  So what did you do?  Kind of just tell
17 me about your day leading up to this time where
18 the truck arrived where you were?
19   A  I was sitting there waiting to pick up
20 my kids.
21   Q  Okay.  Well what were you -- I'm
22 talking about the day, your entire day before

99

1 this happened.  What did you do that day?  You
2 didn't work, so what did you do?
3   A  I just lounge around.  Like I said, I
4 might go to the school with the kids.  I do the
5 fish tank for the school.  I'm real active at the
6 school, so probably just hanging out at the
7 school with the kids.
8   Q  So you -- what time did your kids go
9 to school?
10   A  From 8:45 to what's that, school get
11 out around like 4:30.  So school is from 8:45 to
12 6:00.
13   Q  So your kids leave the house early in
14 the morning, right?
15   A  Yes.
16   Q  They're in school all day?
17   A  Yes.
18   Q  What are you doing?
19   A  Working out?
20   Q  Working out where?
21   A  At the gym.
22   Q  Okay.  What else did you do?

104

1    A    No.
2    Q    Okay.  So what was going on with James
3    and Lamont?
4    A    I don't really remember.  I think it
5    probably was over brakes or something like that
6    and then it got heated, and I just went out there
7    to just talk to him.
8    Q    Okay, and James was not there?
9    A    No, he wasn't there.
10   Q    And so what did you and Lamont talk
11   about?
12   A    I just asked him what happened.
13   Q    What did he tell you?
14   A    I really don't remember.
15   Q    All right.
16   A    And just was sitting out there just
17   talking to him.
18   Q    Was it upsetting to you whatever he
19   was telling you?
20   A    Yeah, it was -- it wasn't upsetting
21   for me, but it was just petty, kind of like a
22   petty argument, that was all.

105

1    Q    So hearing about the petty argument,
2    did it make you agitated or anything like that?
3    A    No.  I just was --
4    Q    This was -- I'm sorry.
5    A    I just like oh, y'all need to not
6    worry about stupid stuff like that.
7    Q    Okay.  So how long had you lived in
8    that house that was in the 5500 block of C
9    Street?
10   A    All my life.
11   Q    And at the same time, did you have the
12   other place up on Horner Place?
13   A    Yes.
14   Q    Okay, and so at that time, at the time
15   we're talking about the incident in November
16   2013, you would split time living at this place
17   and the Horner Place residence?
18   A    Yes.
19   Q    And so you're pretty familiar with the
20   5500 block of C Street?
21   A    Yes.
22   Q    All right, and how would you describe

106

1    that environment, that area, that part of town?
2    A    C Street is great.  It's a lot of
3    houses on the street, you know.  People have been
4    there all their lives.
5    Q    Okay.  So you know a lot of the
6    neighbors?
7    A    I know all of my neighbors.
8    Q    Okay.  Around the time when you were
9    stopped, do you know if there were -- I'm talking
10   about maybe the months leading up to this, would
11   you describe it as an area that had a lot of
12   crime?
13   A    C Street doesn't have any crime, but
14   the probably surrounding areas.  But not C
15   Street, no.
16   Q    And when you say "the surrounding
17   areas," how big of an area are we talking about?
18   A    That's the 6th District, so you know,
19   it's booming.  It's pretty -- it can be almost
20   anything.
21   Q    And when you say it's booming, that
22   means that it's a high crime area?

107

1    A    Southeast.  All of Southeast is pretty
2    much high crime if you want to classify it as
3    that.
4    Q    Sure.  It's an area where there's a
5    lot of illegal drug activity?
6    MR. SHABAZZ:  Objection as to form.
7    THE WITNESS:  There's no drugs on C
8    Street.
9    BY MR. GUEST:
10   Q    Well, I'm not saying specifically C
11   Street, but I'm saying the surrounding area where
12   you testified that there's -- it's a high crime
13   area, you would also agree that there are --
14   there's illegal drug use in that surrounding
15   area, right?
16   A    No, I wouldn't say that.
17   Q    Okay.  Just high crime, right?
18   A    Honestly, it's really nothing goes on
19   around that.
20   Q    Had you been drinking that day?
21   A    No, I didn't drink.
22   Q    Were you ever in the car with your

108

1  brother?
2      A    No.
3      Q    When he was arrested, what happened to
4  his car?
5      A    Honestly, I'm not sure.
6      Q    All right.  So your mom's around.  Did
7  she ever come out during this whole incident that
8  happened from her house?
9      A    Yes.  I told her to go back home.
10     Q    So tell me about that.  What happened?
11     A    I told her just go back in the house.
12     Q    When did she first see you?
13     A    I would say after everything
14 transpired.
15     Q    So does that mean after you were
16 released from handcuffs?
17     A    It was -- I think I was still in
18 handcuffs around that time when she came over.
19     Q    You think or you know?
20     A    No, I think.  Yeah, I believe I was
21 still in handcuffs during that time she came
22 over.

109

1      Q    So your mom comes out of the house,
2  approaches you.  You're sitting on the wall in
3  handcuffs and you just say -- what did she say to
4  you?
5      A    She asked me what's going on.
6      Q    Okay, and what did you say?
7      A    I just told her to go back in the
8  house.
9      Q    That was it?
10     A    Yeah.
11     Q    You didn't say anything else?
12     A    No.
13     Q    She never came back out?
14     A    Nope.
15     Q    What's her name?
16     A    Rose.
17     Q    Rose --
18     A    Robinson.
19     Q    Robinson.  Going back to these three
20 officers, you said that you had never seen them
21 before in your life, right?
22     A    Yeah, I never seen them before.

110

1      Q    Don't know anything about them?
2      A    Don't know anything about them.
3      Q    Still don't know much about them?
4      A    Still don't know anything about them.
5      Q    Okay.  You mentioned that there was a
6  knee on your neck during the time that you were
7  being detained, is that right?
8      A    Yes.
9      Q    Okay.  How long did one of the
10 officers place his knee on your neck?
11     A    His knee was on my neck the whole time
12 I was on my stomach.
13     Q    How long was that?
14     A    I would say under ten seconds.
15     Q    Okay, and you said another officer was
16 laying on you?
17     A    Initially.
18     Q    Yeah, right.  That's what you said,
19 initially.
20     A    Yeah.
21     Q    How long did that last?
22     A    Not long.

111

1      Q    For how long?
2      A    A couple of seconds.
3      Q    Okay.  So do you think, based on your
4  experience as a police officer, that the two
5  officers who were involved in that situation with
6  you, were restraining you on your stomach for
7  purposes of putting you in handcuffs?
8      A    Yeah.
9      Q    Okay, and they were taking actions
10 that you would take as a police officer to
11 restrain someone and put them in handcuffs?
12     A    No.
13     Q    You don't think?
14     A    No.
15     Q    Why not?
16     A    Because you don't have to knee anybody
17 in the neck.
18     Q    Okay.
19          (Pause.)
20          BY MR. GUEST:
21     Q    How long had you been talking to your
22 brother before the police officers showed up?

112

1     A    I would say probably for like 30
2  minutes, 30, 30 minutes.
3     Q    You all right, man?  30 minutes?
4     A    Yeah, probably around that time, a
5  little more.
6     Q    And when the officers approached you
7  initially, got out of the car and approached you
8  and you were sitting on the wall, how would you
9  describe your demeanor or your behavior at that
10  time?
11     A    It was really relaxed.
12     Q    Do you have any other words you can
13  use to describe yourself?
14     A    Like I said, I was just relaxed.
15     Q    Okay, and when the officers first told
16  you -- when the first words out of the officer's
17  mouths to you were "stand up so I can search
18  you," and you said no, right?  We already talked
19  about that.  Do you remember that?
20     A    Yes.
21     Q    Okay.  Would you describe your
22  attitude as being maybe a little stubborn or

113

1  indignant?
2     A    No.
3     Q    Would you say that your attitude was
4  somewhat defiant to these police officers?
5     A    No, I won't say I was defiant.
6     Q    Well, how would you describe yourself,
7  because you were not complying with their
8  request.  So how would you describe how you were
9  behaving?
10     A    My behavior was --
11        MR. SHABAZZ:  Objection as to form.
12        THE WITNESS:  My behavior?  It was
13  relaxed.  I was in a relaxed state.  My behavior
14  wasn't agitated or nothing like that, so I was
15  relaxed.
16        BY MR. GUEST:
17     Q    Okay.  Did you ever tell the officers
18  that they weren't going to take your gun?
19     A    No.
20     Q    Okay.  And you were never technically
21  arrested, right?
22     A    No.

114

1        MR. SHABAZZ:  Objection as to form.
2  Objection as to form.
3        THE WITNESS:  I never went to jail,
4  no.
5        MR. GUEST:  So you were never
6  arrested?
7        MR. SHABAZZ:  Objection as to form.
8        THE WITNESS:  I was placed in
9  handcuffs.
10        MR. GUEST:  Right, but we had already
11  talked about earlier today the difference between
12  a stop and an arrest, and you were never
13  technically arrested?
14        MR. SHABAZZ:  Objection as to form.
15        THE WITNESS:  Uh-huh, yeah.  I would
16  say that, I wasn't arrested.
17        BY MR. GUEST:
18     Q    Okay.  You said you --
19     A    Wasn't.
20     Q    Was not, okay.  At the time the truck
21  pulled up, based on your training and experience
22  was an MPD officer, do you think that there was

115

1  any situation involving your brother and his car
2  that would have prompted the officers to stop by
3  his car?
4     A    No, because that's the GRU, the Gun
5  Recovery Unit.  So he don't carry any guns.
6     Q    Okay.  So because it's your
7  understanding that the Gun Recovery Unit just
8  looks for guns, that they had no reason to pull
9  along the side of your brother's car?
10     A    No reason whatsoever.
11     Q    Okay.  Let me ask you this.  As a
12  normal on duty officer just on patrol, is there
13  anything you remember about the circumstances
14  involving your brother's car that would have
15  prompted just a normal on duty police officer to
16  stop by your brother's car and see what was
17  happening?
18     A    Nothing at all.
19     Q    Okay, and what about -- do you know if
20  he was illegally parked?
21     A    He was parked legally.
22     Q    Legally?

116

1    A   Yes.
2    Q   Okay, and do you think that there was
3    anything relating to your behavior that may have
4    prompted the GRU officers in particular to pull
5    over and check out what was going on?
6    A   No.
7    Q   Same question for if you're a routine
8    patrol officer on patrol, on duty, seeing your
9    brother in a car, seeing you on the wall, do you
10   think there was any reason for them to pull
11   alongside and see what was going on?
12   A   None whatsoever.
13   Q   Okay, and did you ever ask any of the
14   officers why are you approaching me?  Why are you
15   talking to me?  What are you doing?
16   A   No.
17   Q   Okay.  Now after you were placed in
18   the handcuffs and you said, you know, you guys
19   fucked up or you messed up or whatever it was,
20   were you angry at that time?
21   A   Yes, I was upset.
22   Q   Okay.  Were you using other swear

117

1    words at that time?
2    A   Not that I recall.
3    Q   Okay.  Prior to being placed in
4    handcuffs, did you use any profanity with the
5    officers?
6    A   No.
7    Q   Okay.  Did you ever tell any of the
8    officers I'm not going to do what you say before
9    being placed in handcuffs, aside from saying I'm
10   not going to stand up so you can search me?
11   A   No, I didn't tell them I wasn't going
12   to do what they say.
13   Q   Okay.  In general, you never said oh,
14   I'm not going to do what you say?
15   A   Yeah, I never said that.
16   Q   You just said I'm not going to stand
17   up so you can search me?
18   A   Yeah, I just said that.  I'm not
19   standing up to be searched.
20   Q   Okay, okay.
21   A   Like I'm not letting you search me.
22   Q   Okay.

118

1    (Pause.)
2    BY MR. GUEST:
3    Q   So about 20 seconds passes, under a
4    minute passes from when the police officers exit
5    their vehicle and put you in handcuffs?
6    A   Yeah.  All that was under a minute.
7    Q   And one guy had -- one officer had his
8    knee on your body for under ten seconds, and the
9    other officer was contacting your body for just a
10   couple of seconds, right?
11   A   Yes, that sounds about right.
12   Q   And when they -- when they put you on
13   your stomach, did they in your opinion harm any
14   other parts of your body that we haven't talked
15   about?
16   A   Like I say, tackled me, knee, turned
17   over, I turned over.  There was a knee on my
18   neck, my arms behind my back.
19   Q   Okay, and that's it?
20   A   And then they were putting the
21   handcuffs on me.
22   Q   Okay.  Any way about in how the

119

1    handcuffs were put on you that hurt your body?
2    A   Yes.
3    Q   Tell me about that?
4    A   To position the handcuffs, messing
5    with my shoulders and stuff.
6    Q   Okay.  Problems with your shoulders?
7    A   Yeah, because they had the handcuffs
8    on funny.  My hands were funny.
9    Q   Anything else that happened that hurt
10   your body?
11   A   The handcuffs being left on me for so
12   long.
13   Q   Yeah, you talked about that.  Anything
14   else?
15   A   Other than the knee and the -- that's
16   about it.
17   Q   Okay, and then I think your counsel
18   had, you know, some sort of medical record
19   reflecting that you went to, you know, seek some
20   kind of -- you went to see a doctor, right?
21   A   Yes.
22   Q   Where did you go?

120

1    A   Kaiser.
2    Q   Okay.  That's up the street from here,
3  right?
4    A   I went to the Kaiser in Camp Springs.
5    Q   Okay gotcha, so and how, what, tell me
6  about that doctor's visit?
7    A   She said I had a muscle strain and
8  they prescribed me Flexeril.
9    Q   Okay, and what's Flexeril?
10   A   That's a muscle relaxer.
11   Q   How long did you -- did you take that?
12   A   Yes.
13   Q   How long did you take it?
14   A   It was for ten days.
15   Q   Okay, and did you actually see a
16  doctor or was it the nurse practitioner?
17   A   No, I actually seen my doctor.
18   Q   A doctor.
19   A   My primary care physician.
20   Q   Got it, got it.  So you were diagnosed
21  with a strain; you take a muscle relaxant for
22  about ten days, right?

121

1    A   Yes.
2    Q   Did the doctor tell you anything else
3  to do to deal with any kind of situation you were
4  dealing with?
5    A   Ice.
6    Q   Okay.
7    A   Ice on my neck and stuff like that.
8    Q   Okay.  So you've got the neck strain,
9  right?
10   A   Yeah, and my neck and my shoulders.
11   Q   Okay, and then after -- you know, you
12  never -- did you ever seek treatment subsequently
13  for anything that you claim hurt your body as a
14  result of this incident?
15   A   Yeah.  That's what I went to the
16  doctor for, for that.
17   Q   That's what I'm saying.  Anything
18  other than the visit to your doctor that occurred
19  the day after, that relates to anything that you
20  claim hurt your body relating to the incident?
21       MR. SHABAZZ: I have an objection as
22  to the form of the question.

122

1       THE WITNESS: Yeah.  I don't really
2  understand that question.
3       BY MR. GUEST:
4    Q   Yeah, sure.  It wasn't very clear at
5  all.
6    A   Yeah.
7    Q   The incident happens on November 6th?
8    A   Correct.
9    Q   You go see your doctor on November
10  7th?
11   A   Okay.
12   Q   You're diagnosed with some kind of
13  sprain, right?
14   A   Right, strain.
15   Q   You get a muscle relaxant for -- and
16  you take it for ten days.  Did you take it for
17  all ten days?
18   A   Yes.
19   Q   Was there any other time other than
20  that visit to your doctor that you sought medical
21  attention relating to any injuries that you claim
22  resulted from the incident on November 6th?

123

1    A   Oh yes.  I had to go to the Police and
2  Fire Clinic.
3    Q   Okay.  When was that?
4    A   The 7th.
5    Q   Same day?
6    A   Yes.
7    Q   Okay, and why did you go to the Police
8  and Fire Clinic?
9    A   Because I have to report any injuries
10  I sustained.
11   Q   And is that the only reason why you
12  went there?
13   A   It's mandatory.
14   Q   Right, that's what I'm saying.  That's
15  the only reason why you went there?
16   A   I had to go.
17   Q   You didn't have to go because you --
18  you didn't have to go for medical treatment,
19  because you had already seen your doctor, right?
20   A   Right.
21   Q   Okay.  So other than what we just
22  talked about, any other visits to any health care

132

1  right?
2      A    I did.
3      Q    You did?
4      A    Yes.
5      Q    Okay.  Tell me about that.
6      A    I had to go see the -- I think it was
7  the psychiatrist for D.C. government.  So they
8  made me go see them.
9      Q    They made you?
10     A    Yeah, they made me.
11     Q    Okay.  Did you want to go?
12     A    Yeah, I went.
13     Q    Did you want to go?
14     A    Yeah, I didn't have no problem with
15  it.
16     Q    All right.  What was the
17  psychiatrist's name?
18     A    I don't remember.
19     Q    When did you see the psychiatrist?
20     A    I believe it was in November.  I don't
21  know the exact date.
22     Q    November 2013?

133

1      A    Yeah, November 2013, yes.
2      Q    How many visits did you have with the
3  psychiatrist?
4      A    I think it was one.
5      Q    How long was the visit?
6      A    Probably a little less than an hour.
7      Q    What did you talk about?
8      A    She just asked me how I was feeling.
9      Q    What did you tell her?
10     A    She just asked me -- I told her I was
11  feeling good.  I don't have any problems.  Asked
12  me about relationships and stuff like that.
13     Q    Okay.  Did she prescribe you any
14  medications?
15     A    No.
16     Q    Did she recommend that you have visits
17  later with her?
18     A    No.
19     Q    Okay.  Why to your knowledge were you
20  made to go see the psychiatrist?
21     A    I was told because of the incident.
22     Q    Okay.  Do you have any understanding

134

1  based on being an MPD officer why you were
2  referred to and made to go see a psychiatrist
3  regarding the incident?
4      A    That's probably just protocol when
5  something like that happens.
6      Q    Okay.  Do you know if anybody else
7  involved in the incident was also referred to you
8  or saw a psychiatrist?
9      A    I'm not sure.
10     Q    Not sure.  So I'm looking at one of
11  the medical records that your attorney provided,
12  that says at the time of the visit on November
13  7th that you weighed about 225, 225 pounds?
14     A    Yes.
15     Q    Okay.  Is that about how big you are
16  now you think?
17     A    I'm a little bigger.
18     Q    Okay.  But back then you were 225?
19     A    Right.
20     Q    And what's your height?
21     A    5'10.
22     Q    Okay.  Do you know if there were any

135

1  investigations that occurred relating to the
2  incident?
3      A    I just know that Internal Affairs
4  investigated the whole incident.
5      Q    Okay.  Did you part in the
6  investigation?
7      A    I was asked information.
8      Q    And did you give that information?
9      A    Yes.
10     Q    Okay.  Do you know why an
11  investigation was conducted?
12     A    I don't.
13     Q    Did you -- well, what was the nature
14  of the investigation to your knowledge?
15     A    Honestly, I don't even know.
16     Q    You just knew there was an
17  investigation?
18     A    Yeah.
19     Q    And you knew there was an
20  investigation about the incident on November 6th?
21     A    Yeah, I just know there was an
22  investigation on November 6th.

136

1    Q    And that's all you knew about the
2  investigation?
3    A    Right.
4    Q    Do you know what the outcome of the
5  investigation was?
6    A    I was sent back to full duty.
7    Q    To what?
8    A    Full duty.
9    Q    For?
10   A    Full, F-U-L-L.
11   Q    Full, full duty.
12   A    Yes.
13   Q    Okay.  So let me understand that.
14  During the time the investigation was going on,
15  were you on limited duty?
16   A    I was on what they call non-contact.
17   Q    And when were you placed on non-
18  contact duty?
19   A    On the 7th.
20   Q    Of November?
21   A    Yes.
22   Q    Of 2013?

137

1    A    Yes.
2    Q    Okay, and how long did you remain on
3  non-contact duty?
4    A    For -- it was over a month.
5    Q    Is it your recollection that you were
6  -- well, so it was over a month is what you said?
7    A    Yes.
8    Q    And then after that time passed, you
9  were put back on full duty?
10   A    Yes.
11   Q    So is it your understanding that prior
12  to the beginning of 2014, you had returned to
13  full duty?
14   A    Yes, I did.
15   Q    And what does non-contact duty mean?
16   A    That you cannot have any contact with
17  the public as a police officer.
18   Q    Got it.  So what did you do during
19  your day-to-day duties when you were on non-
20  contact duty?
21   A    I just sat at the station.
22   Q    Okay.  Did more administrative work?

138

1    A    Yeah, correct.
2    Q    Because and let me, I just want to
3  clarify this.  When you were an MPD officer, I
4  mean you would go out and go on patrol, you had a
5  squad car, right?
6    A    Yes.
7    Q    Okay, and you would go about and make
8  arrests and respond to calls and things like
9  that, right?
10   A    Correct.
11   Q    And that was pretty much the same
12  during the entire time you were a police officer?
13   A    Yes.
14   Q    All right.  So you were on non-contact
15  duty for a month or so.  You returned to full
16  duty after the investigation is over?
17   A    Yes.
18   Q    And what did you recall the
19  investigation to conclude?
20   A    That I wasn't wrong in the findings,
21  and that I was able to get all my gun and my
22  badge and stuff back and go back to work.

139

1    Q    Okay.  So when you were on non-contact
2  duty, you did not have your badge and your gun?
3    A    No.
4    Q    Okay, and you believe that the
5  investigation determined that you were not wrong?
6    A    It did.
7    Q    It determined that you did nothing
8  wrong; is that true?
9    A    Yeah, I didn't do anything wrong.
10   Q    Okay.  What else do you know about any
11  investigation into the incident?
12   A    That I just know I was investigated,
13  and that they investigated the officers, and
14  that's all.
15   Q    Okay, and when you're saying
16  "investigated the officers," are you referring to
17  Pinto, Clifford and Roe?
18   A    Correct.
19   Q    And what do you know, if anything,
20  about the outcome of that investigation?
21   A    I really didn't keep track of what
22  happened to them.  I just know that they were all

168

1 communications to you or statements to you about
2 the Gun Recovery Unit?
3    A   Right.
4    Q   Okay.  You don't remember who they
5 were?
6    A   I don't remember any by name from
7 that.
8    Q   When did you talk to them?
9    A   Around that time.
10   Q   So we're talking about the end of
11 2013?
12   A   Correct.
13   Q   What did they tell you?
14   A   Just that's how they act and that's
15 what they do.
16   Q   What does that mean?
17   A   That's them.  I'm just telling you
18 that's what they said.
19   Q   What is "that's how they act" mean
20 specifically?
21   A   They just -- just aggressive like
22 that.

169

1    Q   Aggressive.  Did they use the term
2 "aggressive"?
3    A   Yeah.
4    Q   What else did they say?
5    A   I really don't remember, but I just
6 remember they said they're just aggressive like
7 that.
8    Q   Okay.  That's all you can remember
9 when you tell me about any of the conversations
10 you had with MPD personnel about this situation?
11   A   Yeah.  Right now, yes.
12   Q   Okay.  So where did the information
13 come from that said they acted like cowboys?
14   A   Came from another officer.
15   Q   So aggressive, act like cowboys?
16   A   Uh-huh.
17   Q   Yes?
18   A   Yes.
19   Q   Any other information that you can
20 specifically tell me aside from aggressive, act
21 like cowboys?
22   A   Pretty much that's about it.

170

1    Q   That's it, okay.  So we've got the Gun
2 Recovery Unit, you know.  Their job is to go
3 around and get guns off the street, right?
4    A   Right.
5    Q   Okay, and prior -- at the beginning of
6 the deposition, near the beginning, you told me
7 that that's all you knew about the Gun Recovery
8 Unit, right?
9    A   Right.
10   Q   Okay, and apart from anything that you
11 just told me about them being cowboys or acting
12 aggressively, or just seeing complaints about how
13 they do things, you don't have any other
14 knowledge about the Gun Recovery Unit?
15   A   Yeah, that's it.
16   Q   All right.  Do you think getting guns
17 off the street is important?
18   A   Yes.
19   Q   Do you think it's a valuable job for
20 the District of Columbia to be doing?
21   A   Yes.
22   Q   Do you think that getting guns off the

171

1 street at times can be dangerous?
2    A   It is.
3    Q   It is, because you're taking guns off
4 the street.  So you're putting yourself in danger
5 to accomplish that job, right?
6        MR. SHABAZZ:  Objection as to the
7 form.
8        THE WITNESS:  Being a police is
9 dangerous, period.
10       BY MR. GUEST:
11   Q   I agree.
12   A   It doesn't matter what you do in it.
13 It's just dangerous.
14   Q   Sure, because sometimes when you're a
15 police officer or you're in the Gun Recovery
16 Unit, you encounter people that have weapons,
17 right?
18   A   Everybody encounter people with
19 weapons.
20   Q   Right, that's what I'm saying.
21   A   Right.
22   Q   And when you encounter someone with

172

1  weapons, you're putting yourself in a dangerous
2  situations, right?
3      A   Yeah.
4      Q   Okay.  Or when you are encountering
5  people with weapons and believe you were in a
6  dangerous situation, then you take measures to
7  protect yourself, right?
8      A   Yeah or so.
9      Q   Okay.  So did you see any documents or
10  have any conversations with any officers that
11  specifically mention racial targeting?
12     A   That's what -- that's what they read
13  from the -- from the complainants that were
14  making the complaints.
15     Q   Did you see that?  Did you see
16  statements in the actual documents that you were
17  looking at on the database that said specifically
18  that there was racial targeting going on?
19     A   Yes, people stated it.
20     Q   So and then a couple of minutes ago
21  you told me you couldn't remember any of the
22  details in the documents?

173

1      A   Like I say, I don't have the exact
2  details.
3      Q   Then how can you remember that they
4  have racial targeting in the documents if you
5  said you don't have any of the details of the
6  statements that were contained in the documents
7  that you were looking at on the database?
8      A   Like I say, I can't give you pinpoint
9  information about --
10     Q   You just did.
11     A   That wasn't pinpoint.
12     Q   You just said you saw the word "racial
13  targeting."
14     A   I never said I seen the word racial
15  targeting.
16     Q   Okay.  That was my mistake then.  Did
17  you see any statements in the documents that you
18  were looking at on the database that dealt with
19  profiling?
20     A   That's what they were saying.
21     Q   So you have the specific memory now of
22  what the complainants were saying in the

174

1  documents you were looking at?
2      A   That was not specific, it just was
3  general.
4      Q   Then how -- so how is it general if
5  they're specifically saying profiling?
6      A   They didn't say profiling.  They're
7  just saying that --
8      Q   You just said it.  You just said that
9  you saw the word "profiling" in the documents
10  that you were looking at on the database.
11     A   Never said I seen the word
12  "profiling."
13     Q   Okay.  So we're clear on racial
14  targeting, we're clear on profiling.  Did you see
15  any information that indicated any harassment and
16  violations of constitutional rights of African-
17  Americans in the documents that you were looking
18  at on the MPD database?
19     A   Yes.
20     Q   Okay, tell me about that?
21     A   They said, you know, that the unit was
22  harassing people.

175

1      Q   Now that's different than saying that
2  the Gun Recovery Unit was engaging in harassment
3  and violations of constitutional rights of
4  African-Americans?
5          MR. SHABAZZ:  Objection as to the form
6  and characterization of the question.
7          THE WITNESS:  Like I said, that's the
8  only thing, the people that they mess with.
9          BY MR. GUEST:
10     Q   Okay.  So what are you talking about?
11     A   The only mess with blacks.
12     Q   Okay.  Did you see that in documents
13  or is that just your impression of reading
14  complaints about the Gun Recovery Unit?
15     A   That's what you see.  That's not what
16  -- it didn't say like we just target blacks, but
17  you know, on paper it say the race you are.
18     Q   Okay.  So let me just cut it, see if
19  I can clear this up.  You're looking at documents
20  from people who filed complaints, and some of
21  them you noticed were African-American?
22     A   Everybody was.

188

1    Q    Did you have any investigations after
2  the incident that occurred on November 6th, 2013?
3         MR. SHABAZZ:  Objection as to form.
4         THE WITNESS:  Yeah, but that don't
5  have nothing to do with this though.
6         BY MR. GUEST:
7    Q    What did it have to do with?
8    A    Not this.
9    Q    What did it have to do with though?
10   A    Nothing.
11   Q    Well, there was an investigation,
12  right?
13   A    But it doesn't have anything to do
14  with this.
15   Q    Right.  No, I'm asking what the
16  investigation that doesn't have anything to do
17  with November 6th, 2013 incident have to do with?
18   A    Nothing.
19   Q    So why was there an investigation?
20   A    It wasn't.  It was no prior -- no
21  investigation prior to the incident.
22   Q    No, I'm talking about after the

189

1  incident.  So after November 6th, 2013, were you
2  ever under an investigation at MPD?
3         MR. SHABAZZ:  Objection as to form.
4         THE WITNESS:  Yeah, but it doesn't
5  have anything to do with this.
6         MR. GUEST:  Okay, and I'm asking you.
7         MR. SHABAZZ:  You can answer.
8         THE WITNESS:  Huh?
9         MR. SHABAZZ:  You can answer.
10        BY MR. GUEST:
11   Q    I'm asking you what the investigation
12  had to do with?
13   A    Fleeing.
14   Q    Fleeing.
15   A    Uh-huh.
16   Q    And I provided your attorney a
17  document that I'm aware of that resulted in an
18  indictment, I believe, that dealt with fleeing,
19  is that right?
20   A    Uh-huh, correct.
21   Q    When did that occur, the incident, the
22  fleeing?

190

1         MR. SHABAZZ:  Objection as to form.
2         THE WITNESS:  In March 2014.
3         BY MR. GUEST:
4    Q    Okay, and were you disciplined as a
5  result of a fleeing?
6    A    Yes.
7    Q    What happened?
8         MR. SHABAZZ:  Objection, wait until I
9  answer.  Would you repeat the question?
10        MR. GUEST:  Yes sir.  What was the
11  result of the investigation that involved the
12  fleeing?
13        MR. SHABAZZ:  Objection as to form,
14  continuing objection to this line of questioning.
15        THE WITNESS:  I was put on non-contact
16  again.
17        BY MR. GUEST:
18   Q    For how long?
19   A    Two years.
20   Q    Okay.  So that puts us from March 2014
21  until the beginning of 2016?
22   A    Right.

191

1    Q    And was the result of the
2  investigation and the incident involving the
3  fleeing your ultimate termination from MPD?
4    A    Yes.
5    Q    So tell me about the circumstances
6  that involve you fleeing?  What happened?
7    A    I was going to work and I was just
8  driving on, and they stated that I was fleeing.
9    Q    So you were driving your car on the
10  way to work?
11   A    Uh-huh.
12   Q    Yes?
13   A    Yes.
14   Q    And a police vehicle come up behind
15  you and turn on the lights?
16   A    Yeah, that's what they said.
17   Q    Well, is that what happened?
18   A    I didn't see them.
19   Q    Okay.  So what, just kind of walk me
20  through what happened then?
21   A    Driving to work.  I got to the gate.
22  They said like hey, we were behind you.  I was

196

1  were indicted?
2      A   I went to court.
3      Q   Okay, and what was the result of the
4  court proceeding?
5      A   They said I was guilty.
6      Q   Okay.  Did you plead not guilty?
7      A   Yes.
8      Q   Okay, and when was the court
9  proceeding?
10     A   January 2015.
11     Q   And then you were ultimately
12  terminated from MPD as a result?
13     A   Yes.
14     Q   Did you appeal that decision?
15     A   No.
16     Q   Okay.  Have you ever been charged with
17  any other crimes?
18     A   No.
19     Q   Okay.  Do you think that incident
20  involving the fleeing had anything to do with --
21  well what were the races and ethnicities of the
22  officers involved in that, again with the

197

1  fleeing?
2      A   White and black.
3      Q   Huh?
4      A   White and black.
5      Q   Okay.  One white officer, one black
6  officer?
7      A   Yes.
8          MR. SHABAZZ:  Objection.  Just I have
9  a continuing objection to questioning him on any
10  investigation after this incident pertaining to
11  this lawsuit.
12         MR. GUEST:  Let me hand you a document
13  that I'm going to mark as Exhibit 2, and ask you
14  to review that and whether you've seen it before.
15         (Whereupon, the above-referred to
16  document was marked as Robinson Exhibit No. 2 for
17  identification.)
18         MR. SHABAZZ:  Let me see that.
19         (Pause.)
20         MR. GUEST:  Have you seen this before?
21  And what I'm referring to is titled in the
22  subject "Final Investigation Related to the

198

1  Alleged Misconduct by Officer Jamal Robinson,
2  First District, IS 13003158, IAD No. 13-321."
3  The date stamp is "Jamal Robinson, NTC 910".
4          (Pause.)
5          THE WITNESS:  Okay.
6          BY MR. GUEST:
7      Q   Have you seen this before?
8      A   Yes.
9      Q   Yes?
10     A   Yes.
11     Q   Okay, and I'd like to direct your
12  attention please to the third paragraph that
13  starts "Subsequently."  It says that
14  "Subsequently, Officers Pinto, Clifford and Roe
15  encountered unknown to them off duty Officer
16  Robinson, after conducting a traffic stop on a
17  parked vehicle regarding a tint window
18  violation."  Did I read that correctly?
19     A   Yeah, you read it correctly.
20     Q   All right.  So do you agree or do you
21  remember, based on this sentence, that the
22  officers had stopped by your brother's car

199

1  regarding a tint window violation?
2      A   So they stopped his car.  What that
3  had to do with me?
4      Q   No, I'm asking about the tint window
5  violation?
6      A   You can't.  You can't pull nobody over
7  to tint.
8      Q   Okay, and your brother was already
9  parked, right?
10     A   He was parked.  That's what it says.
11     Q   Okay.  But do you remember anything
12  about a tint window violation?
13     A   That's what they said that they
14  stopped him for?
15     Q   Well, do you remember that?
16     A   No.
17     Q   Okay, and it says "Officer Robinson
18  was given several directives and failed to comply
19  with the on duty officer's commands."  Do you
20  agree or disagree with that?
21     A   Like I said, they asked me to stand up
22  so they could search me, I said no.  So yeah, I

200

1   did disagree with their command.

2       Q    Okay, so you would agree with this

3   sentence?

4       A    Well, not several.  Just that.

5       Q    Okay, and then it says "Officer

6   Robinson also used profanity towards the officers

7   during the handcuffing phase of the encounter."

8   Do you agree with that?

9       A    No.

10      Q    It says "Officer Robinson was detained

11  for the period of identification and released

12  after the scene was made safe."  Do you agree

13  with that?

14      A    No, because they already knew who I

15  was.

16      Q    Okay.  It says "Officer Robinson has

17  admitted that the on duty officer's directive

18  shall be complied with and that he used profanity

19  towards the on duty officers after being

20  handcuffed."  Do you agree with that?

21      A    No.

22      Q    Then it says -- well first of all, you

201

1   understand that this is the result of the

2   investigation into alleged misconduct by you?

3       A    Okay.

4       Q    Right?

5       A    Yeah.

6       Q    And you understand that the alleged

7   misconduct was a result of the incident that took

8   place on November 6th, 2013, right?

9       A    Okay.

10      Q    Do you understand that?

11      A    Yeah.

12      Q    Okay.  Then it says "It is the

13  recommendation of the Internal Affairs Division

14  that the facts and circumstances surrounding this

15  investigation regarding the allegation of officer

16  misconduct by Officer Jamal Robinson specifically

17  when approached by members of GRU," and I'm

18  skipping a few words, "He failed to identify

19  himself as a member of MPD prior to advising on

20  duty officers that he was armed with a weapon be

21  classified as sustained," right?

22      A    Yeah, that's what it says.

202

1       Q    Okay, and do you agree that's what

2   happened?

3       A    Yeah.  I told them that -- yeah.

4       Q    And do you agree that that was the

5   result of the investigation, that they found that

6   based on these facts and circumstances, that you

7   had engaged in misconduct?

8       A    I don't believe there was misconduct.

9       Q    But that's what the Internal Affairs

10  Division determined, based on their review of the

11  facts and circumstances, right?

12      A    Yeah, that's what I read.

13      Q    Okay.  And then in the last carrying

14  over, it says "It is also the recommendation that

15  the Internal Affairs Division that the facts and

16  circumstances surrounding this investigation

17  regarding the allegation of officer misconduct,

18  orders and directives by Officer Jamal Robinson,

19  specifically that he used profanity toward on

20  duty MPD Officers Pinto, Clifford and Roe after

21  being stopped on November 6th, 2013, be

22  classified as sustained," right?

203

1       A    Uh-huh.

2       Q    That's what it says?

3       A    Which paragraph was that?

4       Q    The one I just read.

5       A    Was the first sentence --

6       Q    It's the one that carries over from

7   one page to the next.

8       A    Oh okay.  Yeah, I didn't see it.

9   Yeah, that's what it states.

10      Q    Okay, and do you agree with that?

11      A    No.

12      Q    Okay.  But you agree that based on

13  this document, the Internal Affairs --

14      A    No, no, I did use profanity.

15      Q    Okay.

16      A    Yeah.  I did use profanity.

17      Q    Okay, and you recall now that the

18  Internal Affairs Division determined that you had

19  engaged in misconduct because of their review of

20  the facts and circumstances specifically

21  regarding your use of profanity, right?

22      A    That's what it says.

212

1  review the whole thing great, but I can just
2  direct you to some of the statements that I'm
3  interested in.
4        (Whereupon, the above-referred to
5  document was marked as Robinson Exhibit No. 4 for
6  identification.)
7        THE WITNESS:  Uh-huh.
8        BY MR. GUEST:
9     Q    Okay.  That's okay?
10    A    Yeah, that's fine.
11    Q    Okay.  Please look at page 16.
12    A    Okay.
13    Q    The last sentence on the page please,
14  and it says Officers Pinto, Clifford and Roe were
15  operating unmarked vehicle with no front tag and
16  tinted out windows, and they were wearing
17  plainclothes with tactical vests with the word
18  "police" displayed across the front and the rear
19  of their vests, right?
20    A    Yeah, that's what it says.
21    Q    And does that refresh your
22  recollection as to the appearance of the officers

213

1  during the incident on November 6th, 2013?
2     A    Yes, that's what it says.
3     Q    So does that refresh your memory and
4  now you can remember how they were appearing when
5  they exited the vehicle?
6     A    They had plainclothes on with a vest.
7     Q    That said "police," right?
8     A    It was on the back.
9     Q    This says it was on the front.
10    A    On the front of it?  I don't really
11  remember that.
12    Q    Okay.  In the second full paragraph
13  that starts "During the contact."  It says
14  "During the contact, Officer Robinson did not
15  identify himself, refused directives given to him
16  by on duty officers."  Do you agree with that?
17    A    No.
18    Q    It says "When Officer Robinson said he
19  had a gun, he had not yet identified himself as
20  an off duty MPD officer."  Do you agree with
21  that?
22    A    Say it again?

214

1     Q    "When Officer Robinson said he had a
2  gun, he had not yet identified himself as an off
3  duty MPD officer."  Do you agree with that?
4     A    Yeah, because I'm saying it and I
5  agree.
6     Q    Okay.  Further down, it says
7  "Furthermore, it was reported that Officer
8  Robinson was actively resisting during the
9  handcuffing."  Do you agree with that?
10    A    Disagree.
11    Q    Okay.  Do you recall making any
12  movements or giving any indication that you may
13  have been about to flee the scene?
14    A    No, sitting down.
15        (Pause.)
16        BY MR. GUEST:
17    Q    On the paragraph just above on page
18  17, just above "Findings."
19    A    Uh-huh.
20    Q    It starts "During this event."  Please
21  direct your attention to the sentence that says
22  "Officer Robinson stated that after acknowledging

215

1  that he had a gun, he indicated that he had a
2  badge and ID."  Do you agree with that?
3     A    Yeah.
4     Q    In the Findings section, it states
5  "When questioned by the on duty MPD members as to
6  if he was armed as an active armed MPD officer
7  when first approached, Officer Robinson should
8  have done more to make his identity known."  Do
9  you agree with that?
10    A    To know more.  It was -- I did what I
11  did.
12    Q    I'm sorry?
13    A    I told them I was who I was.
14    Q    No, but I'm saying based on how --
15  what the sentence suggests is that "When
16  questioned by the on duty MPD members as to if
17  you were armed as an active MPD officer when
18  first approached, Officer Robinson should have
19  done more to make his identity known."  Do you
20  agree that you should have done more at the time
21  of the incident on November 6th to have made your
22  identity known to the officers?

216

1    A    I think I did.  I did, I let them
2  know.  There's nothing more I can do.  I told
3  them, I told them what it was.
4    Q    So you disagree with this?
5    A    Yeah, I disagree with it.
6    Q    Do you believe that the police
7  officers who were on the scene on November 6th in
8  any way mistreated your brother?
9    A    Yeah.
10    Q    Okay, and how do you -- what are your
11  thoughts on that?
12    A    He was arrested for nothing.
13    Q    Okay.  Do you believe they mistreated
14  your brother?
15    A    Yeah, that's mistreatment.
16    Q    Well, in terms of how they were
17  handling him if at all or speaking to him?
18    A    Like I say, I just don't think it was
19  no point to talk to them.
20    Q    But other than that, you don't think
21  the police officers engaged in any mistreatment?
22    A    I wouldn't have been arrested.

217

1    Q    Do you know whether or not any of the
2  three officers that are involved in this lawsuit
3  affirmatively filed any type of complaint against
4  you?
5    A    I don't know.
6    Q    When did you decide to file this
7  lawsuit?
8    A    Right after the incident.
9    Q    Did you consult with anybody not
10  including your attorneys about whether to file a
11  lawsuit?
12    A    I just talked to my attorney.
13    Q    Okay.  Take a look at what was Exhibit
14  2.
15    A    Uh-huh.
16    Q    I apologize.  You believe the incident
17  could have happened later in the day than 4:00 or
18  4:30?
19    A    No.
20    Q    Okay.
21         (Pause.)
22         BY MR. GUEST:

218

1    Q    Take a look at the Exhibit 4 on page
2  14.
3    A    Okay.
4    Q    And this has a statement recorded from
5  you; correct?
6    A    I'm not sure.  Where it at?
7    Q    On page 14.
8    A    Okay.
9    Q    It says "Involved officer's statement,
10  Officer Jamal Robinson, 1st District," right?
11    A    Uh-huh, yes.
12    Q    And do you recall giving a statement
13  on November 7th?
14    A    Yes.
15    Q    Okay.  If you take a look at page 15.
16    A    Okay.
17    Q    On March 9th, 2014, you gave a
18  supplemental audio statement, that's what it
19  says?
20    A    Yes.
21    Q    Do you remember giving both of those
22  statements?

219

1    A    Yes.
2    Q    Okay.  If you went to the second to
3  last bullet point on page 15, it says that
4  Officer Robinson stated that the on duty officer
5  is in charge when confronting an on duty officer;
6  correct?
7    A    Yes.
8    Q    Okay, and was that your position at
9  the time on March 19th, 2014 when you gave this
10  statement?
11    A    Yes.
12    Q    Okay, and if you turn to page 16, it
13  says "Additionally, he stated that it was
14  approximately one to three minutes passed before
15  he was handcuffed."  And that's a statement you
16  gave on March 9th, 2014, right?
17    A    Yes, that's what I gave.
18    Q    Okay, and does that refresh your
19  recollection in terms of how long had passed
20  between when you were initially contacted by the
21  officers and when you were placed in handcuffs?
22    A    Like I said this, what I said one

224

1    Q    Okay, and you saw yourself on the
2  video after you had been put in handcuffs, right?
3    A    Yes.
4    Q    And I understand you had a muscle
5  strain, but there were no physical indications on
6  your face or anywhere else on your body that you
7  had been injured, right?
8    A    No.
9    Q    What injuries do you recall seeing on
10  the video that indicated you had been injured on
11  any part of your body?
12    A    I don't remember seeing anything on
13  the video.
14    Q    That's what I'm saying.  Did the video
15  show that you had been injured?
16    A    No, it didn't show any injuries.
17    Q    Okay.  You were standing up at one
18  point immediately after you had been handcuffed,
19  right?
20    A    I believe so.
21    Q    Okay.
22        (Pause.)

225

1        BY MR. GUEST:
2    Q    And the video did not indicate that
3  any of the officers were yelling at you, right?
4    A    Not that I know of, no.
5    Q    And the video did not indicate that
6  the officers were treating you disrespectfully,
7  right?
8    A    Not that I'm aware of, no.
9    Q    And the video did not show that the
10  officers were using any profanity towards you,
11  right?
12    A    No.
13    Q    So they didn't -- you didn't see the
14  officers on the video using profanity?
15    A    No.
16    Q    Okay.  As an MPD officer, do you think
17  that it's a reasonable action to take when you
18  see a car illegally parked to stop and see what's
19  going on with the car?
20    A    If it's illegally parked, if it's
21  illegally parked.
22    Q    Then yes?

226

1    A    Yes.
2    Q    Okay.  Do you think it's a reasonable
3  action to take if you see someone stopped in a
4  car that has illegally tinted windows, to stop
5  and investigate what's going on?
6    A    No.
7    Q    Okay.  Do you believe that it's a
8  reasonable action to take to stop and engage with
9  someone who is sitting on a wall that has no
10  trespassing signs on the property?
11        MR. SHABAZZ: Objection as to form.
12        THE WITNESS: No.
13        MR. GUEST: Okay.  At the time that
14  you were -- that you first encountered the
15  officers, do you think that you had any right
16  that was clearly established at that time?
17        MR. SHABAZZ: Objection.
18        THE WITNESS: What you mean "right"?
19  What you mean?
20        MR. GUEST: Like a right.  Like a
21  right as a citizen.
22        MR. SHABAZZ: Objection as to form.

227

1        THE WITNESS: To sit there?
2        BY MR. GUEST:
3    Q    Like a legal right.
4    A    To be there?
5    Q    I'm asking you, do you think you had
6  any right at that time, when the officers first
7  encountered you, that was clearly established?
8        MR. SHABAZZ: Objection as to form.
9        THE WITNESS: Yes.
10        BY MR. GUEST:
11    Q    What?
12    A    That I can be there.
13    Q    Okay.  Do you think that the police
14  officers who encountered you took longer than
15  necessary when touching your body to put you in
16  handcuffs?
17    A    I don't get that question.
18    Q    Sure.  I'll ask it slightly
19  differently.  When the officers contacted your
20  body to put you in handcuffs, do you believe that
21  they took longer than they should have?
22    A    I don't know.  When they contacted my

228

1  body, did they take longer than they should have?
2     Q   To put you in handcuffs?
3     A   No.
4     Q   Okay.  Do you think that the officers
5  who contacted you and put you in handcuffs could
6  have had the reasonable understanding that after
7  you identified having a gun, that they themselves
8  were in danger?
9     A   No.
10    Q   And why is that?
11    A   Because --
12        MR. SHABAZZ:  Can you repeat the
13  question?
14        MR. GUEST:  Sure.
15        MR. SHABAZZ:  Go ahead, I'm listening.
16        MR. GUEST:  I'll try to pull it back.
17  The officers who encountered you on November 6th,
18  do you think that it is -- that they could have
19  had a reasonable belief that after you identified
20  having a weapon, that they could have feared for
21  their safety?
22        MR. SHABAZZ:  Objection as to form.

229

1        THE WITNESS:  How did they fear for
2  their safety?
3        MR. GUEST:  I'm asking you about your
4  opinion, whether you think that it's possible the
5  officers could have been under the reasonable
6  belief that they were fearing for their safety
7  after you identified yourself as someone who had
8  a weapon?
9        MR. SHABAZZ:  Objection as to form.
10       THE WITNESS:  No.
11       BY MR. GUEST:
12    Q   You don't think that's possible?
13    A   No.
14    Q   Okay.  Do you think that if the
15  officers had a belief that they were fearing for
16  their safety after you identified having a
17  weapon, that that belief would have been
18  unreasonable?
19       MR. SHABAZZ:  Objection.
20       THE WITNESS:  I don't understand that
21  question.
22       MR. SHABAZZ:  Objection as to form.

230

1        BY MR. GUEST:
2     Q   Sure.  If the officers who stopped you
3  and you had identified yourself as having a
4  weapon feared for their safety at that time, do
5  you think that that belief would have been
6  unreasonable?
7     A   It was no reason why they should fear
8  for their safety.
9     Q   Okay, and why do you say that?  Why do
10  you say that?
11    A   Nothing was going on.
12    Q   And you identified yourself as having
13  a gun, right?
14    A   That was one of the questions, did I
15  have a weapon.
16    Q   And you said you had a weapon?
17    A   And then I explained what I had.
18    Q   Right.  You said you had a weapon
19  though, right?
20    A   Yes.
21    Q   Okay, and you told me earlier that the
22  Gun Recovery Unit goes around and gets guns off

231

1  the street, right?
2     A   Right.
3     Q   And you told me earlier that the Gun
4  Recovery Unit does dangerous work just like any
5  other police officer, right?
6     A   Right.
7     Q   And you told me earlier that when the
8  Gun Recovery Unit confronts someone that has a
9  weapon, that they themselves are in a dangerous
10  situation, right?
11    A   No, not necessarily.
12    Q   Not necessarily, but you admitted that
13  that's a dangerous situation to put yourself in,
14  right?
15       MR. SHABAZZ:  Objection as to form.
16       THE WITNESS:  Well, with a gun?
17       BY MR. GUEST:
18    Q   Right.
19    A   I'm saying it could be dangerous.
20    Q   It could be, sure.
21    A   Yeah.
22    Q   And what I'm asking you is because

232

1 these officers had encountered you and you told
2 them that they, that you had a weapon, that it
3 could be that they believed the situation to have
4 posed a threat to their safety, right?
5         MR. SHABAZZ: Objection as to form.
6         THE WITNESS: I don't know why.
7         MR. GUEST: Because you said you had
8 a gun.
9         MR. SHABAZZ: Objection as to form.
10        THE WITNESS: I wasn't doing anything.
11        BY MR. GUEST:
12    Q    Okay. But let's just put the fact of
13 whether you were doing anything aside, okay.
14    A    Uh-huh.
15    Q    Right, okay?
16    A    Right.
17    Q    Okay. Do you agree -- do you agree
18 that in a circumstance where just when someone
19 says they have a gun, an officer they had told
20 that to could have a reasonable belief that
21 there's a threat to their safety?
22        MR. SHABAZZ: Objection as to form.

233

1         THE WITNESS: No.
2         BY MR. GUEST:
3    Q    Ever?
4    A    Not ever.
5    Q    Okay. What would a situation be when
6 someone tells an officer they have a gun, that
7 would lead them to have a reasonable belief that
8 they were in a situation that was a threat to
9 their safety?
10        MR. SHABAZZ: Objection as to form.
11        THE WITNESS: If they said they had a
12 gun and they're about to do something with it.
13        BY MR. GUEST:
14    Q    Okay.
15    A    That would be safety.
16    Q    Okay. Otherwise, not reasonable to
17 think there's a dangerous situation involved.
18        MR. SHABAZZ: Objection as to form.
19        BY MR. GUEST:
20    Q    Now you said -- you said earlier that
21 if you see, if you see a police officer wearing a
22 vest that has the word "police" on it, you don't

234

1 necessarily take at face value that they may
2 actually be a police officer?
3    A    Right.
4    Q    Because you can get that kind of stuff
5 at Amazon, right?
6         MR. SHABAZZ: I mean objection to
7 form, asked and answered. Badgering the witness.
8 Asked a million times.
9         BY MR. GUEST:
10    Q    So in a situation where you stop an
11 individual in plainclothes, and that person says
12 to you that they are a police officer, do you
13 also think that person may not be a police
14 officer?
15    A    That's a possibility.
16    Q    Right. So someone could say hey, I
17 have a gun, also say hey, I'm a police officer
18 and you think to yourself well maybe that
19 person's not a police officer, right?
20    A    That would be profiling if you think
21 they're not.
22    Q    I'm asking -- I'm not saying anything

235

1 about profiling. I'm saying if you're in a
2 situation where someone says they have a gun and
3 someone says to you I'm MPD, you could reasonably
4 believe that that person is not actually MPD,
5 right?
6    A    They could not be MPD.
7    Q    Right. That's possible, right?
8    A    Right.
9    Q    So you can be a situation where
10 someone has a gun, says they are MPD but they
11 actually aren't MPD, right?
12        MR. SHABAZZ: Objection as to form.
13        THE WITNESS: That could happen.
14        MR. GUEST: So in that situation,
15 you're dealing with an individual who has a
16 firearm, has a weapon and is not MPD, right?
17        MR. SHABAZZ: Objection as to form.
18        THE WITNESS: Is he black?
19        MR. GUEST: I'm just saying generally,
20 not talking about race. So just to repeat my
21 question, you can be in a situation where you
22 confront an individual who has a gun and says

236

1   he's MPD but he's not, right?
2          MR. SHABAZZ:  Objection as to form.
3          THE WITNESS:  Yes, we can be in that
4   situation.
5          COURT REPORTER:  I'm sorry, sir.
6          MR. SHABAZZ:  Objection as to form.
7          (Simultaneous speaking.)
8          MR. GUEST:  But in that situation, if
9   you are dealing with an individual who says he
10  has a gun; you're not sure whether or not he is
11  MPD because he's only just told you he's MPD,
12  that can be a dangerous situation, right?
13         MR. SHABAZZ:  Objection as to form.
14         THE WITNESS:  It could, it could.
15         MR. GUEST:  Okay, and in that
16  situation after someone has identified themselves
17  as having a weapon, you don't know if they're MPD
18  or not.  You're a police officer.  Is it
19  reasonable to take action to determine whether or
20  not that individual is actually MPD, right?
21         MR. SHABAZZ:  Objection as to form.
22         THE WITNESS:  Yes.

237

1          MR. GUEST:  Okay.  And so given that,
2   it is possible that how Officers Pinto, Clifford
3   and Roe conducted themselves on November 6, 2013,
4   after you had identified yourself as having a
5   weapon, but they were not certain that you were
6   MPD or not, they acted reasonably?
7          MR. SHABAZZ:  Objection, objection.
8   Why you want to do this?  I'm serious.  Why you
9   want to do this?  You know this ain't coming in.
10  You know this stuff ain't coming in.  Why you
11  want to ask all these questions that you know are
12  not coming in?
13         You know you're not an expert.  You
14  know he can't testify to the legal standard, but
15  you take up all this time?  Can I ask you that
16  question?
17         MR. GUEST:  No.
18         MR. SHABAZZ:  I'm asking.  I mean you
19  know you're just wasting time.
20         (Pause.)
21         MR. GUEST:  What -- I'm almost done.
22  What evidence do you have, if any, that the

238

1   District of Columbia or MPD had to know that
2   Officer Pinto or Officer Clifford were conducting
3   illegal searches and seizures, detainments and
4   arrests?
5          MR. SHABAZZ:  Objection as to form.
6          THE WITNESS:  It was.  It was illegal.
7   It was just illegal.
8          BY MR. GUEST:
9   Q   No.  I'm asking what evidence do you
10  have -- okay, I understand your position on
11  November 6th, right?  You think that was an
12  illegal stop, right?
13  A   It was.
14  Q   Okay.  Now why do you say that the
15  District of Columbia or the MPD should have known
16  that Pinto, Clifford were conducting illegal
17  searches and seizures, detainments and arrests?
18  A   Because of how they were addressing
19  people.
20  Q   What evidence do you have of that?
21  And I'm not talking about November 6th and your
22  belief that that was an illegal stop.  I'm asking

239

1   outside of that, do you have any evidence that
2   MPD or the District of Columbia should have known
3   that Officer Pinto and Officer Clifford had
4   allegedly been conducting illegal searches and
5   seizures, detainments and arrests?
6   A   I don't have anything.
7   Q   What evidence do you have as to
8   whether the District of Columbia or MPD knew or
9   should have known that Officer Pinto and Officer
10  Clifford were allegedly engaging in dangerous,
11  illegal, unprofessional and unconstitutional
12  actions?
13         MR. SHABAZZ:  Objection to the form.
14         THE WITNESS:  After this incident?
15         BY MR. GUEST:
16  Q   Yes.
17  A   They should have known about it after
18  this incident.
19  Q   After this incident?
20  A   Yes.
21  Q   Okay.  But you have no evidence, apart
22  from the incident that you're involved in, that

240

1 the District of Columbia knew or should have
2 known that Officer Pinto or Officer Clifford were
3 engaging in allegedly dangerous, illegal,
4 unprofessional and unconstitutional actions?
5     A   I don't have anything.
6     Q   Right.  You don't have any evidence
7 that the District of Columbia or MPD knew or
8 should have known that Officer Pinto or Officer
9 Clifford were engaged in any allegedly racial
10 targeting?
11        MR. SHABAZZ:  Objection as to form.
12        THE WITNESS:  I don't have anything.
13        MR. GUEST:  Okay.  I'm going to
14 quickly look through my notes for like two
15 minutes, is that okay, and then we'll wrap up,
16 all right?
17        MR. SHABAZZ:  Uh-huh.
18        (Pause.)
19        BY MR. GUEST:
20     Q   If there are documents that state the
21 officers approached you after six o'clock on
22 November 6th, you would disagree with that?

241

1     A   Yes.
2     Q   Okay.
3        (Pause.)
4        MR. GUEST:  All right, Mr. Robinson.
5 Thanks for your time today.  I appreciate it.
6        THE WITNESS:  All right.
7 CROSS EXAMINATION
8        BY MR. SHABAZZ:
9     Q   Hi, Mr. Robinson.  I need to ask you
10 a few questions and we'll be ready to go home.
11 The 5500 block of C Street is where your mother
12 lives, right?
13     A   Correct.
14     Q   And how often are you there before you
15 pick up your children?
16        MR. GUEST:  Objection to the form.
17        THE WITNESS:  Every day.
18        BY MR. SHABAZZ:
19     Q   You have to go there -- you go there.
20 Is it true that you go there before you pick up
21 your children?
22     A   Yes, that's correct.

242

1     Q   And that happens about how often?
2     A   Monday through Friday.
3     Q   All right, and have you ever had any
4 problems there before?
5        MR. GUEST:  Objection to the form.
6        THE WITNESS:  No, never.
7        MR. SHABAZZ:  Has any neighbors
8 complained to you?
9        MR. GUEST:  Objection to the form.
10        THE WITNESS:  No.
11        BY MR. SHABAZZ:
12     Q   Have the police ever been called on
13 you at that site?
14     A   No.
15     Q   Okay.  On this day, November 6th,
16 2013, was anyone -- did anyone ask you to leave
17 that area where you were, that address?  Did
18 anyone ask you?
19     A   No.
20     Q   Did anyone speak to you about being
21 there?
22     A   No.

243

1     Q   Okay.  During the entire incident
2 where the -- when you were being detained or
3 arrested, the entire time, did they -- was there
4 any mention that a call was made in reference to
5 you at that site?
6        MR. GUEST:  Objection to form.
7        THE WITNESS:  Yes.
8        BY MR. SHABAZZ:
9     Q   Okay.  What was said?
10     A   GRU stated that they had a call from
11 where I was sitting at, but nobody lived there.
12     Q   Who said that?
13     A   The Gun Recovery Unit.
14     Q   Which one?
15     A   Who was driving?
16     Q   What did he say?
17     A   He said that we got a call for this
18 incident, for this location.
19     Q   Did he specify what the call was
20 about?
21     A   No, he didn't.
22     Q   Did you ask?