# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

_____ :
IN THE MATTER OF:                :
                                 :
JAMAL B. ROBINSON,               :
                                 :
            Plaintiff,           :
                                 :
    v.                           :    C.A. No.
                                 :    15-100 (RJL)
DISTRICT OF COLUMBIA, et al.:
                                 :
            Defendant.           :
                                 :
_____:

            Thursday,
            March 15, 2018

            Washington, D.C.


DEPOSITION OF:

          DETECTIVE SCOTT PINTO

called for examination by Counsel for the
Defendant, pursuant to Notice of Deposition, in

the Office of the Attorney General for the

District of Columbia, located at One Judiciary

Square, 441 4th Street NW, Washington, DC 20001,

when were present on behalf of the respective

parties:

**APPEARANCES:**


**On Behalf of the Plaintiff:**

GREGORY L. LATTIMER, ESQ.
Law Office of Gregory L. Lattimer
1200 G Street NW, Suite 800
Washington, DC 20005
lattlaw@aol.com

MALIK SHABAZZ, ESQ.
6411 Ivy Lane, Suite 402
Greenbelt, Maryland 20770
attorney.shabazz@yahoo.com


**On Behalf of the Defendant:**

NATHAN GUEST, ESQ.
Assistant Attorney General
441 4th Street NW
Suite 630 South

Washington, D.C. 20001

(202)-442-9867

nathan.guest@dc.gov

4

1          P-R-O-C-E-E-D-I-N-G-S
2                10:15 a.m.
3    WHEREUPON,
4          DETECTIVE SCOTT PINTO
5    was called as a witness by Counsel for the
6    Defendant and, having been first duly sworn,
7    assumed the witness stand, was examined and
8    testified as follows:
9          DIRECT EXAMINATION
10         BY MR. LATTIMER:
11   Q    Can you state your full name, please?
12   A    It's Scott Pinto.
13   Q    And how do you spell your last name?
14   A    P-I-N-T-O.
15   Q    And how are you employed?
16   A    The Metropolitan Police Department in
17   Washington, D.C.
18   Q    And what's your position?
19   A    I'm currently a detective.
20   Q    So Detective Pinto, my name is Greg
21   Lattimer and I'm going to be asking you some
22   questions today in a matter that's currently

5

1    pending in United States District Court for the
2    District of Columbia that is entitled Jamal
3    Robinson v. District of Columbia, et al.
4          If at any time I ask you a question
5    that you don't understand, please let me know and
6    I'll try to clarify the question to ensure that
7    the question is responsive, I mean that your
8    answer is responsive to the question.
9          I don't anticipate it being very long,
10   but it doesn't matter.  If you need to take a
11   break for whatever reason, let me know that as
12   well and an adequate opportunity will be made for
13   you to take whatever break you need.
14   A    Okay.
15   Q    If during the course of the deposition
16   you need to speak with counsel, again, let me
17   know that and adequate opportunity will be made
18   for you to take whatever time you need to speak
19   with counsel.
20         The only caveat to that would be if
21   there is a question pending, please I'd like for
22   you to answer the question first and then, you

6

1    know, take whatever time you need to speak with
2    counsel.  Now, have you ever done a deposition
3    before?
4    A    I have.
5    Q    Okay, so you understand everything
6    that you say or I say, or anybody in the room
7    says is being taken down by a court reporter, so
8    it is important that we not talk over one another
9    so that he can get a good transcript.
10         So I'm going to do my best to let you
11   answer before I start another question, and I'm
12   going to ask you to do your best to let me finish
13   the question before you start your answer, that
14   way we'll get a good transcript.
15         And finally, as human nature, when
16   people ask a question, you shake your head or nod
17   your head, uh-huh, nuh-uh.  You know what you
18   mean.  I know what you mean, but it doesn't
19   translate very well for the court reporter, so
20   I'm going to ask you to verbalize your answer,
21   whatever it may be, and again, that way it
22   ensures that we get a good transcript, all right?

7

1    A    Okay.
2    Q    Any questions?
3    A    No questions.
4    Q    All right, how long have you been with
5    MPD?
6    A    16 years.
7    Q    Okay, give me a little background on
8    your positions and places that you've ever been
9    working out of, in other words, what districts,
10   precincts, whatever?
11   A    Sure, so I started in January of 2002.
12   I was initially assigned to the 4th District
13   which is the northwest portion mainly of D.C.  I
14   was assigned to the patrol division in the 4th
15   District and I was in that capacity for
16   approximately three years, three-and-a-half
17   years, and then I went to a vice unit and I was
18   in the vice unit until approximately 2011.
19   Q    Was that in 4D?
20   A    That was in 4D.
21   Q    Okay.
22   A    And then in 2011, I went to the Gun

8

1    Recovery Unit.
2        Q    Is that out of SOD?
3        A    That's out of NSID.
4        Q    Okay.
5        A    And then in March of 2016, I made
6    investigator and went to the criminal
7    investigations division and was assigned out of
8    the 5th District, which I'm currently in that
9    position as detective out of the 5th District.
10       Q    So you've been in 5D since 2016?
11       A    Correct.
12       Q    Where do you work, rotating shift or
13   do you have a set shift?  Where do you work?
14       A    Currently rotate.
15       Q    Okay, this incident happened back in
16   April 2012.  Where were you stationed at that
17   point?
18           MR. GUEST:  Objection,
19   mischaracterizes the evidence.
20           MR. LATTIMER:  I'm sorry.  I'm looking
21   at the wrong -
22           BY MR. LATTIMER:

9

1        Q    November 6, 2013, where were you
2    stationed?
3        A    I was with the Gun Recovery Unit.
4        Q    Out of NSID?
5        A    Correct.
6        Q    And where is NSID physically?
7        A    Currently it's at 2850 New York Avenue
8    in northeast.
9        Q    And where was it back then?
10       A    It was on 3rd Street NE, I believe,
11   back at that time.
12       Q    Okay, tell me about that unit.
13       A    So the unit is a citywide unit
14   primarily responsible for recovering illegal
15   drugs - excuse me, illegal guns off the street,
16   and we do operations citywide throughout D.C.
17   where guns are primarily the focus to recover off
18   the streets.
19       Q    Okay, was that a uniformed or a plain
20   clothes operation?
21       A    It's a plain clothes unit.
22       Q    How many people were assigned?

10

1            MR. GUEST:  Objection.  You can
2    answer.
3            DETECTIVE PINTO:  To the entire unit?
4            MR. LATTIMER:  Mm-hmm.
5            DETECTIVE PINTO:  Approximately 25, I
6    think it is.
7            BY MR. LATTIMER:
8        Q    And then you all were divided into,
9    like, units within the division?
10       A    We have, like, squads.
11       Q    And how many in a squad?
12       A    Approximately 10 to each squad.
13       Q    And each squad had a commander or a
14   sergeant?
15       A    Correct.
16       Q    Which one?
17           MR. GUEST:  Objection.
18           BY MR. LATTIMER:
19       Q    A commander or a sergeant?
20       A    Sergeant.
21       Q    Sergeant, and then the overall unit
22   was supervised by a lieutenant?

11

1        A    Correct.
2        Q    Okay, do you remember who that
3    lieutenant was?
4            MR. GUEST:  Objection.
5            DETECTIVE PINTO:  Lieutenant Coligan,
6    Coligan is his name, C-O-L-I-G-A-N.
7            BY MR. LATTIMER:
8        Q    Okay, and in your squad, who was your
9    sergeant?
10       A    Sloan.
11       Q    And so tell me your duties and
12   responsibilities on a daily basis in that unit.
13   What would you do once you'd come in?  Did you
14   all have roll call?
15       A    We have, like, an unofficial roll
16   call, yes.
17       Q    Okay, so did you work like a set
18   schedule then or was it rotating as well?
19       A    It was mainly set at that point.
20       Q    And what were the hours?
21       A    The evening shift, so like a 3:00 to
22   11:00 p.m. shift.

16

1  certain areas where, like, a recent violent crime
2  was committed or a homicide just to get into that
3  area to do our regular operations in those areas.
4      Q   So now, since you guys are in unmarked
5  vehicles and you're in plain clothes, how did you
6  all coordinate that with the district?  Say for
7  instance you're going into 6D to conduct
8  operations.  They don't know who you are, so what
9  would be the way that you would let everybody,
10  give everybody a head's up that, "We're here.
11  We're going to be conducting operations"?
12      MR. GUEST:  Objection.
13      DETECTIVE PINTO:  So it's my
14  understanding that our supervisors would contact
15  the watch commanders to whatever district that we
16  would go into and let them know, "Hey, look, the
17  Gun Recovery Unit's going to be deployed in your
18  district today," and then it's my understanding
19  that the watch commander is supposed to let the
20  street supervisors know that to pass the word
21  along to the members that GRU would be deployed
22  in their district for that tour.

17

1      BY MR. LATTIMER:
2      Q   Okay, so you had, there was some
3  coordination with the, whatever district you're
4  going to go into?
5      A   Mainly through supervisors, not on my
6  level.
7      Q   Okay, so do you recall the incident
8  with Mr. Robinson?
9      A   I do.
10      Q   Tell me what you recall.
11      A   I recall going into the 5100 block of
12  C Street SE.  I recall being with Officer
13  Clifford and Officer Roe.  I recall when we
14  entered the block, I observed a vehicle that was
15  sitting idling.  It was not parked properly.  It
16  had heavy tint on it.
17      I observed two males, one of them we
18  later found out was Mr. Robinson, sitting on this
19  property, in front of this property where there
20  was a no trespassing sign or something to that
21  effect sign in that residence's window.
22      I recall asking Mr. Robinson and the

18

1  other male if they lived there.  They didn't
2  initially respond.  They kind of both looked at
3  each other kind of suspiciously.  I asked again
4  and Mr. Robinson responded something to the
5  effect of, "No, but you don't need to know what's
6  going on," something to that effect.
7      I recall exiting the vehicle to
8  approach the motor vehicle that I observed and
9  Officer Clifford and Roe advised that they were
10  going to approach the two males.
11      Q   Okay, now, you said that the car was
12  not parked properly.  What does that mean?
13      A   So the car was in the block, but it
14  was more than 12 inches away from the curb.
15      Q   Okay, but you said it was idling?
16      A   The car was.
17      Q   And so was that some violation that
18  you saw?
19      A   The idling was not, but the car just
20  sitting in a parked position more than 12 feet
21  away -
22      Q   12 feet away or -

19

1      A   I'm sorry, 12 inches - apologies, I
2  misspoke - was a violation.
3      Q   Of what?
4      A   Obstructing the proper flow of traffic
5  and not parked properly.
6      Q   But if - was someone in the vehicle?
7      A   Yes.
8      Q   So that wouldn't be considered parked.
9  That would be considered standing, wouldn't it?
10      A   Parked or standing, the vehicle was in
11  a parked position.
12      Q   Okay, and so you're aware of some law
13  in the District of Columbia that says that a
14  vehicle that is standing with an individual in it
15  and idling has to be within 12 inches of the
16  curb?
17      MR. GUEST:  Objection.
18      DETECTIVE PINTO:  Or it has to be not
19  obstructing the flow of traffic.
20      BY MR. LATTIMER:
21      Q   Well, how is it obstructing the flow
22  of traffic?  As I understood, you pulled your

20

1 vehicle up next to it, didn't you?
2      A    I was behind it if I recall correctly.
3      Q    So you pulled up behind it, and so no
4 traffic could get by?  Is that what you're
5 saying?
6          MR. GUEST:  Objection.
7          DETECTIVE PINTO:  I don't recall if
8 traffic was able to get by my vehicle or not.
9          BY MR. LATTIMER:
10      Q    I'm saying the vehicle that you say
11 was not properly parked, no traffic - a vehicle
12 12 inches from the curb was obstructing the flow
13 of traffic and so that no traffic could come by?
14 Is that what you're saying?
15      A    I don't recall if traffic was able to
16 get by or not.
17      Q    Okay, you weren't going to write a
18 ticket, right?
19      A    I did write a ticket.
20      Q    For illegal parking?
21      A    I did.
22      Q    When did you do that?

21

1      A    During the course of the arrest of the
2 driver.
3      Q    The driver was arrested for no permit?
4      A    Correct.
5      Q    And so you're saying you wrote a
6 parking ticket?
7      I recall writing a ticket for the tint
8 as well as being more than 12 inches from the
9 curb.
10      Q    Okay, and the tint you say, you had a
11 tint meter?
12      A    A tint meter was on the scene.  I
13 don't recall if I personally had one or if I had
14 to request one.
15      Q    Okay, so did you use it?
16      A    Yes.
17      Q    And what was the tint you saw that
18 came up on your meter?
19      A    I can't recall the exact percentage.
20      Q    And when did you have training with
21 regard to the tint meter?
22      A    Several years ago, I went to training

22

1 for it during one of our 40-hour courses.  I
2 can't recall what year it was.
3      Q    Okay, a 40-hour course on a tint
4 meter?
5      A    No, no, no, it wasn't 40 hours, but it
6 was during that block of training.  One of it
7 was, I recall, the tint training.
8      Q    So if I got it straight, you got out.
9 You wrote a ticket, a parking ticket for parking
10 improperly, is that right?
11      A    At one point, I did, yes.
12      Q    For a vehicle that was occupied and
13 idling, you wrote a parking ticket, right?
14      A    Correct.
15      Q    Okay, and then you wrote a ticket for
16 an illegal tint, and what is the standard for
17 that?
18      A    For the District, it's 70 percent, and
19 for the state of Maryland, 35 percent.
20      Q    But you weren't in Maryland, right?
21      A    No, we were in the District of
22 Columbia.

23

1      Q    Okay, so you wrote the ticket, a D.C.
2 ticket, right?
3      A    Correct.
4      Q    And neither of those are arrestable
5 offenses, are they?
6      A    The tint or the parking?
7      Q    Right.
8      A    No.
9      Q    All right, so then you said, as I
10 understood you, that you saw two guys sitting on
11 the wall, retaining wall that was in front of the
12 house, correct?
13      A    That's how I would characterize that
14 property, yeah.
15      Q    And you said the house had a no
16 trespassing sign?
17      A    Yes.
18      Q    And I take it there's a sidewalk?
19      A    Yes.
20      Q    Okay, and so the people who were
21 sitting on the retaining wall, their feet were on
22 the sidewalk?

24

1        MR. GUEST:  Objection.

2        DETECTIVE PINTO:  I don't recall if

3  their feet were touching the sidewalk when I

4  first saw them.

5        BY MR. LATTIMER:

6    Q    Well, the sidewalk would go up to the

7  wall, would you agree?

8    A    Yeah, I would agree.

9    Q    Okay, and so you said something to the

10  two people sitting on the wall, right?

11    A    Right.

12    Q    And then they looked suspiciously?

13        MR. GUEST:  Objection.

14        DETECTIVE PINTO:  Right.

15        BY MR. LATTIMER:

16    Q    What does that mean?

17    A    They both kind of looked at each

18  other, kind of just didn't know how to respond or

19  react to my question.

20    Q    Well, could it have been bewildered

21  that you were asking them a question?

22        MR. GUEST:  Objection.

25

1        DETECTIVE PINTO:  I don't know.

2        BY MR. LATTIMER:

3    Q    Well, what were you asking them?

4    A    I recall identifying myself and asking

5  if they lived there.

6    Q    And they had no obligation to respond,

7  did they?

8        MR. GUEST:  Objection.

9        DETECTIVE PINTO:  Well, I was asking

10  them a question because, based on what I

11  observed.

12        BY MR. LATTIMER:

13    Q    I understand that, but they had no

14  obligation to respond, right?

15    A    No.

16    Q    I mean, just because a police officer

17  says something to you doesn't mean you have to

18  respond to the police officer, right?

19    A    No.

20    Q    Okay.

21    A    You can choose not to.

22    Q    All right, and so that was suspicious

26

1  from your perspective?

2        MR. GUEST:  Objection.

3        DETECTIVE PINTO:  The body language

4  that I observed and not answering right away was

5  suspicious to me.

6        BY MR. LATTIMER:

7    Q    Okay, so you just mentioned body

8  language.  What were the two guys who were

9  sitting on the wall, what was the body language

10  that you observed?

11    A    I observed looking in each other's

12  direction, looking back over at my vehicle.  I

13  observed Mr. Robinson at one point.  He had a

14  jacket on.  I recall him kind of standing up,

15  looking back and forth, sitting down, at one

16  point putting his hands in his jacket.  That's

17  what I recall observing.

18    Q    Was it cold?

19    A    No, it was unseasonably warm that day

20  actually.

21    Q    So he had on a jacket?

22    A    He did.

27

1    Q    Did you have on a jacket?

2    A    Nope.

3    Q    It was November 6, right?

4    A    Right.

5    Q    Okay, so you got out of your vehicle,

6  correct?

7    A    Correct.

8    Q    And went where?

9    A    To the driver's side of that vehicle.

10    Q    All right, and so the two guys sitting

11  on the wall, what did they do?

12        MR. GUEST:  Objection.

13        DETECTIVE PINTO:  They remained in

14  that vicinity while Officers Clifford and Roe

15  approached.

16        BY MR. LATTIMER:

17    Q    Now, what was the significance you

18  mentioned of the no trespassing sign on the

19  house?

20    A    Well, that the occupants obviously,

21  based on that sign, don't want people on their

22  property.  The house appeared to be an abandoned

28

1  property.
2      Q    Okay, and so was anybody in the house?
3          MR. GUEST:  Objection.
4          DETECTIVE PINTO:  I don't know.
5          BY MR. LATTIMER:
6      Q    Had you observed the two individuals
7  go in the house?
8      A    No.
9      Q    Had you observed them come out of the
10  house?
11      A    No.
12      Q    The only place you saw them was on the
13  retaining wall next to the sidewalk, is that
14  right?
15      A    The retaining wall kind of on the
16  curtilage of the property.
17      Q    Right, and the sidewalk is right
18  there, correct?
19      A    Correct.
20      Q    All right, so you go to, I take it,
21  the driver's side of the vehicle?
22      A    Correct.

29

1      Q    All right, and you then encounter the
2  driver, correct?
3      A    Correct.
4      Q    And then what was the purpose of that,
5  to write a ticket?
6          MR. GUEST:  Objection.
7          DETECTIVE PINTO:  To instruct the
8  driver of the violation I was approaching him on.
9          BY MR. LATTIMER:
10      Q    Right, to tell him that you were going
11  to give him a ticket for parking, I guess,
12  inappropriate and/or by his tint, correct?
13      A    It was to approach him to let him know
14  the violations I was stopping him for and then
15  conduct my traffic stop.
16      Q    Well, you weren't stopping him.  He
17  was already stopped, right?
18          MR. GUEST:  Objection.
19          DETECTIVE PINTO:  He was in a stopped
20  mode, but I was, as a police officer, telling him
21  that he is stopped on a traffic stop.
22          BY MR. LATTIMER:

30

1      Q    Well, that's certainly not part of
2  your duties and responsibilities, was it?
3          MR. GUEST:  Objection.
4          BY MR. LATTIMER:
5      Q    Conducting traffic stops in the
6  District?
7      A    It is.
8      Q    It is?
9      A    Yes.
10      Q    So officers in plain clothes and
11  unmarked vehicles had a responsibility to stop
12  motorists for traffic violations?
13          MR. GUEST:  Objection.
14          DETECTIVE PINTO:  As a plain clothes
15  officer, we still have the right to enforce the
16  DCMR.
17          BY MR. LATTIMER:
18      Q    Right, I understand that, but don't
19  you have general orders that go to that, that
20  when you're in plain clothes and in unmarked
21  vehicles, doesn't it address whether or not
22  traffic stops are something that they should

31

1  engage in?
2          MR. GUEST:  Objection, asked and
3  answered.
4          DETECTIVE PINTO:  There is a general
5  order in regards to that.
6          BY MR. LATTIMER:
7      Q    And it says that that is not something
8  that should be done, doesn't it?
9      A    It says something to that effect, that
10  a stop for - an unmarked vehicle to conduct a
11  traffic stop.
12      Q    Because that's very dangerous because
13  the people in the vehicle that you're stopping
14  don't know who you are and that could escalate a
15  situation, correct?
16          MR. GUEST:  Objection.
17          DETECTIVE PINTO:  I didn't write the
18  order, so I don't know the purpose behind it, but
19  I could speculate that that would be a reason why
20  that was incorporated.
21          BY MR. LATTIMER:
22      Q    Well, now, police officers have an

32

1  obligation to be familiar with and understand
2  general orders that are submitted by the Chief of
3  Police, correct?
4      A   That's correct.
5      Q   You would agree?
6      A   I would agree.
7      Q   And you all, in the training academy,
8  you all go through the general orders and they
9  talk to you about that, correct?
10      A   Correct.
11      Q   And particularly when you go from
12  uniformed units to plain clothes units, you are
13  given instructions as to how you are to react
14  with regard to citizens.  You're also given a
15  sign that you're supposed to use when you
16  encounter officers who are in uniform so that we
17  don't have an escalation of that, correct?
18      MR. GUEST:  Objection.
19      DETECTIVE PINTO:  Correct.
20      BY MR. LATTIMER:
21      Q   And so traffic stops, normally if you
22  see someone in that position, the proper recourse

33

1  is to call for a marked vehicle, and in fact,
2  undercover officers do it routinely when they
3  want to make a drug stop is they call for a
4  marked unit to make the traffic stop and then you
5  all can conduct the drug investigation, correct?
6      MR. GUEST:  Objection.
7      DETECTIVE PINTO:  Yes, we try to get
8  a marked vehicle to engage our stops if possible,
9  yes.
10      BY MR. LATTIMER:
11      Q   Okay, so in this situation, now it was
12  just three of you from the unit, from the squad
13  rather, in the vehicle when this occurred?
14      A   Correct.
15      Q   Okay, were you driving?
16      A   I was.
17      Q   So when the stop was made, I take it
18  that the first thing you wanted to do was to have
19  him turn the vehicle off so that you didn't get
20  into a chase situation, right?
21      MR. GUEST:  Objection.
22      DETECTIVE PINTO:  I don't recall that.

34

1      BY MR. LATTIMER:
2      Q   I mean, you did tell him to turn the
3  vehicle off, right?
4      MR. GUEST:  Objection.
5      BY MR. LATTIMER:
6      Q   The driver, since it was idling?
7      A   No, I don't recall that.
8      Q   Okay, so what did you do first when
9  you walked up to the vehicle?
10      A   I recall asking him to roll his window
11  down.
12      Q   Okay, were any of the windows down in
13  the vehicle at that time?
14      A   I recall that the passenger window was
15  down.
16      Q   Did you observe the gentleman in the
17  vehicle speaking with the people on the retaining
18  wall?
19      A   It did appear that they were engaging
20  in a conversation.
21      Q   Now, was your weapon drawn when you
22  approached?

35

1      A   No.
2      Q   Did any of the other members of the
3  squad have their weapons drawn?
4      A   I did not see their weapons drawn.
5      Q   So did you conduct a search of the
6  individual in the vehicle?
7      A   After he was placed under arrest.
8      Q   You didn't search him before that?
9      A   No.
10      Q   So you asked him to get out of the
11  vehicle at some point?
12      A   Yes.
13      Q   For what?
14      A   Once I determined I was going to place
15  him under arrest for no permit.
16      Q   So you asked him for his permit while
17  he was still in the vehicle?
18      A   Correct.
19      Q   Did you ever ask him out of the
20  vehicle before you were going to place him under
21  arrest?
22      MR. GUEST:  Objection.

40

1  that the person didn't have a permit on the day
2  of the offense, I'm not sure if that would be
3  upheld or not.
4       BY MR. LATTIMER:
5       Q   All right, so anyway, you decided to -
6  now, was this arrest made so that you could
7  conduct a search?
8       MR. GUEST:  Objection.
9       DETECTIVE PINTO: No.
10       BY MR. LATTIMER:
11       Q   I mean, because you all were looking
12  for guns, right?
13       MR. GUEST:  Objection.
14       DETECTIVE PINTO:  Our primary focus is
15  guns, correct?
16       BY MR. LATTIMER:
17       Q   Right, and you didn't have any reason
18  to search him unless you arrested him, correct?
19       A   I had no reason to search him,
20  correct.
21       Q   You had to no reason to search him.
22  You had no basis to search the vehicle unless you

41

1  arrested him, right?
2       MR. GUEST:  Objection.
3       DETECTIVE PINTO:  Correct.
4       BY MR. LATTIMER:
5       Q   Okay, so the only way that you were
6  going to search that vehicle and him was to
7  arrest him for something, right?
8       MR. GUEST:  Objection.
9       DETECTIVE PINTO:  I can't recall if a
10  search was conducted on the vehicle.  I do know
11  we did a search instant to the arrest of his
12  person.
13       BY MR. LATTIMER:
14       Q   Okay, you got to search the vehicle
15  because you've got to do an inventory search at a
16  minimum, correct?
17       MR. GUEST:  Objection.
18       DETECTIVE PINTO:  An inventory search
19  if it's not a search related to an arrest is
20  supposed to be conducted, correct.
21       BY MR. LATTIMER:
22       Q   And in this now, you're saying that

42

1  the vehicle is inappropriately parked, you're
2  arresting the driver, so you can't leave the
3  vehicle in this inappropriately parked position,
4  correct?
5       A   Correct.
6       Q   So it's got to be moved, correct?
7       A   Correct.
8       Q   And if MPD is moving that vehicle, MPD
9  has to conduct an inventory search, isn't that
10  correct?
11       A   We are supposed to conduct an
12  inventory search of items of value if we are
13  arresting the occupant of the vehicle.
14       Q   Before you take that vehicle to the
15  impound lot, it has to be searched, correct?
16       A   It has to be inventoried before the
17  vehicle is either impounded or left unattended.
18       Q   Right, so what I'm saying is the only
19  way that vehicle gets searched, the only way he
20  gets searched is an arrest, correct?
21       MR. GUEST:  Objection.
22       DETECTIVE PINTO:  In this situation,

43

1  yes.
2       BY MR. LATTIMER:
3       Q   Okay, so now, the two guys on the
4  wall, they're not - did you ever see them in the
5  vehicle?
6       A   No.
7       Q   Did you ever see them exit the
8  vehicle?
9       A   No.
10       Q   All right, so as far as you knew, the
11  individuals on the wall had never been in the
12  vehicle?
13       A   Correct.
14       Q   All right, and so them sitting on the
15  wall in front of a property that has a no
16  trespassing sign is not a crime, is it?
17       MR. GUEST:  Objection.
18       DETECTIVE PINTO:  Them sitting on
19  curtilage to a property that has a no trespassing
20  sign is something that could constitute unlawful
21  entry.
22       BY MR. LATTIMER:

44

1    Q    Well, unlawful entry, you have to
2  enter the property, correct?
3        MR. GUEST:  Objection.
4        DETECTIVE PINTO:  Or attempt to enter,
5  correct.
6        BY MR. LATTIMER:
7    Q    Right, and you never saw them attempt
8  to enter the property, correct?
9    A    On the curtilage, I don't know if an
10  attempt was made while they were on that
11  curtilage.
12    Q    Well, that's what I'm saying.  If
13  there was, you didn't see it, correct?
14    A    Them on the curtilage could be, could
15  constitute an attempt.
16    Q    An attempt to do what?
17    A    They're on curtilage of property, so
18  I don't know what their intent is, if it's to
19  enter that property.
20    Q    Well, you weren't going to arrest them
21  for unlawful entry, right?
22    A    An investigation, I think, was going

45

1  to be conducted in regards to that.
2    Q    For somebody sitting on a wall with
3  their feet on the sidewalk and a property, a
4  house that has no trespassing, somebody was going
5  to investigate whether or not sitting on that
6  wall constituted trespassing?
7        MR. GUEST:  Objection.
8        DETECTIVE PINTO:  Correct.
9        BY MR. LATTIMER:
10    Q    Who?  It wasn't you guys, was it?
11    A    It was.
12    Q    You guys from the gun unit were going
13  to investigate whether or not somebody sitting on
14  the wall with their feet on the sidewalk
15  constituted trespassing?
16        MR. GUEST:  Objection,
17  mischaracterizes his prior testimony.
18        DETECTIVE PINTO:  Yes.
19        BY MR. LATTIMER:
20    Q    That's totally outside your duties and
21  responsibilities, wasn't it?
22        MR. GUEST:  Objection.

46

1        DETECTIVE PINTO:  No, not necessarily.
2        BY MR. LATTIMER:
3    Q    You were there for guns.  Isn't that
4  what you all were doing?
5    A    Yes.
6    Q    And you're in a specialized unit that
7  was for guns, correct?
8    A    Correct.
9    Q    And so you're going to now look for
10  people, whether or not sitting on a wall is
11  trespassing?
12    A    Properties that are abandoned and are
13  vacant sometimes are used to house and store guns
14  and drugs.
15    Q    Okay, but you had never seen them
16  inside the house, right?
17    A    Correct.
18    Q    And you had never seen them come out
19  of the house, correct?
20    A    Correct.
21    Q    And nobody called - did you call for
22  a marked cruiser to come by at that point?

47

1    A    No.
2    Q    Did you call a supervisor at that
3  point?
4        MR. GUEST:  Objection.
5        BY MR. LATTIMER:
6    Q    Your sergeant, what was his name,
7  Sergeant Sloan, I think it was, right?
8    A    At that point, no, I did not.
9    Q    Okay, all right, so did you see what
10  happened when the other two officers approached?
11  Well, were they officers or detectives?
12        MR. GUEST:  Objection.
13        DETECTIVE PINTO:  Officers.
14        BY MR. LATTIMER:
15    Q    Okay, when the other two officers
16  approached the two men on the wall, did you see
17  what happened?
18        MR. GUEST:  Objection.
19        DETECTIVE PINTO:  I saw a portion of
20  what occurred.
21        BY MR. LATTIMER:
22    Q    Okay, did either of them - when they

48

1  approached Mr. Robinson in particular, what
2  happened?  What did they do?  What did they say?
3      MR. GUEST:  Objection.
4      DETECTIVE PINTO:  I recall them
5  standing next to Mr. Robinson as I was talking to
6  the driver of the vehicle.  I recall hearing
7  Officer Roe yell something out like, "Stop!"  I
8  recall seeing Mr. Robinson make like a movement
9  toward his right kind of, resisting kind of away
10 from where Officer Clifford and Roe was.
11     I observed Officer Clifford turn Mr.
12 Robinson around where this wall and grass area
13 was and put him in a downward position so Mr.
14 Robinson was kind of laying on his stomach area,
15 and then I walked over, well, kind of ran over
16 and observed Officer Clifford behind Mr. Robinson
17 and Officer Roe attempting to handcuff Mr.
18 Robinson.
19     I observed Mr. Robinson kind of
20 flailing his arms a little bit while Officer
21 Clifford and Roe were trying to handcuff Mr.
22 Robinson as I stood by while this was occurring.

49

1      BY MR. LATTIMER:
2      Q    Now, where was the other guy that was
3  on the wall?
4      A    I don't know.
5      Q    Okay, so there's three officers and
6  you all are all three involved with Mr. Robinson,
7  is that right?
8      MR. GUEST:  Objection.
9      DETECTIVE PINTO:  At some point, yes,
10 all three of us had to be involved with Mr.
11 Robinson.
12     BY MR. LATTIMER:
13     Q    And there's another guy who is on the
14 wall with Mr. Robinson and you don't know where
15 he is?
16     A    Correct, I didn't know where he went.
17     Q    Now, that's inconsistent with police
18 practices, isn't it?
19     MR. GUEST:  Objection.
20     DETECTIVE PINTO:  I don't know how -
21 I don't know.
22     BY MR. LATTIMER:

50

1      Q    Well, in a situation where you
2  encounter individuals that you don't know, isn't
3  the - aren't you trained and taught that
4  everybody has to be secured?
5      MR. GUEST:  Objection.
6      DETECTIVE PINTO:  If they are stopped,
7  correct.
8      BY MR. LATTIMER:
9      Q    All right, and in this situation, you
10 don't know whether Mr. Robinson is armed or the
11 other man is armed, correct?
12     MR. GUEST:  Objection, assumes facts
13 not in evidence.
14     DETECTIVE PINTO:  At that point,
15 that's correct.
16     BY MR. LATTIMER:
17     Q    And you have already indicated that
18 you perceived these individuals to act
19 suspiciously when you spoke to them, correct?
20     MR. GUEST:  Objection.
21     DETECTIVE PINTO:  Correct.
22     BY MR. LATTIMER:

51

1      Q    And so you allowed an individual who
2  had not been searched, am I correct?
3      A    My understanding, he was not searched.
4      Q    You allowed him to get out of your
5  sight while you and two other officers engaged
6  Mr. Robinson.  Do I have that correct?
7      A    He did get out of my sight, the other
8  male, yes.
9      Q    All right, and so if he were armed,
10 the three of you would have been in a very
11 precarious position, would you agree?
12     MR. GUEST:  Objection.
13     DETECTIVE PINTO:  Depending on the
14 circumstances, yes.
15     BY MR. LATTIMER:
16     Q    Well, depending on the circumstances,
17 he's got a gun and you don't know where he is,
18 he's automatically got the drop on you, correct?
19     MR. GUEST:  Objection.
20     DETECTIVE PINTO:  Possibility.
21     BY MR. LATTIMER:
22     Q    Because your gun, your weapon isn't

52

1 drawn yet, is it?

2    A    My weapon was never drawn.

3    Q    Okay, and the weapon of the other two

4 officers, the weapons of the other two officers

5 were never drawn, correct?

6        MR. GUEST: Objection.

7        DETECTIVE PINTO: Correct.

8        BY MR. LATTIMER:

9    Q    So if that guy, the third guy, the

10 second guy rather, who was sitting on the wall,

11 if he's got a gun and you all don't know where he

12 is, that's not consistent with police practices,

13 is it?

14        MR. GUEST: Objection.

15        DETECTIVE PINTO: It's not consistent

16 if he was still detained.

17        BY MR. LATTIMER:

18    Q    He was, wasn't he?

19        MR. GUEST: Objection.

20        DETECTIVE PINTO: I don't know if

21 Officer Clifford or Roe gave him any orders that

22 he was detained.

53

1        BY MR. LATTIMER:

2    Q    Well, nobody gave him orders that he

3 could leave, right?

4    A    Not that I'm aware of.

5    Q    And nobody gave Mr. Robinson orders

6 that he was detained, right?

7        MR. GUEST: Objection.

8        DETECTIVE PINTO: I don't know at that

9 point if he was given that order.

10        BY MR. LATTIMER:

11    Q    Now, what about the driver?  Had you

12 handcuffed him at that point?

13    A    No.

14    Q    So the driver is out of the vehicle

15 and he's not handcuffed, and so there's two men

16 that have not been searched and you guys who are

17 in a gun intervention unit are all occupied with

18 Mr. Robinson.  Do I have it right?

19        MR. GUEST: Objection, he didn't say

20 the driver was out of the vehicle.

21        DETECTIVE PINTO: No, you do not have

22 it right.

54

1        BY MR. LATTIMER:

2    Q    What do I have wrong?

3    A    The driver was not out of the vehicle

4 at this point.

5    Q    So you've left him in the vehicle,

6 right?

7    A    Correct.

8    Q    So he would have access to anything in

9 that vehicle, say a gun in the glove compartment,

10 correct?

11        MR. GUEST: Objection.

12        DETECTIVE PINTO: Could have.

13        BY MR. LATTIMER:

14    Q    A gun under the seat?

15    A    Could have.

16    Q    And in your experience, often times

17 when people are stopped and guns are found in

18 vehicles, they are in the glove compartment or

19 under the seat, isn't that correct?

20    A    Those are areas where we recover guns.

21    Q    And those are of specific concern to

22 police officers when they make the traffic stop,

55

1 aren't they?

2    A    They are.

3    Q    All right, and so this gentleman is

4 left in the vehicle with access to anything in

5 that vehicle, correct?

6        MR. GUEST: Objection.

7        DETECTIVE PINTO: Correct.

8        BY MR. LATTIMER:

9    Q    And so if he's got a weapon, you all

10 again are in a very precarious position.  Would

11 you agree?

12        MR. GUEST: Objection.

13        DETECTIVE PINTO: In that situation,

14 yes.

15        BY MR. LATTIMER:

16    Q    Okay, so notwithstanding that, the

17 attention is drawn to Mr. Robinson, correct?

18    A    Correct.

19    Q    All right, now, what did you do when

20 you approached Mr. Robinson?

21    A    I recall going to the side of him and

22 putting my hand, like, on his back area while

56

1  Officer Clifford was getting him handcuffed.
2      Q    Okay, now, why was he being
3  handcuffed?
4          MR. GUEST:  Objection.
5          DETECTIVE PINTO:  Based on the
6  resisting move that he made from Officer Roe and
7  Clifford.
8          BY MR. LATTIMER:
9      Q    Well, when you say "resisting move,"
10 what do you mean?
11     A    Pulled away from.
12     Q    Well, were they arresting him?
13     A    At that point, I don't know if they
14 were arresting him.
15     Q    Well, the only thing that you can
16 resist is an arrest, isn't that correct?
17         MR. GUEST:  Objection.
18         DETECTIVE PINTO:  That's not correct.
19         BY MR. LATTIMER:
20     Q    Well, was he being detained?
21     A    It's my understanding that he was
22 being detained based on a statement that he made

57

1  to them.
2      Q    What was that statement based on your
3  understanding?
4      A    That he had a gun.
5      Q    He was being detained because he said
6  he had a gun?
7      A    That's my understanding, yes.
8      Q    I mean, didn't he say he had a gun,
9  "I'm MPD"?
10         MR. GUEST:  Objection.
11         DETECTIVE PINTO:  It's my
12 understanding that he told the officers that he
13 had a gun after he was specifically asked by
14 Officer Roe?
15         BY MR. LATTIMER:
16     Q    What, "Do you have a gun?"
17     A    Yes.
18     Q    And he said, "Yes"?
19     A    Yes.
20     Q    Okay, and then he said, "I'm MPD.  I'm
21 an officer," right?
22         MR. GUEST:  Objection.

58

1          DETECTIVE PINTO:  At one point, he did
2  identify himself as an officer.
3          BY MR. LATTIMER:
4      Q    Okay, so at that point, what was the
5  point of handcuffing him as opposed to just
6  verifying the information?
7          MR. GUEST:  Objection.
8          DETECTIVE PINTO:  I think Officer Roe
9  and Officer Clifford would have to answer that a
10 little bit better.
11         BY MR. LATTIMER:
12     Q    Fair enough.  Fair enough, okay.  So
13 at some point, he is handcuffed, correct?
14     A    Correct.
15     Q    All right, and you find out that he
16 told you if he had a weapon, right?
17     A    Correct.
18     Q    A weapon was taken from his person,
19 right?
20     A    Correct.
21     Q    All right, and you also found out that
22 he was MPD, correct?

59

1      A    Correct.
2      Q    He had his identification with him,
3  correct?
4      A    Correct.
5      Q    Okay, so then why was he kept in
6  handcuffs?
7          MR. GUEST:  Objection.
8          BY MR. LATTIMER:
9      Q    After securing his weapon and
10 verifying that he was MPD?
11     A    Well, I notified an official almost
12 immediately to respond, Sergeant Sloan.
13     Q    Okay.
14     A    So any interactions with off duty
15 members, we're supposed to notify an official.
16     Q    I understand.
17     A    Based on the fact that he physically
18 resisted and made a physical resistance away from
19 Officer Clifford and Officer Roe, a determination
20 was made to keep him handcuffed and secured so he
21 wouldn't attempt to physically get physical with
22 us or attempt to leave the scene based on the

60

1  investigation.
2       Q    Leave the scene, what do you mean?
3       A    We were to handcuff if he were to
4  attempt to run away or flee.
5       Q    What gave you an indication that he
6  might do that?
7       A    Based on the fact that he resisted
8  Officer Clifford and Officer Roe when they were
9  interacting with him.
10      Q    Didn't they throw him to the ground?
11           MR. GUEST:  Objection.
12           DETECTIVE PINTO:  I saw movement of
13  turning his body and putting it down.  I don't
14  know if I would characterize it as throwing to
15  the ground.
16           BY MR. LATTIMER:
17      Q    So how did he get on the ground if
18  they didn't throw him to the ground?
19           MR. GUEST:  Objection.
20           DETECTIVE PINTO:  He was put in like
21  a takedown move to the ground, the grass area.
22           BY MR. LATTIMER:

61

1       Q    Okay, and let's see, now, you all have
2  a couple of takedown moves.  Which one did they
3  use?
4            MR. GUEST:  Objection.
5            DETECTIVE PINTO:  I can't recall the
6  exact move that Officer Clifford or Roe used.
7            BY MR. LATTIMER:
8       Q    Well, did an officer get behind him
9  and one kick his knee in or kick the joint in on
10  the leg to force him down with a hand on his
11  back?
12           MR. GUEST:  Objection.
13           DETECTIVE PINTO:  I can't recall if I
14  saw that.
15           BY MR. LATTIMER:
16      Q    Well, I'm trying to understand.  You
17  saw him and I think you said at some point he
18  stood up, correct?
19      A    Correct.
20      Q    And initially when you saw him, he was
21  sitting down?
22      A    Correct.

62

1       Q    So when you saw him on the ground,
2  where was he?  Was he on the sidewalk?  Was he in
3  the street?  Where was he?
4            MR. GUEST:  Objection.
5            DETECTIVE PINTO:  When I saw him - can
6  you try to recharacterize the question for me?
7            BY MR. LATTIMER:
8       Q    Right, what I'm asking you is you
9  indicated you saw him on the ground, correct?
10      A    After he - are you referring to after
11  he resisted the officers?
12      Q    When you went over to assist putting
13  the handcuffs on him.
14      A    Right.
15      Q    That's what I'm talking about.
16      A    Okay.
17      Q    He was on the ground at that point,
18  right?
19      A    Yeah, he was, like, on that wall,
20  grass area to that property.
21      Q    Okay, so what I'm trying to understand
22  is in front of, between the vehicle that you had

63

1  stopped and the wall, there was a sidewalk,
2  right?
3       A    Correct.
4       Q    All right, now, on the other side of
5  the wall, there was ground, meaning dirt, grass,
6  or something like that, correct?
7       A    Correct.
8       Q    Okay, what I'm asking you is where was
9  he?  Was he on the grass, dirt part or was he on
10  that sidewalk part?
11      A    I recall him being, like, on the, like
12  the grass retaining area of this property.
13      Q    Okay, all right, so did you see how he
14  got there?
15      A    I recall seeing Clifford behind him
16  and making some type of move to get his body into
17  that position.
18      Q    Okay, and that's one of the takedown
19  moves that you all are taught in the academy,
20  correct?
21           MR. GUEST:  Objection.
22           DETECTIVE PINTO:  Yes.

64

1    BY MR. LATTIMER:
2    Q    Okay, and that takedown move was
3  supposed to be done as quickly as possible, sort
4  of like a surprise so that before an individual
5  has an opportunity to react, you have effectuated
6  a takedown because once you get him off his feet,
7  it's easier to deal with someone who may be a
8  combatant, would you agree?
9        MR. GUEST:  Objection.
10        DETECTIVE PINTO:  I would.
11        BY MR. LATTIMER:
12    Q    Okay, and so when he was taken down,
13  the reason that, as I understood you to say, you
14  believe that he was taken was because he said he
15  had a weapon?
16    A    Correct.
17    Q    All right, and so how long was he held
18  handcuffed?
19    A    I don't know the exact time.  I could
20  estimate.
21    Q    What's your best estimate?
22    A    20 to 30 minutes.

65

1    Q    Okay, then what happened after - well,
2  let me back up.  Did the official arrive on the
3  scene, Sergeant Sloan?
4    A    Yes.
5    Q    Okay, when Sergeant Sloan arrived on
6  the scene, what happened?
7    A    We briefed him about what occurred.
8    Q    All right, and then what happened?
9    A    It's my understanding that Sergeant
10  Sloan contacted our Internal Affairs Division,
11  and ultimately, Mr. Robinson was sent on his way.
12    Q    Was he charged with a crime?
13        MR. GUEST:  Objection.
14        DETECTIVE PINTO:  No.
15        BY MR. LATTIMER:
16    Q    Okay, so the handcuffs were taken off
17  and he was given his gun back?
18    A    The handcuffs were taken off.  I don't
19  recall if his gun was given back to him.
20    Q    What about his ID?
21    A    I don't recall in regards to that
22  either.

66

1    Q    Who secured the weapon?
2        MR. GUEST:  Objection.
3        DETECTIVE PINTO:  Initially, Officer
4  Roe did.
5        BY MR. LATTIMER:
6    Q    So what did he do, put it in his
7  vehicle, well, your, in the vehicle?
8    A    It's my understanding that he did.
9    Q    Okay, and so did you have any
10  conversation with Mr. Robinson?
11    A    Brief.
12    Q    What was the nature of your
13  conversation?
14    A    I recall after he was handcuffed, I
15  just tried to explain to him the justification
16  for the stop and talked about the house with the
17  sign, the no trespassing.
18    Q    Well, here again with regard to him,
19  the reason that you all approached him was
20  because you wanted to search him, right?
21        MR. GUEST:  Objection,
22  mischaracterizes his testimony.

67

1        DETECTIVE PINTO:  I would not say
2  that.  I wouldn't characterize it that way.
3        BY MR. LATTIMER:
4    Q    Well, I mean, that was part of the
5  unit.  You all were in gun intervention, correct?
6    A    Correct.
7    Q    And you go to what you consider high
8  crime neighborhoods, correct?
9    A    Correct.
10    Q    And if you see individuals gathered,
11  or hanging, or whatever in those neighborhoods,
12  you approach them, correct?
13        MR. GUEST:  Objection.
14        DETECTIVE PINTO:  Sometimes we do,
15  yes.
16        BY MR. LATTIMER:
17    Q    And when you approach them, you ask
18  them if you can do a pat down, correct?
19        MR. GUEST:  Objection.
20        BY MR. LATTIMER:
21    Q    If you don't have reasonable suspicion
22  with regard to any other crime, you ask them for

72

1  11:16 a.m.)
2        BY MR. LATTIMER:
3     Q   Who was Officer Sharpton?
4     A   He was also an officer with the Gun
5  Recovery Unit.  He was on another squad that
6  arrived on the scene after the fact.
7     Q   He wasn't in the vehicle with you?
8     A   No, he was not.
9        MR. LATTIMER:  All right, I think
10 that's all I have.
11       DETECTIVE PINTO:  Okay.
12       MR. LATTIMER:  I appreciate your time.
13       DETECTIVE PINTO:  No problem.
14       MR. GUEST:  I have some questions,
15 Detective Pinto.
16       DETECTIVE PINTO:  Yes, sir.
17       MR. GUEST:  Actually, we'll go in just
18 one second.
19            CROSS EXAMINATION
20       BY MR. GUEST:
21    Q   Okay, Detective Pinto, I just want to
22 follow up on a couple of things that you

73

1  discussed with Mr. Robinson's attorney.  When you
2  first arrived on the scene in your vehicle with
3  Officer Clifford and Officer Roe, do you recall
4  whether anything was said to any of the
5  individuals - well, strike that.  You said that
6  you mentioned that you made a comment to the two
7  individuals sitting on the wall, right?
8     A   Correct.
9     Q   And was that said to them while you
10 were still in the vehicle?
11    A   Yes.
12    Q   And you talked about the fact that you
13 were in an unmarked car.  What else can you
14 describe to me about that car?
15    A   The vehicle had emergency lights in it
16 and it was an unmarked Explorer, if I recall
17 correctly, which is the same make and model of
18 our marked vehicles.
19    Q   Okay, you mentioned that members of
20 the GRU are in plain clothes.
21    A   Correct.
22    Q   What do you remember, if anything,

74

1  about the clothing you were wearing that day?
2     A   I remember wearing a tactical vest
3  that's clearly labeled "police" in white
4  lettering with a black background across my chest
5  and across my back, and I recall wearing my badge
6  on my left lapel.
7     Q   Do you recall what type of clothing
8  Officers Roe and Clifford were wearing that day
9  at the time you stopped and encountered Mr.
10 Robinson?
11    A   Similar fashion.
12    Q   They had tactical vests on?
13    A   Correct.
14    Q   And that they were labeled with the
15 word "police"?
16    A   Correct.
17    Q   And did the word "police" appear on
18 the front and the back?
19    A   Yes.
20    Q   Describe for me if you will or if you
21 would the scene in terms of other people around
22 in the vicinity of the 5500 block of C Street SE

75

1  in addition to the two individuals on the wall
2  and the driver of the car we've already talked
3  about.
4     A   I recall people across the street from
5  that location.
6     Q   What do you remember about those
7  individuals across the street?
8     A   I recall -
9     Q   Or how many individuals across the
10 street were there if you remember?
11    A   I recall seeing two and I recall them
12 looking in our direction.
13    Q   Did you see anybody else on the scene
14 if you remember?
15    A   I can't recall.
16    Q   At any time - well, strike that.  Let
17 me back up.  You talked about some of the things
18 you heard Mr. Robinson say, right?
19    A   Correct.
20    Q   You mentioned that he said that he had
21 a weapon?
22    A   Correct.

76

1    Q    Do you remember any other - and you
2  said that you spoke with him?
3    A    I did.
4    Q    And after you - well, before Mr.
5  Robinson was placed in handcuffs, do you remember
6  anything else he said?
7    A    I recall him saying, when asked about
8  residing at that location, him saying, "No," and
9  them him making a comment, something to the
10  effect like, "I don't even know what's going on
11  here."
12    Q    Do you remember him saying anything
13  else before he was placed in handcuffs?
14    A    I recall him - I recall hearing him
15  say, "No," before I ran over to assist, and then
16  I recall him saying something about not touching
17  his gun as Officer Clifford was handcuffing or
18  just concluding handcuffing Mr. Robinson.
19    Q    Now, you just said that you ran over
20  there, right?
21    A    Yes.
22    Q    What prompted you to leave where you

77

1  were talking to the driver of the car to run over
2  there to where Mr. Robinson was?
3    A    When I heard Officer Roe yell out and
4  then I, seeing the movement of Mr. Robinson kind
5  of pull away from the officers, and then seeing
6  Officer Clifford trying to get control of Mr.
7  Robinson.
8    Q    And you said that you heard Officer
9  Roe yell out.  What did you hear?  Did Officer
10  Roe yell any words?
11    A    I recall hearing him yell, "Stop!"
12    Q    So you mentioned you're in GRU.  You
13  guys do dangerous work, right?
14    A    Correct.
15    Q    Officer Clifford and Officer Roe are
16  involved with an individual and you hear Officer
17  Roe yell, "Stop!"
18    A    Correct.
19    Q    And so you run over there?
20    A    Correct.
21    Q    And you said that you, at one point,
22  were on, that you had placed your arm on Officer

78

1  Robinson's shoulder?
2    A    Shoulder, back area.
3    Q    Do you recall how long you had, that
4  you were touching Mr. Robinson?
5    A    A couple seconds.
6    Q    Okay, and what, if anything, do you
7  recall about your behaviors once you ran over
8  there in terms of, you know, were you surveying
9  the scene?  What were you doing?
10    A    I recall telling him to stop.  I think
11  I said, "Stop resisting."  I recall looking
12  around the scene, you know, trying to keep my
13  eyes on the driver of that vehicle and making
14  sure that these other individuals I saw across
15  the street weren't going to run over and
16  interfere with our scene, and I recall getting on
17  the radio to have backup come and Sergeant Sloan
18  come.
19    Q    And did all - tell me how long all of
20  those events took place once you ran over to
21  where Mr. Robinson was?
22    A    Seconds.

79

1    Q    So your understanding is that you hear
2  Officer Roe yell.  You identify the situation as
3  being Officer Clifford and Officer Roe struggling
4  with someone trying to place him in handcuffs,
5  and you run over there?
6    A    Correct.
7    Q    Are you nervous?
8    A    Yes.
9    Q    Are you thinking that your safety may
10  be in danger?
11    A    Yes.
12    Q    And you say that you call Sergeant
13  Sloan?
14    A    Correct.
15    Q    And he arrives.  How long after you
16  made the call did he - well, strike that.  Was
17  Sergeant Sloan the first guy who showed up on the
18  scene who wasn't you, Officer Clifford, or
19  Officer Roe who was involved with MPD?
20    A    He was not the first person.
21    Q    So who is the first person who shows
22  up?

80

1    A    I believe it was Officer Remick-Cook.
2    Q    Okay, and was he a patrol officer at
3 the time?
4    A    No, he was also with the Gun Recovery
5 Unit.
6    Q    Okay, and so how long after you made
7 the call to Sergeant Sloan does he arrive at the
8 scene?
9    A    I can't recall the exact time.  I
10 could give an estimation.
11    Q    Sure.
12    A    I would say within five minutes, five
13 to 10 minutes.
14    Q    And you said that Mr. Robinson was in
15 handcuffs for, what did you say, about 20 to 30
16 minutes?
17    A    Correct.
18    Q    Okay, so who showed up on the scene
19 that prompted you all to make the determination
20 to remove the handcuffs from Mr. Robinson?
21    A    Once Sergeant Sloan and Lieutenant
22 Coligan arrived on the scene and they were

81

1 briefed, and at some point after they were
2 briefed, a determination was made to take him out
3 of handcuffs.
4    Q    Okay, now, when you, and Officer
5 Clifford, and Officer Roe were involved with Mr.
6 Robinson, do you recall whether he was using any
7 profanity toward you?
8    A    Yes, I do recall that he did use some
9 profanity.
10    Q    And what do you recall Mr. Robinson
11 saying?
12    A    That we, "fucked up," and I heard him
13 say, "fuck."
14    Q    How would you describe Mr. Robinson's
15 demeanor leading up to the time that he was
16 placed in handcuffs?
17    A    Cocky, arrogant, disrespectful.
18    Q    And how would you describe his
19 demeanor after he was placed in handcuffs before
20 the handcuffs were taken off?
21    A    He began to act somewhat more humble
22 after that.

82

1    Q    Before being placed in handcuffs,
2 would you ever - based on your recollection,
3 would you describe Mr. Robinson as being in a
4 relaxed mood?
5    A    No, I would not describe him that way.
6    Q    Based on your training with MPD, are
7 you aware of any protocols or rules regarding
8 contact between on duty officers and off duty
9 officers?
10    A    Yes, I am.
11    Q    And what is that?
12    A    That if you are off duty on a scene,
13 that the on duty officer is assumed lead or is to
14 assume control of the scene unless otherwise
15 noted or an official arrives on the scene.
16    Q    And is that how Mr. Robinson was
17 conducted himself to your knowledge?
18    A    No.
19    Q    What else, if anything, do you recall
20 Mr. Robinson saying at any time during this
21 incident?
22    A    He made a comment that he was angry,

83

1 that he had just witnessed his brothers get into
2 a fight and that's why he was angry, and that he
3 didn't want to have to take police action against
4 his brothers or arrest them and he was in an
5 angry mood because of that, and that that had just
6 recently occurred or was occurring as we came
7 into the block.
8    Q    Okay, now obviously there are other -
9 well, strike that.  Are you aware of whether Mr.
10 Robinson said anything about whether he did
11 anything wrong at the time of the incident?
12    A    I do recall him making a comment that
13 his actions were wrong on how he dealt with us,
14 something to that effect.
15    Q    Do you recall specifically what he
16 said?
17    A    I can't recall right now.
18    Q    Did you talk to any of the other
19 officers on the scene regarding anything Mr.
20 Robinson said about whether he made any mistakes
21 during the day of the incident we're talking
22 about?

84

1    A   Yes.
2    Q   And what's that?
3    A   I recall speaking to an officer who
4  advised that Mr. Robinson made a comment in his
5  presence that he knows that he messed up,
6  something to that effect.
7    Q   And who was that, the person that
8  relayed that information to you?
9    A   Officer Jordan Catz.
10   Q   At any time before you left the scene
11  - well, strike that.  Did Mr. Robinson leave the
12  area before you did?
13   A   I can't recall.
14   Q   At any time did you see Mr. Robinson -
15  well, strike that.  Did you ever see any elderly
16  woman come to the scene and talk with Mr.
17  Robinson?
18        MR. LATTIMER:  I'm not even going to
19  object to leading.  Why don't you just go ahead
20  and testify?
21        DETECTIVE PINTO:  I don't recall
22  seeing that.

85

1        BY MR. GUEST:
2    Q   Now, you said that you did at some
3  point learn that Mr. Robinson was MPD.  When's
4  the first time you recall hearing Mr. Robinson
5  say that he was MPD?
6    A   I recall it was right as he was
7  getting handcuffed.
8    Q   And you mentioned that when he was
9  being placed in handcuffs, that he was flailing
10  his arms?
11   A   I did see flailing as Officer Clifford
12  was attempting to handcuff him.
13   Q   And you saw - when we were talking
14  about Officer Clifford and Officer Roe
15  handcuffing him, do you believe that they were
16  too rough with Mr. Robinson?
17   A   No.
18   Q   Do you believe that Officer Clifford
19  and Officer Roe used the appropriate amount of
20  restraint in order to place Mr. Robinson in
21  handcuffs?
22        MR. LATTIMER:  Objection.

86

1        DETECTIVE PINTO:  I do.
2        BY MR. GUEST:
3    Q   And talking about the other guy who
4  was on the wall, is it fair to say that during
5  the incident with Mr. Robinson, that you lost
6  sight of this other individual?
7    A   Yes.
8    Q   And given the situation at the time,
9  and what was going on with Mr. Robinson and what
10  you knew about Mr. Robinson, the fact that he had
11  already identified himself as having a gun, did
12  you believe that Mr. Robinson posed the immediate
13  threat at that time?
14   A   I did.
15   Q   Did you ever receive any complaint -
16  well, strike that.  Do you know whether the
17  driver of the car who was arrested ever filed a
18  complaint?
19   A   Not that I'm aware of.
20        MR. GUEST:  All right, thank you.
21        DETECTIVE PINTO:  Thank you.
22        REDIRECT EXAMINATION

87

1        BY MR. LATTIMER:
2    Q   I take it you did a 163, right?
3    A   Correct.
4    Q   Because when you do an arrest, you
5  have to do a PD-163, right?
6    A   Correct.
7    Q   Did you do a 251 too?
8    A   I believe one was done, yes.
9    Q   For Mr. Robinson?
10   A   No, for the - I don't recall in
11  regards to the interaction with Mr. Robinson.
12  I'm referring to the actual driver.
13   Q   Right, the arrest you made, but with
14  regard to Mr. Robinson, did anybody do a report?
15   A   I don't recall.
16   Q   Well, aren't you supposed to do a
17  report every time there's a use of force?
18        MR. GUEST:  Objection.
19        DETECTIVE PINTO:  We are supposed to
20  report any use of force.
21        BY MR. LATTIMER:
22   Q   Okay, and force was used, wasn't it?