1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

---

IN THE MATTER OF:

JAMAL B. ROBINSON,

        Plaintiff,

v.

DISTRICT OF COLUMBIA, et al.:

        Defendant.

C.A. No.
15-100 (RJL)

---

Thursday,
March 15, 2018

Washington, D.C.

DEPOSITION OF:

    OFFICER MAURICE CLIFFORD

called for examination by Counsel for the Defendant, pursuant to Notice of Deposition, in the Office of the Attorney General for the District of Columbia, located at One Judiciary Square, 441 4th Street NW, Washington, DC, when were present on behalf of the respective parties:

4

1        P-R-O-C-E-E-D-I-N-G-S
2               (1:00 p.m.)
3        MR. SHABAZZ: Good afternoon, Mr.
4   Clifford.
5        THE WITNESS: Good afternoon.
6        MR. SHABAZZ: My name is Malik
7   Shabazz. I am an attorney for Mr. Jamal
8   Robinson.
9        This deposition is in regards to an
10  incident that took place on November the 6th,
11  2013, and is the subject of a lawsuit. The
12  lawsuit charges, amongst other things, that Mr.
13  Robinson was falsely arrested, that he --
14  excessive force was used on him during this false
15  arrest and that other Constitutional violations
16  occurred.
17  Whereupon,
18            MAURICE CLIFFORD
19  appeared as a witness herein and, having been
20  first duly sworn, was examined and testified as
21  follows:
22          DIRECT EXAMINATION

5

1        BY MR. SHABAZZ:
2    Q   Have you ever taken a deposition
3   before?
4    A   Yes, I have.
5    Q   Okay. How many time?
6    A   I believe twice.
7    Q   Twice. What was the reason for that
8   deposition?
9    A   Similar suits involving units I was in
10  at the time.
11   Q   Were you sued personally in those?
12   A   No. I was a part -- ETAR, like a part
13  of my unit was, myself and some other officers
14  and members of the unit.
15   Q   The Gun Recovery Unit?
16   A   Not at that time.
17   Q   What unit was that?
18   A   The Fourth District Vice Unit.
19   Q   Fourth District Vice. Okay, and you
20  testified for what reason, you were a witness; is
21  that correct?
22       MR. GUEST: Objection.

6

1        BY MR. SHABAZZ:
2    Q   Were you a witness?
3    A   Yes.
4    Q   What happened in that case?
5    A   I don't know the outcome of it, I
6   don't recall the outcome of that.
7    Q   But you testified -- what were you
8   testifying to?
9        MR. GUEST: Objection.
10       BY MR. SHABAZZ:
11   Q   What was it about, what was the case
12  about?
13   A   It was about an arrest.
14   Q   Okay. And was the person -- was the
15  case you were involved in about a person claiming
16  that they had been arrested falsely?
17   A   No.
18   Q   What was the case about?
19   A   I believe the defendant at the time
20  claimed that one of the officers had injured his
21  wrist in the course of him being arrested
22  lawfully.

7

1    Q   And one of those officers was a member
2   of your vice unit; is that right?
3        MR. GUEST: Objection.
4    A   Yes.
5        BY MR. SHABAZZ:
6    Q   Okay. That was one occasion. What
7   year was that?
8    A   2007.
9    Q   2007 you testified. Do you know what
10  year the incident was?
11   A   I don't recall.
12   Q   Okay. What was the other time you
13  testified?
14   A   In another suit, I believe that was in
15  2008.
16   Q   Was it a deposition?
17   A   Yes.
18   Q   Okay.
19   A   And a trial.
20   Q   And a trial, okay. What was the trial
21  about?
22   A   An individual who was convicted of

Page 8

1  assaulting me, claimed that I used excessive
2  force in arresting him. And that was dismissed.
3      Q    But you were the defendant in that
4  case?
5      A    I was and I was exonerated.
6      Q    Okay. You were --
7      A    So that went to trial and it was --
8  their case was dismissed.
9      Q    Okay. What year did the incident take
10 place?
11     A    2005.
12     Q    Okay. Who was the plaintiff, the
13 person that said that they were injured?
14     A    Jared Wells.
15     Q    W-e-l-l-s?
16     A    I guess so.
17     Q    Jared Wells, okay. So you were
18 accused of using excessive force then?
19          MR. GUEST: Objection.
20          BY MR. SHABAZZ:
21     Q    A lawsuit was filed against you for
22 using excessive force.

Page 9

1      A    And it went to trial and I was
2  acquitted.
3      Q    I just asked you
4      A    That's what it was for,
5      Q    Okay. So you're familiar with these
6  proceedings; aren't you?
7      A    Yes, sir.
8      Q    All right. Okay, now is there
9  anything that would inhibit you from testifying
10 here today -- any medication or anything that
11 would cloud your memory or impair you from
12 effectively speaking and communicating with me
13 today?
14     A    No.
15     Q    Okay. Just so we can get our
16 communication right, if I ask a question I want
17 to make sure you understand the question, so I
18 would like you to wait 'til I ask the question
19 and then respond.
20          If at some point you don't hear or
21 can't understand what I'm asking, then it's
22 perfectly okay to ask me to ask -- to clarify my

Page 10

1  question or to ask it again.
2          If you need a break at some point,
3  it's okay. Speak with your counsel. However, if
4  I'm in the middle of a question and you take a
5  break, I would prefer that the question be
6  answered before you take a break with your
7  attorney, Mr. Guest.
8          Is that clear?
9      A    Yes, sir.
10     Q    Okay. Let me ask you this, what is --
11 can you tell me the significance -- can you tell
12 me the meaning of the tattoos on your arm?
13         MR. GUEST: Objection, relevance.
14     A    This one is St. Michael, who is the
15 patron saint of police officers.
16         BY MR. SHABAZZ:
17     Q    I've never heard of St. Michael. Tell
18 me the origin of St. Michael --
19         MR. GUEST: Objection, relevance.
20     Q    -- being the patron saint of police
21 officers.
22     A    Patron saint -- St. Michael is the

Page 11

1  patron saint of police officers and armed service
2  members.
3      Q    Okay, what is the origin of that.
4          MR. GUEST: Objection, relevance.
5      A    It emanates -- issues from the Bible
6  and as, you know, throughout history, certain
7  saints have been assigned to certain professions,
8  and St. Michael is the patron saint of police
9  officers and so it's more of a good luck and
10 protection in the line of work that I have.
11         BY MR. SHABAZZ:
12     Q    Do you get that like when you start,
13 you know, employment with the police department?
14 How do you come about --
15     A    No, I chose to do this on my own.
16     Q    After you started working?
17     A    Yes, sir.
18     Q    Okay, now that's the one on your left
19 forearm; right?
20     A    Yes, sir.
21     Q    Okay. What about the one on your left
22 bicep, what's that?

## Page 36

1  can initiate the stop or you can initiate the
2  contact.
3       BY MR. SHABAZZ:
4    Q   Okay, so let me see -- if you see a
5  group, you say under the totality of
6  circumstances, so in a so-called high crime area,
7  African-American men that may be hanging out,
8  would this be a source -- just hanging out --
9    A   Is that your question?
10   Q   No, I'm not finished.  African-
11 American men just hanging out in the community of
12 a high crime area and you encounter them upon
13 approach, what is your criterion for deciding
14 what is suspicious?
15       MR. GUEST:  Objection, incomplete and
16 improper hypothetical.
17   A   In the context that you described it,
18 there is nothing inappropriate about that.
19 Individuals have a -- a group of men standing
20 around or hanging out in an area and there's no
21 other observation that they're engaged in
22 criminal activity or breaking the law, then

## Page 37

1  there's no contact that would be initiated.
2       BY MR. SHABAZZ:
3    Q   Okay.  And is standing on the sidewalk
4  a reason for a contact or to consider a person
5  being suspicious?
6       MR. GUEST:  Objection, incomplete and
7  improper hypothetical.
8    A   Just standing --
9       BY MR. SHABAZZ:
10   Q   Just standing on the sidewalk in front
11 of a private residence.
12      MR. GUEST:  Objection, complete and
13 improper hypothetical.
14   A   It depends.
15      BY MR. SHABAZZ:
16   Q   A sidewalk is public property; right?
17      MR. GUEST:  Objection.
18   A   To answer your question specifically
19 as you asked it, an individual just standing on
20 the sidewalk is not going to be a violation of
21 the law.
22      BY MR. SHABAZZ:

## Page 38

1    Q   Okay.  And you can't be arrested for
2  standing on the sidewalk in front of a private
3  residence; can you?
4       MR. GUEST:  Objection.
5    A   Not that I'm aware of.
6       BY MR. SHABAZZ:
7    Q   Okay.  And is it an indication of
8  criminal activity for a person to stand in front
9  of a private residence on the public sidewalk?
10      MR. GUEST:  Objection.
11   A   It depends on that residence.
12      BY MR. SHABAZZ:
13   Q   Okay.  How would it depend on that
14 residence?
15   A   With no other factors involved, then
16 no, that would not be a cause for arrest,
17 specifically standing on the sidewalk.  But if
18 there were other factors involved, then it could
19 be a reason to initiate a contact.
20   Q   Okay.  What kind of factors?
21   A   The nature of the property.
22   Q   Okay.  Explain.

## Page 39

1       MR. GUEST:  Objection.
2       BY MR. SHABAZZ:
3    Q   What you mean by nature of the
4  property, please explain what you mean by nature
5  of the property.
6    A   Okay.  If a property has indications
7  that it's private, that would be -- that could be
8  a cause to initiate a contact.
9    Q   Well, every property is private; isn't
10 it?
11      MR. GUEST:  Objection.
12      BY MR. SHABAZZ:
13   Q   All residential homes are owned by
14 private owners; is that right?
15   A   That's correct.
16   Q   Okay.  So what would make one home --
17 when you say an indication that it's private,
18 what do you mean by that?
19   A   Indication that there's no ownership;
20 i.e., a vacant property.
21   Q   Okay.  And that would mean what?
22   A   That it's not under the control of any

Neal R. Gross and Co., Inc.
Washington DC
(202) 234-4433   www.nealrgross.com

Page 40

1  individual.
2  Q   And if individuals were standing in
3  front of that property, that would raise your
4  suspicion in what regard?
5       MR. GUEST: Objection, improper and
6  incomplete hypothetical.
7  A   If an individual was standing in front
8  of a vacant property that displayed placards such
9  as "No trespassing" or something of that nature,
10 that would -- and the property is clearly vacant
11 and they're on the property, then that would lead
12 us to initiate a contact under unlawful entry or
13 to investigate further.
14 Q   Okay. If they were on the property;
15 is that right? They would have to be on the
16 property for you to say that they were doing
17 something wrong; is that right?
18 A   Well, like I said, an unlawful entry
19 -- using the term for example, unlawful entry,
20 the nature of unlawful entry is that a person who
21 has entered or is intending to enter a property
22 unlawfully. So we wouldn't know that until we go

Page 41

1  to investigate, to determine that nothing has
2  taken place. So we don't know unless we
3  investigate.
4  Q   Okay. And if you haven't been called
5  that there's a problem, then you would have to,
6  by your observation, make a determination as to
7  whether a person has entered illegally or
8  attempted to enter illegally; is that right?
9       MR. GUEST: Objection, ambiguous and
10 vague.
11 A   Well, yeah.
12      BY MR. SHABAZZ:
13 Q   You would have to get a call to know
14 whether somebody was trying to illegally enter
15 that property?
16 A   No.
17      MR. GUEST: Objection.
18      BY MR. SHABAZZ:
19 Q   You could find that out by
20 observation; right?
21      MR. GUEST: Let him answer the
22 question, please.

Page 42

1       MR. SHABAZZ: I'm sorry, go ahead.
2  A   Repeat your question.
3       BY MR. SHABAZZ:
4  Q   I said you wouldn't have -- my first
5  one was you wouldn't have to get a -- would you
6  have to get a call of someone complaining of an
7  illegal entry or an attempt to enter illegally?
8  A   No, sir.
9  Q   Okay. You could make your own
10 observation --
11      MR. GUEST: Objection.
12 Q   -- to see whether a person was
13 illegally entering or attempting to enter
14 illegally; is that fair?
15 A   Yes, we have to use our own
16 observations and we have to conduct an
17 investigation.
18 Q   Okay. So if a person was on a
19 sidewalk lawfully in front of such residence as
20 you've described, that you say is a vacant
21 property, how would you come about making a
22 determination -- strike that. If a person was on

Page 43

1  the public sidewalk lawfully in front of a vacant
2  property, do you consider that an attempt to
3  illegally enter?
4       MR. GUEST: Objection, incomplete and
5  improper hypothetical.
6  A   Specifically the question you're
7  asking, someone on a sidewalk, no, that's not
8  just -- no, I would not just assume that that
9  person is trying to enter or break into a vacant
10 property. You have to look at the circumstances
11 and you have to investigate to determine whether
12 or not you believe that or not. You can
13 determine the reasonable suspicion if you believe
14 that that is taking place, but you don't know
15 unless you initiate a contact, unless you ask.
16      BY MR. SHABAZZ:
17 Q   Okay. Now, so what would a person
18 have to do in front of this vacant property --
19 what would they have to do in order for you to
20 make a determination that you needed to make a
21 contact?
22      MR. GUEST: Objection.

44

1    BY MR. SHABAZZ:
2    Q    What would they have to be doing?
3    A    Well, traditionally in my experience,
4    vacant properties are often associated with drugs
5    and weapons, stash houses. So vacant properties
6    are traditionally a haven for illicit activity.
7    So the first step would be ascertaining if the
8    individual resided there or had a reason to be
9    there.
10   Q    Okay. so is it fair to say that you
11   would initiate a contact with any person that you
12   found in front of a abandoned property?
13       MR. GUEST: Objection.
14   A    Yes.
15       BY MR. SHABAZZ:
16   Q    Okay. So any person you found in
17   front of an abandoned property, you initiate a
18   contact.
19       MR. GUEST: Objection.
20   A    If an individual is on the property or
21   close to -- for example, if you on an abandoned
22   property, then we would probably contact -- we

45

1    would contact you, because at that point I
2    believe you'd be in violation of the unlawful
3    entry rule -- law.
4        BY MR. SHABAZZ:
5    Q    But if you're on the public sidewalk
6    in front of it.
7        MR. GUEST: He just said if he was on
8    the property.
9        BY MR. SHABAZZ:
10   Q    Do you stop persons who are in front
11   of abandoned properties --
12       MR. GUEST: Objection.
13   Q    -- due to all of the factors of crime
14   and things that you say happen in those abandoned
15   properties?
16       MR. GUEST: Objection.
17   A    If an individual -- yes, it would be
18   a contact though, not a stop.
19       BY MR. SHABAZZ:
20   Q    You would make a contact. And that
21   contact would be -- would cause you to do what?
22   A    As I just -- ascertain if the person

46

1    was there or resides there, has a reason to be
2    there.
3    Q    Okay. So it could be fair to say that
4    routinely that you would ask any person that was
5    standing in front of a property that was not --
6    that you could determine that was vacant, that
7    you would begin asking them did they live there
8    and did they have a right to be there?
9        MR. GUEST: Objection,
10   mischaracterizes the testimony?
11       BY MR. SHABAZZ:
12   Q    Is that your routine?
13       MR. GUEST: Objection,
14   mischaracterizes the testimony.
15   A    I don't have a routine.
16       BY MR. SHABAZZ:
17   Q    Is that the practice?
18       MR. GUEST: Objection.
19   A    It's not a practice.
20       BY MR. SHABAZZ:
21   Q    But you say you do it all the time.
22       MR. GUEST: Objection,

47

1    mischaracterizes his testimony.
2    A    That's not what I said. What I said
3    was that if I -- anybody that I personally would
4    observe in front of a vacant property, I would --
5    it would get my attention and I would technically
6    or typically initiate a contact to find out if
7    they live there or if they have a reason to be
8    there, for the factors that I explained to you
9    before; i.e., vacant properties are a haven for
10   illicit activity, break-ins, drug usage, stashing
11   -- they use them as stash locations, they use to
12   hide weapons, they use to hide guns. Vacant
13   properties are a haven for illicit activity.
14       BY MR. SHABAZZ:
15   Q    Now when you say vacant properties are
16   a haven for illicit activity, that's true
17   throughout the District of Columbia?
18   A    Yes, sir.
19   Q    Okay. So in your GRU unit, what
20   districts did you patrol?
21   A    All seven.
22   Q    All seven. Okay. You patrolled --

Page 64

1  Q  Okay. But he was not arrested for
2  unlawful entry; right?
3  A  No, he wasn't.
4  Q  And he was not arrested for attempting
5  to enter; is that right?
6  A  No.
7  Q  And you never saw him go over that
8  wall; is that right?
9     MR. GUEST: Objection.
10 A  When I saw him, he was seated on the
11 wall.
12 Q  And you never saw him on the other
13 side of the wall at any time.
14 A  No.
15 Q  Okay. And so in that time with the
16 GRU, is it fair to say that any person that you
17 would see leaning on a wall, standing on public
18 space leaning on a wall like you saw Jamal
19 Robinson, leaning on that wall in front of that
20 vacant property, that you would initiate your
21 contact.
22    MR. GUEST: Objection, incomplete and

Page 65

1  improper hypothetical.
2  A  I'm not going to say any time, but I'm
3  going to say that if we -- in the course of our
4  patrol, if we observed individuals on vacant
5  properties, we would initiate a contact.
6     BY MR. SHABAZZ:
7  Q  Okay. And "on" means inside of the --
8  "on" means on the vacant property.
9  A  I've already answered that.
10 Q  Okay.
11 A  You want me to answer the question?
12 Like I said, if you're in the yard of a vacant
13 property or on the vacant property and you don't
14 have a reason to be there, or we can't find out
15 if you have a reason to be there, that would get
16 our attention; yes, it would.
17 Q  Okay, now -- and if a person is -- if
18 their feet are on the sidewalk and they are
19 leaning on the wall, that's not on the property;
20 is it?
21    MR. GUEST: Objection, incomplete and
22 improper hypothetical.

Page 66

1     BY MR. SHABAZZ:
2  Q  That's not on the property; is it?
3     MR. GUEST: Same objection.
4  A  Is that a question?
5  Q  Yes.
6  A  It's not a question.
7  Q  Okay, let me explain it again. If a
8  person is standing on the sidewalk leaning on the
9  wall that protects a property, that is not being
10 on that property; is it?
11    MR. GUEST: Objection.
12 A  I don't hear the question in that. Are
13 you asking me --
14    BY MR. SHABAZZ:
15 Q  Was Jamal Robinson on that property
16 that day?
17 A  Yes.
18 Q  He was on the property.
19 A  Sitting on the retaining wall of the
20 vacant property. As I say, I believe that he was
21 on that property, yes.
22 Q  Okay. So he was on a property that

Page 67

1  was not his; is that right?
2  A  That's correct.
3  Q  Okay, but he was not arrested for
4  that.
5     MR. GUEST: Objection, asked and
6  answered.
7     BY MR. SHABAZZ:
8  Q  He had no reason for being there.
9     MR. GUEST: Objection, asked and
10 answered.
11    BY MR. SHABAZZ:
12 Q  On the reverse -- well, you can still
13 answer. The reverse of that, if he wasn't on the
14 property, then you would be wrong; is that right?
15    MR. GUEST: Objection, vague and
16 ambiguous.
17    BY MR. SHABAZZ:
18 Q  If he wasn't on -- if he wasn't -- if
19 the facts would show that being on the sidewalk
20 and leaning on that wall does not constitute
21 entry to that property, then the basis for your
22 stop would be incorrect; is that right?

68

1  MR. GUEST: Objection, improper
2  hypothetical, vague and ambiguous.
3    A   Well, as I stated to you previously,
4  upon our -- my initial approach of Mr. Robinson,
5  it wasn't a stop, it was a contact. And as a
6  police officer, we can initiate a contact with
7  anybody we want at any time. We can ask people
8  questions, we can do that at any point.
9    BY MR. SHABAZZ:
10   Q   You can contact any person at any
11  time.
12   A   Yeah, we can.
13   Q   For any reason.
14   A   Yes. Now a stop is when someone is
15  not free to leave, but a contact, he is, absent
16  any additional circumstances.
17   Q   Okay. And in a contact, a person does
18  not have to respond if they don't desire; is that
19  correct?
20   A   They don't have to.
21   Q   If you contact me and ask me questions
22  like where am I going and what am I doing here, I

69

1  don't have to speak to you; do I?
2    A   You don't. But if we're stopping you
3  for reasons that we can clearly articulate and
4  you don't -- if we initiate a contact and -- for
5  example, if I, we initiate contact -- if I have
6  other circumstances that I believe -- that I'm
7  investigating and I initiate a contact with you
8  to try to ascertain whether or not you're in
9  violation of the law and I have those
10 circumstances already, and you refuse to respond
11 to me or answer me or give me any kind of
12 affirmative answer or what-have-you, then you can
13 be stopped.
14   Q   Okay. And there was a second man with
15 Mr. Robinson; right?
16   A   That's correct.
17   Q   What happened to him?
18   A   So when we got out of the vehicle, the
19 individual who was with Mr. Robinson turned away
20 from us and began to walk away at a high rate of
21 speed and I believed that he was about to take
22 flight on foot. Additionally, Mr. Robinson

70

1  quickly stood up as well, at the same time. So I
2  believed that that individual was about to flee.
3    Q   The second man that was with Mr.
4  Robinson.
5    A   Both of them.
6    Q   Okay, so what happened with the second
7  man?
8    A   One of the officers said "stop,
9  police." I don't recall who said that. And then
10 I basically directed my attention to Mr. Robinson
11 because I was closest to him at that point.
12   Q   Okay. So when the second man started
13 to leave the contact or when he left the contact,
14 that would arouse your suspicion; wouldn't it?
15   MR. GUEST: Objection.
16   BY MR. SHABAZZ:
17   Q   Or that did -- strike that. When the
18 second man left as you approached; didn't that
19 arouse your suspicion?
20   MR. GUEST: Objection.
21   A   My attention at that point was
22 directed at Mr. Robinson. So I can't

71

1  specifically say what we did with that -- or what
2  happened with that other individual because Mr.
3  Robinson became the focus of the -- of our
4  attention.
5    Q   Why only Robinson?
6    A   Because he was the closest to me and
7  because of his demeanor and what transpired after
8  that.
9    Q   Okay. Did any of your other officers
10 go after the second man?
11   MR. GUEST: Objection.
12   A   I don't recall.
13   BY MR. SHABAZZ:
14   Q   Okay. So the second man was never
15 pursued?
16   MR. GUEST: Objection.
17   A   I don't recall.
18   BY MR. SHABAZZ:
19   Q   Is that right?
20   A   I don't recall.
21   Q   Okay. Was he detained?
22   MR. GUEST: Objection.

96

1  confirmed that he was an officer. And when we
2  confirmed that he was an officer is when we
3  requested the supervisors to respond to the
4  scene. Sergeant Sloan and a lieutenant came out.
5     Q   So that confirmation that he was an
6  officer, that was right away; wasn't it?
7        MR. GUEST: Objection.
8     A   I don't --
9        BY MR. SHABAZZ:
10    Q   It was right away. I mean once you
11 took him down, took his gun -- took him down,
12 took his gun, then you went and checked his
13 credentials. You all had his credentials.
14    A   Yeah.
15    Q   Okay. So once you know he's a police
16 officer, know he's not carrying an illegal
17 weapon, you know you are not going to arrest him
18 for attempting unlawful entry or unlawful entry,
19 what is the point of continuing to detain the
20 man?
21       MR. GUEST: Objection, asked and
22 answered.

97

1     A   I just --
2     Q   Because I mean --
3     A   I've answered the question. I just
4  explained to you, like I said, he already
5  demonstrated a lack of compliance with
6  instructions.
7     Q   Uh-huh.
8     A   And if you're going to go down that
9  road, the fact that he was a police officer, he
10 basically threw that out the window when he
11 violated basically every code of conduct for an
12 off-duty officer. He -- number one, an off-duty
13 officer, upon approach of an on-duty officer, is
14 to immediately identify themselves as a police
15 officer. He didn't do that.
16    Q   But that's not my question.
17    A   I'm answering it. So he failed to
18 identify himself as a police officer. And the
19 second most important thing is that an off-duty
20 officer is to at all times comply with the
21 instructions of an on-duty officer. He failed to
22 do that when he failed to show me his hands after

98

1  asking him three different times. So he already
2  threw -- that was out the window as far as him
3  abiding by the directives of an MPD officer and
4  what an MPD officer is supposed to do when
5  dealing with on-duty members.
6        So at that point, we had no reason to
7  believe that he was no longer a threat. He
8  actively resisted my and Officer Roe's attempts
9  to handcuff him. Okay? So he was still, in our
10 determination, a threat.
11       And the fourth factor is that he was
12 going to be detained, because, for example, if he
13 was a civilian, he would have been immediately
14 arrested. There would have been no --
15    Q   Been arrested for what?
16    A   APO hindering.
17    Q   Huh?
18    A   Hindering.
19    Q   Hindering.
20    A   Anybody who resists -- who evades,
21 resists or impedes an officer in their official
22 capacity is -- you can look that up, the assault

99

1  charge, assaulting a police officer is under the
2  hindering statute. So when I basically went to
3  grab him and he began to actively resist him, he
4  could easily have been charged -- he had met
5  probable cause to be arrested for APO hindering.
6     Q   But he wasn't arrested; right?
7     A   He was not arrested for that, but I
8  was -- as I stated previously, if he was a
9  civilian, if he was Mr. Robinson after that would
10 have been arrested for carrying a pistol without
11 a license, a felony, having that weapon on him
12 would have been a felony.
13    Q   But that wasn't the case.
14    A   If you're talking about Mr. Robinson,
15 I'm explaining to you about why Jamal Robinson
16 was detained and why we didn't just take the
17 cuffs off him, because he failed to comply with
18 all --
19    Q   Isn't --
20       MR. GUEST: He's not done talking,
21 please.
22    A   He failed to comply with all the

100

1  directives that he was supposed to as an MPD
2  officer. He actively resisted my attempts to
3  handcuff him. Okay? And then at that point we,
4  because he is a police officer, we have to
5  contact a higher rank which was Sergeant Sloan
6  and Lieutenant Coligan, which is exactly what we
7  immediately did, to determine whether or not he
8  would be placed under arrest. And that's why he
9  was detained and he was going to remain detained
10 until they responded to the scene and determined
11 what course of action we were going to take.
12         BY MR. SHABAZZ:
13     Q   Okay. So thank you for all of that.
14     A   You're welcome.
15     Q   All right. Now let's get back to
16 this. Once you determined that no crime had been
17 committed and that he was not in possession of an
18 illegal weapon and he was not committing an
19 unlawful entry and he should have been free to
20 leave at that point; shouldn't he?
21         MR. GUEST: Objection, asked and
22 answered.

101

1          BY MR. SHABAZZ:
2      Q   Once you -- those are your orders; is
3  that right? That once you determine that a
4  person -- that you do not have probable cause and
5  that that person should be free to leave, and Mr.
6  Robinson should have been free to leave at that
7  point; isn't that right?
8      A   That's not what I just said.
9      Q   Okay. But shouldn't he have been free
10 to leave after you checked his ID, had his
11 weapon, determined that he wasn't going to commit
12 a crime, he should have been free to leave at
13 that point; is that right?
14     A   No.
15         MR. GUEST: Objection, asked and
16 answered.
17         BY MR. SHABAZZ:
18     Q   Why?
19     A   I just said this. I'll say it again.
20 He already -- based on my experience and what I
21 would have done -- I was already satisfied that
22 he had met the probable cause for the hindering,

102

1  the APO hindering, right there by actively
2  resisting my attempts to handcuff him. So if it
3  was up to me, I would have -- the arrest would
4  have been made.
5          But because he was an MPD officer, he
6  was not free to leave. He was not free to leave
7  because if it was just up to us and there was no
8  MPD officer involved, he would already have been
9  arrested and he would have been charged with a
10 felony. Like I said, if he was just Mr.
11 Robinson, having that firearm on him would have
12 been carrying a pistol without a license, a
13 felony, a felony arrest. Okay? So he'd be
14 locked up for CPWL, he'd be locked up for APO
15 hindering, probably unregistered hand gun --
16     Q   All that don't mean nothing because he
17 was a police officer.
18     A   It doesn't matter whether or not he's
19 a police officer. Okay. So that just eliminates
20 -- so him being a police officer means that he
21 was lawfully allowed to have that weapon, so that
22 removes the weapon offense. Okay? But him

103

1  resisting me is still an assault on a police
2  officer and that is what was going to be
3  determined, whether or not he was going to be
4  charged with. And that determination about
5  whether or not we were going to -- the decision
6  to -- whether or not a D.C. police officer is
7  going to be arrested is not a decision that a
8  same rank can make. Okay?
9          So that's why we had to have the
10 supervisors come down and the supervisors,
11 Sergeant Sloan and the lieutenant, determined
12 that he was not going to be arrested but that we
13 were going to handle it administratively. And
14 that's the decision that they made. So you can
15 ask it any way you want, but the decision to --
16 about who was going to arrest him or who wasn't
17 going to arrest him was not my decision to make.
18 That decision was made by our supervisors because
19 he was an MPD officer.
20     Q   Okay. Now and this is the reason why
21 you kept him handcuffed until they came.
22     A   Yes.