1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

IN THE MATTER OF:

JAMAL B. ROBINSON,

       Plaintiff,

v.

DISTRICT OF COLUMBIA, et al.:

       Defendant.

C.A. No.
15-100 (RJL)

Thursday,
March 15, 2018

Washington, D.C.

DEPOSITION OF:

       DETECTIVE SCOTT PINTO

called for examination by Counsel for the Defendant, pursuant to Notice of Deposition, in the Office of the Attorney General for the District of Columbia, located at One Judiciary Square, 441 4th Street NW, Washington, DC 20001, when were present on behalf of the respective parties:

16

1 certain areas where, like, a recent violent crime
2 was committed or a homicide just to get into that
3 area to do our regular operations in those areas.
4    Q   So now, since you guys are in unmarked
5 vehicles and you're in plain clothes, how did you
6 all coordinate that with the district?  Say for
7 instance you're going into 6D to conduct
8 operations.  They don't know who you are, so what
9 would be the way that you would let everybody,
10 give everybody a head's up that, "We're here.
11 We're going to be conducting operations"?
12        MR. GUEST:  Objection.
13        DETECTIVE PINTO:  So it's my
14 understanding that our supervisors would contact
15 the watch commanders to whatever district that we
16 would go into and let them know, "Hey, look, the
17 Gun Recovery Unit's going to be deployed in your
18 district today," and then it's my understanding
19 that the watch commander is supposed to let the
20 street supervisors know that to pass the word
21 along to the members that GRU would be deployed
22 in their district for that tour.

17

1        BY MR. LATTIMER:
2    Q   Okay, so you had, there was some
3 coordination with the, whatever district you're
4 going to go into?
5    A   Mainly through supervisors, not on my
6 level.
7    Q   Okay, so do you recall the incident
8 with Mr. Robinson?
9    A   I do.
10   Q   Tell me what you recall.
11   A   I recall going into the 5100 block of
12 C Street SE.  I recall being with Officer
13 Clifford and Officer Roe.  I recall when we
14 entered the block, I observed a vehicle that was
15 sitting idling.  It was not parked properly.  It
16 had heavy tint on it.
17       I observed two males, one of them we
18 later found out was Mr. Robinson, sitting on this
19 property, in front of this property where there
20 was a no trespassing sign or something to that
21 effect sign in that residence's window.
22       I recall asking Mr. Robinson and the

18

1 other male if they lived there.  They didn't
2 initially respond.  They kind of both looked at
3 each other kind of suspiciously.  I asked again
4 and Mr. Robinson responded something to the
5 effect of, "No, but you don't need to know what's
6 going on," something to that effect.
7       I recall exiting the vehicle to
8 approach the motor vehicle that I observed and
9 Officer Clifford and Roe advised that they were
10 going to approach the two males.
11   Q   Okay, now, you said that the car was
12 not parked properly.  What does that mean?
13   A   So the car was in the block, but it
14 was more than 12 inches away from the curb.
15   Q   Okay, but you said it was idling?
16   A   The car was.
17   Q   And so was that some violation that
18 you saw?
19   A   The idling was not, but the car just
20 sitting in a parked position more than 12 feet
21 away -
22   Q   12 feet away or -

19

1    A   I'm sorry, 12 inches - apologies, I
2 misspoke - was a violation.
3    Q   Of what?
4    A   Obstructing the proper flow of traffic
5 and not parked properly.
6    Q   But if - was someone in the vehicle?
7    A   Yes.
8    Q   So that wouldn't be considered parked.
9 That would be considered standing, wouldn't it?
10   A   Parked or standing, the vehicle was in
11 a parked position.
12   Q   Okay, and so you're aware of some law
13 in the District of Columbia that says that a
14 vehicle that is standing with an individual in it
15 and idling has to be within 12 inches of the
16 curb?
17       MR. GUEST:  Objection.
18       DETECTIVE PINTO:  Or it has to be not
19 obstructing the flow of traffic.
20       BY MR. LATTIMER:
21   Q   Well, how is it obstructing the flow
22 of traffic?  As I understood, you pulled your

Page 20

1  vehicle up next to it, didn't you?
2     A    I was behind it if I recall correctly.
3     Q    So you pulled up behind it, and so no
4  traffic could get by?  Is that what you're
5  saying?
6          MR. GUEST:  Objection.
7          DETECTIVE PINTO:  I don't recall if
8  traffic was able to get by my vehicle or not.
9          BY MR. LATTIMER:
10    Q    I'm saying the vehicle that you say
11 was not properly parked, no traffic - a vehicle
12 12 inches from the curb was obstructing the flow
13 of traffic and so that no traffic could come by?
14 Is that what you're saying?
15    A    I don't recall if traffic was able to
16 get by or not.
17    Q    Okay, you weren't going to write a
18 ticket, right?
19    A    I did write a ticket.
20    Q    For illegal parking?
21    A    I did.
22    Q    When did you do that?

Page 21

1     A    During the course of the arrest of the
2  driver.
3     Q    The driver was arrested for no permit?
4     A    Correct.
5     Q    And so you're saying you wrote a
6  parking ticket?
7     A    I recall writing a ticket for the tint
8  as well as being more than 12 inches from the
9  curb.
10    Q    Okay, and the tint you say, you had a
11 tint meter?
12    A    A tint meter was on the scene.  I
13 don't recall if I personally had one or if I had
14 to request one.
15    Q    Okay, so did you use it?
16    A    Yes.
17    Q    And what was the tint you saw that
18 came up on your meter?
19    A    I can't recall the exact percentage.
20    Q    And when did you have training with
21 regard to the tint meter?
22    A    Several years ago, I went to training

Page 22

1  for it during one of our 40-hour courses.  I
2  can't recall what year it was.
3     Q    Okay, a 40-hour course on a tint
4  meter?
5     A    No, no, no, it wasn't 40 hours, but it
6  was during that block of training.  One of it
7  was, I recall, the tint training.
8     Q    So if I got it straight, you got out.
9  You wrote a ticket, a parking ticket for parking
10 improperly, is that right?
11    A    At one point, I did, yes.
12    Q    For a vehicle that was occupied and
13 idling, you wrote a parking ticket, right?
14    A    Correct.
15    Q    Okay, and then you wrote a ticket for
16 an illegal tint, and what is the standard for
17 that?
18    A    For the District, it's 70 percent, and
19 for the state of Maryland, 35 percent.
20    Q    But you weren't in Maryland, right?
21    A    No, we were in the District of
22 Columbia.

Page 23

1     Q    Okay, so you wrote the ticket, a D.C.
2  ticket, right?
3     A    Correct.
4     Q    And neither of those are arrestable
5  offenses, are they?
6     A    The tint or the parking?
7     Q    Right.
8     A    No.
9     Q    All right, so then you said, as I
10 understood you, that you saw two guys sitting on
11 the wall, retaining wall that was in front of the
12 house, correct?
13    A    That's how I would characterize that
14 property, yeah.
15    Q    And you said the house had a no
16 trespassing sign?
17    A    Yes.
18    Q    And I take it there's a sidewalk?
19    A    Yes.
20    Q    Okay, and so the people who were
21 sitting on the retaining wall, their feet were on
22 the sidewalk?

40

1  that the person didn't have a permit on the day
2  of the offense, I'm not sure if that would be
3  upheld or not.
4       BY MR. LATTIMER:
5       Q   All right, so anyway, you decided to -
6  now, was this arrest made so that you could
7  conduct a search?
8       MR. GUEST: Objection.
9       DETECTIVE PINTO: No.
10      BY MR. LATTIMER:
11      Q   I mean, because you all were looking
12  for guns, right?
13      MR. GUEST: Objection.
14      DETECTIVE PINTO: Our primary focus is
15  guns, correct.
16      BY MR. LATTIMER:
17      Q   Right, and you didn't have any reason
18  to search him unless you arrested him, correct?
19      A   I had no reason to search him,
20  correct.
21      Q   You had to no reason to search him.
22  You had no basis to search the vehicle unless you

41

1  arrested him, right?
2       MR. GUEST: Objection.
3       DETECTIVE PINTO: Correct.
4       BY MR. LATTIMER:
5       Q   Okay, so the only way that you were
6  going to search that vehicle and him was to
7  arrest him for something, right?
8       MR. GUEST: Objection.
9       DETECTIVE PINTO: I can't recall if a
10  search was conducted on the vehicle. I do know
11  we did a search instant to the arrest of his
12  person.
13      BY MR. LATTIMER:
14      Q   Okay, you got to search the vehicle
15  because you've got to do an inventory search at a
16  minimum, correct?
17      MR. GUEST: Objection.
18      DETECTIVE PINTO: An inventory search
19  if it's not a search related to an arrest is
20  supposed to be conducted, correct.
21      BY MR. LATTIMER:
22      Q   And in this now, you're saying that

42

1  the vehicle is inappropriately parked, you're
2  arresting the driver, so you can't leave the
3  vehicle in this inappropriately parked position,
4  correct?
5       A   Correct.
6       Q   So it's got to be moved, correct?
7       A   Correct.
8       Q   And if MPD is moving that vehicle, MPD
9  has to conduct an inventory search, isn't that
10  correct?
11      A   We are supposed to conduct an
12  inventory search of items of value if we are
13  arresting the occupant of the vehicle.
14      Q   Before you take that vehicle to the
15  impound lot, it has to be searched, correct?
16      A   It has to be inventoried before the
17  vehicle is either impounded or left unattended.
18      Q   Right, so what I'm saying is the only
19  way that vehicle gets searched, the only way he
20  gets searched is an arrest, correct?
21      MR. GUEST: Objection.
22      DETECTIVE PINTO: In this situation,

43

1  yes.
2       BY MR. LATTIMER:
3       Q   Okay, so now, the two guys on the
4  wall, they're not - did you ever see them in the
5  vehicle?
6       A   No.
7       Q   Did you ever see them exit the
8  vehicle?
9       A   No.
10      Q   All right, so as far as you knew, the
11  individuals on the wall had never been in the
12  vehicle, correct?
13      A   Correct.
14      Q   All right, and so them sitting on the
15  wall in front of a property that has a no
16  trespassing sign is not a crime, is it?
17      MR. GUEST: Objection.
18      DETECTIVE PINTO: Them sitting on
19  curtilage to a property that has a no trespassing
20  sign is something that could constitute unlawful
21  entry.
22      BY MR. LATTIMER:

44

1  Q  Well, unlawful entry, you have to
2  enter the property, correct?
3     MR. GUEST: Objection.
4     DETECTIVE PINTO: Or attempt to enter,
5  correct.
6     BY MR. LATTIMER:
7  Q  Right, and you never saw them attempt
8  to enter the property, correct?
9  A  On the curtilage, I don't know if an
10 attempt was made while they were on that
11 curtilage.
12 Q  Well, that's what I'm saying. If
13 there was, you didn't see it, correct?
14 A  Them on the curtilage could be, could
15 constitute an attempt.
16 Q  An attempt to do what?
17 A  They're on curtilage of property, so
18 I don't know what their intent is, if it's to
19 enter that property.
20 Q  Well, you weren't going to arrest them
21 for unlawful entry, right?
22 A  An investigation, I think, was going

45

1  to be conducted in regards to that.
2  Q  For somebody sitting on a wall with
3  their feet on the sidewalk and a property, a
4  house that has no trespassing, somebody was going
5  to investigate whether or not sitting on that
6  wall constituted trespassing?
7     MR. GUEST: Objection.
8     DETECTIVE PINTO: Correct.
9     BY MR. LATTIMER:
10 Q  Who? It wasn't you guys, was it?
11 A  It was.
12 Q  You guys from the gun unit were going
13 to investigate whether or not somebody sitting on
14 the wall with their feet on the sidewalk
15 constituted trespassing?
16    MR. GUEST: Objection,
17 mischaracterizes his prior testimony.
18    DETECTIVE PINTO: Yes.
19    BY MR. LATTIMER:
20 Q  That's totally outside your duties and
21 responsibilities, wasn't it?
22    MR. GUEST: Objection.

46

1     DETECTIVE PINTO: No, not necessarily.
2     BY MR. LATTIMER:
3  Q  You were there for guns. Isn't that
4  what you all were doing?
5  A  Yes.
6  Q  And you're in a specialized unit that
7  was for guns, correct?
8  A  Correct.
9  Q  And so you're going to now look for
10 people, whether or not sitting on a wall is
11 trespassing?
12 A  Properties that are abandoned and are
13 vacant sometimes are used to house and store guns
14 and drugs.
15 Q  Okay, but you had never seen them
16 inside the house, right?
17 A  Correct.
18 Q  And you had never seen them come out
19 of the house, correct?
20 A  Correct.
21 Q  And nobody called - did you call for
22 a marked cruiser to come by at that point?

47

1  A  No.
2  Q  Did you call a supervisor at that
3  point?
4     MR. GUEST: Objection.
5     BY MR. LATTIMER:
6  Q  Your sergeant, what was his name,
7  Sergeant Sloan, I think it was, right?
8  A  At that point, no, I did not.
9  Q  Okay, all right, so did you see what
10 happened when the other two officers approached?
11 Well, were they officers or detectives?
12    MR. GUEST: Objection.
13    DETECTIVE PINTO: Officers.
14    BY MR. LATTIMER:
15 Q  Okay, when the other two officers
16 approached the two men on the wall, did you see
17 what happened?
18    MR. GUEST: Objection.
19    DETECTIVE PINTO: I saw a portion of
20 what occurred.
21    BY MR. LATTIMER:
22 Q  Okay, did either of them - when they